ARIELLE M. CANEPA
arielle.canepa@zimmreed.com
ZIMMERMAN REED LLP
6420 Wilshire Blvd., Suite 1080
Los Angeles, California 90048
Telephone: (877) 500-8780
Facsimile: (877) 500-8781

BRIAN C. GUDMUNDSON
brian.gudmundson@zimmreed.com
RACHEL K. TACK
rachel.tack@zimmreed.com
MICHAEL J. LAIRD
michael.laird@zimmreed.com
ZIMMERMAN REED LLP
1100 IDS Center
80 South 8th Street
Minneapolis, Minnesota 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0400

*Attorneys For Plaintiff and Putative Class*
(additional attorneys listed on signature page)

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| JENNIFER L. COOK, d/b/a JL Cook, JL Cook Sculptor, and SNAKEARTS.COM,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC., f/k/a FACEBOOK, INC.,<br><br>Defendant. | Case No. 4:22-cv-02485-YGR<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(b)(6)**<br><br>Date: August 30, 2022<br>Time: 2:00 p.m.<br>Courtroom: 1 – 4th Floor<br>Judge Yvonne Gonzalez Rogers |

**TABLE OF CONTENTS**

RELEVANT ALLEGATIONS AND BACKGROUND ................................................................. 2

    A.    Meta: The Ad Company. ................................................................................. 3

    B.    Plaintiff: The Infringed. ................................................................................. 4

ARGUMENT ......................................................................................................................... 4

I.    THE DMCA DOES NOT SHIELD META FROM LIABILITY. ...................................... 6

    A.    Meta Does Not Satisfy the Threshold Criteria in 17 U.S.C. § 512(i) for *Any* DMCA Safe Harbor Protection. ........................................................ 6

        1.    *Meta Did Not Reasonably Implement a Repeat Infringer Policy.* ................ 7

            a.    Meta does not employ a "three strikes" policy ................................. 7

            b.    The Court must also consider the allegations of infringement notices sent by other Creators, not just Plaintiff. ........................ 8

            c.    Meta did not remove Repeat Infringers after three strikes. ............ 9

        2.    *Meta interferes with standard technical measures.* ........................................ 9

    B.    Meta Does Not Satisfy the Conditions of 17 U.S.C. § 512 (c). ........................... 10

        1.    *Meta Did Not Merely Store Infringing Content "At the Direction of the User."* ................................................................................................... 10

        2.    *Meta Had Actual and Apparent Knowledge of the Infringing Content on its Site.* ................................................................................................... 11

        3.    *Meta did not expeditiously remove or disable access to infringing content.* ................................................................................................... 12

        4.    *Meta received a financial benefit directly attributable to the infringing activity.* ................................................................................................... 12

        5.    *Meta had the right and ability to control the infringing activity on its site.* ................................................................................................... 13

        6.    *The DMCA Does Not Preclude Plaintiff from Seeking Injunctive Relief.* ................................................................................................... 15

    C.    § 512(m) Does Not Absolve Meta from Any Duty to Monitor for Infringement. ................................................................................................... 15

II.    META IS DIRECTLY LIABLE FOR COPYRIGHT INFRINGEMENT (COUNT I). ......................... 17

III.    META IS CONTRIBUTORILY LIABLE FOR COPYRIGHT INFRINGEMENT (COUNT II). ........... 18

    A.    Meta had Knowledge of Infringing Activity on Facebook. ................................. 18

**B.**  **Meta Materially Contributed to the Infringement.** ................................ 19

**IV.**  **META IS VICARIOUSLY LIABLE FOR COPYRIGHT INFRINGEMENT (COUNT III).** ................. 20

    **A.**  **Meta Exercised Control Over the Counterfeiters and Repeat Infringers.** ...........20

    **B.**  **Meta Derives a Direct Financial Benefit from Infringing Activity on Facebook.** .............................................................................................21

**V.**  **PLAINTIFF ALLEGES META VIOLATED THE VISUAL ARTISTS' RIGHTS ACT (COUNT IV).** ................................................................................ 21

**VI.**  **THE COPYRIGHT ACT DOES NOT PREEMPT OR PRECLUDE COUNTS VI, VIII, & IX.** ......... 22

    **A.**  **The Copyright Act Does Not Preclude Plaintiff's Lanham Act Claim.** .............. 22

    **B.**  **The Copyright Act Does Not Preempt Plaintiff's FDUTPA Claim.** .................... 24

    **C.**  **The Copyright Act Does Not Preempt Plaintiff's Unjust Enrichment Claim.** ..... 24

**VII.**  **PLAINTIFF AGREES TO DISMISS COUNTS V & VII WITHOUT PREJUDICE.** ......................... 25

**VIII.**  **CONCLUSION** ................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*1-800 Contacts, Inc. v. Lens.com, Inc.,*
  722 F.3d 1229 (10th Cir. 2013) ................................................................................. 18

*A&M Records, Inc. Napster,*
  239 F.3d 1004 (9th Cir. 2001) ........................................................................... passim

*Adobe Sys., Inc. v. Canus Prods., Inc.,*
  173 F. Supp. 2d 1044 (C.D. Cal. 2001) ...................................................................... 20

*Alameda Films S A De C V v. Authors Rights Restoration Corp.,*
  331 F.3d 472 (5th Cir. 2003) ...................................................................................... 22

*Atari Interactive, Inc. v. Redbubble, Inc.,*
  515 F. Supp. 3d 1089 (N.D. Cal. 2021) ........................................................ 10, 15, 19

*Best Carpet Values, Inc. v. Google LLC,*
  No. 5:20-cv-04700-EJD, 2021 WL 4355337 (N.D. Cal. Sep. 24, 2021).................. 24, 25

*Butler v. Target Corp.,*
  323 F. Supp. 2d 1052 (C.D. Cal. 2004) ...................................................................... 23

*Capital Records, LLC v. Vimeo, LLC,*
  972 F. Supp. 2d 500 (S.D.N.Y. 2013)...................................................................... 7, 8

*Carter v. Helmsley-Spear, Inc.,*
  71 F.3d 77 (2d Cir. 1995)..................................................................................... 21, 22

*Coach, Inc. v. Goodfellow,*
  717 F.3d 498 (6th Cir. 2013) ...................................................................................... 18

*Coats v. Holbrook,*
  2 Sand. Ch. 586 (N.Y. 1845) ...................................................................................... 22

*Columbia Pictures Indus., Inc. v. Fung,*
  710 F.3d 1020 (9th Cir. 2013) ............................................................................ 5, 6, 12

*Craigslist Inc. v. 3Taps Inc.,*
  942 F. Supp. 2d 962 (N.D. Cal. 2013) ........................................................................ 23

*Dastar Corp v. Twentieth Century Fox Film Corp.,*
  539 U.S. 23 (2003)................................................................................................ 22, 23

*Donald Frederick Evans Assocs., Inc. v. Continental Homes, Inc.,*
  785 F.2d 897 (11th Cir. 1986) .................................................................................... 24

*Ediciones Musicales Y Representaciones Internacionales, S.A. v. Matea San Martin,*
  582 F. Supp. 2d 1358 (S.D. Fla. 2008) ...................................................................... 24

*Ellison v. Robertson,*
  357 F.3d 1072 (9th Cir. 2004) .......................................................................... 5, 8, 18, 19

*Focal Point Films, LLC v. Sandhu,*
  No. 19-cv-02898-JCS, 2019 WL 7020209 (N.D. Cal. Dec. 20, 2019).........................................23

*Foley v. Luster,*
  249 F.3d 1281 (11th Cir. 2001) ..........................................................................................24

*Fonovisa, Inc. v. Cherry Auction, Inc.,*
  76 F.3d 259 (9th Cir. 1996) ..................................................................................................5

*Friedman v. Zimmer,*
  No. CV 15-502 GHK (Ex), 2015 WL 6164787 (C.D. Cal. July 10, 2015) .................................23

*Good Morning to You Prods. Corp. v. Warner-Chappel Music, Inc.,*
  No. 13-440-GHK (MRWx), 2013 WL 12138670 (C.D. Cal. Oct. 16, 2013) ...............................5

*Grady v. Scholastic Inc.,*
  No. CV 12-07992-GAF (JCGx), 2013 WL 12132199 (C.D. Cal. Jan. 31, 2013) .......................23

*Harrington v. Pinterest,*
  No. 5:20-CV-05290-EJD, 2021 WL 4033031 (N.D. Cal. Sept. 3, 2021)....................................5

*Harris v. San Jose Mercury News,*
  No. 04-05262 CRB, 2006 WL 862953 (N.D. Cal. Apr. 3, 2006).................................................5

*Harrison v. Facebook, Inc.,*
  No. C 19-01547 JSW, 2019 WL 11343562 (N.D. Cal. July 2, 2019) ........................................18

*Hunley v. Instagram, LLC,*
  No. 21-CV-03778-CRB, 2022 WL 298570 (N.D. Cal. Feb. 1, 2022)....................................4, 5

*In re Aimster Copyright Litig.,*
  334 F.3d 643 (7th Cir. 2003) .........................................................................................11, 15

*Kantemirov v. Goldine,*
  No. C05-01362 HRL, 2005 WL 1593533 (N.D. Cal. June 29, 2005) ........................................25

*Keck v. Alibaba.com Hong King Ltd.,*
  369 F. Supp. 3d 932 (N.D. Cal. 2019) ....................................................................5, 13, 20, 21

*Kodadek v. MTV Networks, Inc.,*
  152 F.3d 1209 (9th Cir. 1998) .............................................................................................24

*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.,*
  658 F.3d 936 (9th Cir. 2011) .............................................................................................5, 18

*Luxottica Group, S.p.A. v. Airport Mini Mall, LLC,*
  932 F.3d 1303 (11th Cir. 2019) ...........................................................................................18

*Mavrix Photographs, LLC v. Livejournal, Inc.,*
  873 F.3d 1045 (9th Cir. 2017) ...................................................................................10, 11, 14

*Media.net Advertising FZ-LLC v. NetSeer, Inc.,*
  156 F. Supp. 3d 1052 (N.D. Cal. 2016) ..................................................................................24

*MGA Entm't v. Harris*,
  20-11548 JVS, 2021 WL 4732923 (C.D. Cal. Aug. 27, 2021) ................................................... 22

*MGM Studios Inc. v. Grokster, Ltd*.,
  545 U.S. 913 (2005) .......................................................................................................... 5, 18

*Nintendo of Am., Inc. v. Dragon Pac. Int'l*,
  40 F.3d 1007 (9th Cir. 1994) .................................................................................................. 22

*O'Brien v. PopSugar Inc.*,
  No. 18-cv-04405-HSG, 2019 WL 462973 (N.D. Cal. Feb. 6, 2019) .......................................... 25

*Perfect 10, Inc. v. Cybernet*,
  213 F. Supp. 2d 1146 (C.D. Cal. 2002) ................................................................ 12, 13, 14, 15

*Perfect10, Inc. v. CCBill, LLC*,
  488 F.3d 1102 (9th Cir. 2007) ................................................................................................... 8

*Polar Bear Prod. v. Timex Corp.*,
  384 F.3d 700 (9th Cir. 2004) .................................................................................................... 24

*Princeton Univ. Press v. Mich. Document Servs., Inc.*,
  99 F.3d 1381 (6th Cir. 1996) .................................................................................................... 17

*Rosen v. eBay, Inc.*,
  No. CV 13-6801 MWF EX, 2015 WL 1600081 (C.D. Cal. Jan. 16, 2015) .................................. 7

*Rosen v. eBay, Inc.*,
  No. CV 13-6801-MWF (EX), 2018 WL 4815746 (C.D. Cal. Jan. 24, 2018) ............................... 7

*Rosen v. eBay, Inc.*,
  16-9183-MWF (Ex), 2018 WL 4802101 (C.D. Cal. Jan. 24, 2018) ............................................ 7

*Rosetta Stone Ltd. v. Google, Inc.*,
  676 F.3d 144 (4th Cir. 2012) .................................................................................................... 18

*Ryan v. Carl Corp.*,
  No. 97-3873 FMS, 1998 WL 320817 (N.D. Cal. June 15, 1998) ................................................. 5

*Ryan v. Editions Ltd. W. Inc.*,
  417 Fed. Appx. 699 (9th Cir. 2011) .......................................................................................... 24

*Shapiro v. Green Co.,*
  *Inc.*, 316 F.2d 304 ................................................................................................................... 15

*Sid Avery and Assocs., Inc. v. Pixels.com, LLC*,
  479 F. Supp. 3d 859 (C.D. Cal. 2020) ....................................................................................... 17

*Summit Mach. Tool Mfg. Corp. v. Victor CNC Sys., Inc.*,
  7 F.3d 1434 (9th Cir. 1993) ...................................................................................................... 24

*Sybersound Records, Inc. v. UAV Corp.*,
  517 F.3d 1137 (9th Cir. 2008) .................................................................................................. 23

*U.S. v. Aina–Marshall,*
    *336 F.3d 167 (2d Cir. 2003)* ............................................................................ 16

*UMG Recordings, Inc. v. Shelter Cap. Partners LLC.,*
    *718 F.3d 1006 (9th Cir. 2013)* ............................................. 6, 11, 15, 16

*Ventura Content, Ltd. v. Motherless, Inc.,*
    *885 F.3d 597 (9th Cir. 2018)* ............................................................. 11

*Viacom Intern, Inc. v. YouTube, Inc.,*
    *676 F.3d 19 (2d Cir. 2012)* ................................................................ 7, 9

*Viacom Intern, Inc. v. YouTube, Inc.,*
    *718 F. Supp. 2d 514 (S.D.N.Y 2010)* ................................................. 7, 8

*Williams v. Cavalli,*
    *No. CV 14-06659-AB (JEMx), 2015 WL 1247065 (C.D. Cal. Feb. 12, 2015)* ...................... 22, 23

*Williams v. Gaye,*
    *895 F.3d 1106 (9th Cir. 2018)* ........................................................... 13

*Wolk v. Kodak Imaging Network, Inc.,*
    *840 F. Supp. 2d 724 (S.D.N.Y. 2012)* ............................................... 9, 17

**Statutes**

17 U.S.C. § 106 ................................................................................................ 17

17 U.S.C. § 301 ................................................................................................ 24

17 U.S.C. § 501 ................................................................................................ 17

17 U.S.C. § 512 (c) ....................................................................................... passim

17 U.S.C. §§ 512 (c)(1) .................................................................................... 10

17 U.S.C. § 512 (i) ................................................................................... 2, 6, 7, 9

17 U.S.C. § 512 (i)(2) ........................................................................................ 7

17 U.S.C. § 512 (i)(1)(A) .................................................................................... 8

17 U.S.C. § 512 (j) ........................................................................................... 10

17 U.S.C. § 512 (m) .............................................................................. 6, 15, 16

California Business Professions Code § 17200 .............................................. 24

**Rules**

Fed. R. Civ. P. 12(b)(6) ...................................................................................... 1

Fed. R. Civ. P. 12(6)(6) ...................................................................................... 1

Plaintiff Jennifer Cook d/k/a d/b/a "JL Cook," "JL Cook Sculptor", and "SnakeArts.com" ("Plaintiff" or "Cook") respectfully submits this memorandum of law in opposition to Defendant Meta Platforms, Inc.'s, f/k/a Facebook, Inc.'s ("Defendant" or "Meta") Motion to Dismiss Plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(6)(6) ("Motion").

## PRELIMINARY STATEMENT

Meta's Motion is not a proper Rule 12(b)(6) motion to dismiss—it is a plea with the Court to accept facts, asserted by Defendant, that directly contradict the well-pled complaint. The Court should deny the Motion as a matter of law.

Plaintiff's Complaint describes, in detail, Meta's exploitation of copyrighted works, including specific acts of infringement on Facebook and Meta's knowledge thereof, spineless takedown policies and efforts, and blind eye treatment and encouragement of Repeat Infringers. Glossing over these detailed and damning allegations, Meta asks the Court to skip discovery, expert reports, and a trial, and reject every well-pled assertion, because it is supposedly "shield[ed] … from liability." There is no basis, in law or fact, to exonerate Meta for its conduct at this stage.

Meta attempts to use the Digital Millennium Copyright Act ("DMCA") to shift the blame for the ubiquitous infringement on Facebook to the Counterfeiters[1] (the other beneficiaries of Meta's open-door policy for infringement) and the Creators, tasking them with policing Facebook for the onslaught of infringing content published there every single day. Meta's volitional conduct, however, violates the intent of the DMCA, a tool aimed at limiting copyright infringement on the internet through a reasonable reporting and takedown protocol, which Meta does not employ.

Congress enacted the DMCA to protect both copyright owners and passive, innocent, online service providers ("OSPs") from liability for copyright infringement occurring on their sites in certain situations. However, Meta is neither passive nor innocent and the DMCA does not protect it because: (1) the DMCA has threshold criteria before an OSP can assert any safe harbor and additional, specific criteria for each individual safe harbor, none of which Meta satisfied; (2) the DMCA does not protect Meta from liability for direct copyright infringement; (3) Meta received a

---

[1] All capitalized terms shall have the definitions provided in Plaintiff's Complaint. Compl. ¶¶ 39-45.

direct financial benefit from the infringing activity on Facebook; and (4) the DMCA does not prevent the Court from ordering injunctive relief.  Each of these bar DMCA protection here.

*First*, Meta did not take the specific threshold actions it needed to take to qualify for DMCA protection.  To assert *any* DMCA safe harbor defense, Meta must have first reasonably implemented a repeat infringer policy and avoided interference with standard technical measures. 17 U.S.C. § 512(i).  It did neither and is ineligible for DMCA protection.  Beyond these threshold criteria, each individual safe harbor defense has its own conditions.  For instance, Meta asserts the DMCA § 512(c) defense, which required Meta to only store infringing content at the direction of the advertisers/users, lack actual or apparent knowledge of the infringing activity, expeditiously remove infringing content, and receive no direct financial benefit from infringing activity it has the right and ability to control.  Meta must establish every condition of § 512(c) to assert the Safe Harbor defense.  As discussed below, Meta establishes none, and its defense fails.

*Second*, DMCA safe harbor protection does not apply to direct copyright infringement, in which Plaintiff expressly and plausibly alleges Meta engaged here.

*Third*, Plaintiff alleges Meta received a direct financial benefit from its infringing activity.  This includes revenue from ads paid by Repeat Infringers (after Meta knew they were Repeat Infringers) and "per-click" revenue from Counterfeiter Ads.

*Fourth*, Plaintiff has demanded injunctive relief under the Copyright Act, which Meta's Motion does not address.  The DMCA's protections limit monetary relief only, not a finding of ultimate liability or a request for injunctive relief.  Meta cannot defend its failure to prevent or remove infringement on Facebook or enforce its Repeat Infringer policy—the components of Plaintiff's request for injunctive relief.  Rather, Meta invokes a DMCA safe harbor defense to avoid paying damages.  Thus, Plaintiff's request for injunctive relief should proceed in any event.

The DMCA safe harbor is Meta's only defense and it fails.  For these reasons, and those set forth below, the Court should deny Meta's Motion in its entirety.

## RELEVANT ALLEGATIONS AND BACKGROUND

This is a class action lawsuit for violations of Federal and State intellectual property and

unfair competition laws arising from Meta's use of stolen images for advertising revenue, and for direct infringement of Plaintiff's and the Class's exclusive rights to copy, display, and distribute copyrighted works.  Compl. ¶ 28.

### A.      Meta: The Ad Company.

Meta, formerly known as "Facebook," is a multi-billion-dollar ad company.  *Id*. ¶ 4.  To advertise on Facebook, Meta requires advertisers to participate in an ad review and approval process.  *Id*. ¶ 83.  The process involves both algorithms and human moderators that purportedly review for content, legality, aesthetics, and the likelihood for, and actual, ad success (measured by the number of views, clicks, etc.) and Meta approves or denies ads accordingly.  *Id*. ¶¶ 4, 14, 16.  Meta knowingly approves and publishes ads submitted by Repeat Infringers and ads containing infringing content.  *Id*. ¶¶ 3, 10, 11, 16, 22, 25.  In some cases, Meta even removes identifying marks from images to make locating and demonstrating infringement more difficult for copyright owners.  *Id*. ¶ 31.

Then, Meta specifically distributes Counterfeiter Ads to Facebook users through aggressive ad targeting, without input from Counterfeiters.  *Id*. ¶¶ 13, 15, 81-83, 139, 152.  As a direct result, the Counterfeiter Ads reach users they could not reach, but for Meta.  *Id*. ¶¶ 13, 142.  Thus, Meta is both initiating and contributing to copyright infringement.  *Id*. ¶ 2.  This is not simply a circumstance of Meta's "neutral" ad platform; it is a business model.

Meta generates the bulk of its annual revenue from targeting ads to Facebook users.  *Id*. ¶¶ 4, 77.  Typically, Meta collects ad revenue on a "per click," basis, making money each time a user clicks on a link displaying infringing content.  *Id*. ¶ 63.  Thus, Meta and the Counterfeiters jointly benefit from high click rates--Meta receiving revenue on the one hand, and Counterfeiters gaining increased access to specific, targeted customers on the other.

In 2020, Meta made more than $80 billion in ad revenue.  *Id*. ¶ 77.  Meta knows that more than forty percent of the pages on Facebook are linked to infringing content and a substantial portion of its ad revenue comes from infringing activity.  *Id*. ¶¶ 8, 10.  Meaning, without revenue from Counterfeiter Ads and Repeat Infringers, Meta's bottom line takes a hit.  So, Meta intentionally works with, not against, Repeat Infringers and knowingly publishes, displays, and distributes

infringing content to protect, or pad, its bottom line.  *Id*. ¶¶ 6, 8, 27, 141, 155.  Indeed, Meta's conduct, which includes knowingly collecting and retaining revenue from Counterfeiter Ads and operating a Counterfeiter friendly platform, supports each of Plaintiff's claims.

### B.    Plaintiff: The Infringed.

Plaintiff Jennifer Cook creates reptile sculptures.  *Id*. ¶¶ 30.  She owns the copyrights for her Creative Works, including the exclusive rights to display, copy, and distribute them.  *Id*. ¶ 90.  She displayed her Creative Works for sale on sites such as SnakeArts.com and Etsy.  *Id*. ¶ 95, 102.

Without Cook's authorization, Facebook published more than a thousand Counterfeiter Ads that unlawfully displayed and purported to sell her Creative Works.  *Id*. ¶ 96, 118.  Indeed, Plaintiff identified 101 unique Repeat Infringers, from June through August 2021, who together with Meta, directly infringed Plaintiff's Creative Works at least 1,042 different times.  *Id*. ¶ 123.

Plaintiff submitted takedown notices to Meta for these specific infringements, identifying both the infringing content and the infringer.  *Id*. ¶ 103.  Meta did not expeditiously, or even reasonably, respond to Cook's notices.  *Id*. ¶¶ 110-118.  To get Meta to take down even a portion of the Counterfeiter Ads displaying her Creative Works, Cook had to submit numerous takedown notices *and* locate and contact Meta's Intellectual Property ("IP") attorney--- steps the DMCA does not require of copyright owners.  *Id*. ¶ 112-116.  Meta is still displaying some of the Counterfeiter Ads.  *Id*. ¶ 119.

Meta routinely fails to respond expeditiously or reasonably to remove Repeat Infringers and infringing content Creators report.  *Id*. ¶¶ 23, 45, 62, 70, 103, 111 fn.41, 114, 123, 124, 128.  By its affirmative display and distribution of infringing content and failure to meaningfully respond to infringement reports from Creators, Meta is directly and contributorily liable for infringement.

### ARGUMENT

Meta opens its Motion with the unremarkable assertion that courts have dismissed class actions based on copyright infringement "that failed to state a claim."  Def. Mem. at 5-6.  Plaintiff agrees that complaints that fail to state a claim should be dismissed.  However, Meta's cited cases highlight just why *Plaintiff's* action should proceed.  *See Hunley v. Instagram, LLC,* No. 21-CV-

03778-CRB, 2022 WL 298570, at *1-2 (N.D. Cal. Feb. 1, 2022) (involving the display of infringing photos on third party websites, not on defendant Instagram's site, and where plaintiff failed to plead an underlying act of direct infringement)[2]; *Harrington v. Pinterest,* No. 5:20-CV-05290-EJD, 2021 WL 4033031, at *7 (N.D. Cal. Sept. 3, 2021) (did not involve direct copyright infringement and plaintiff failed to allege Pinterest had knowledge of infringement or that he reported infringement to Pinterest)[3]; *Harris v. San Jose Mercury News,* No. 04-05262 CRB, 2006 WL 862953, at *1 (N.D. Cal. Apr. 3, 2006) (injunctive relief claim only and plaintiff failed to allege a pattern of infringement likely to continue in the future); *Ryan v. Carl Corp.,* No. 97-3873 FMS, 1998 WL 320817, at *1, *3 (N.D. Cal. June 15, 1998) (limited standing for copyright claims to registered owners, which Plaintiff here is); *Good Morning to You Prods. Corp. v. Warner-Chappel Music, Inc.*, No. 13-440-GHK (MRWx), 2013 WL 12138670, at *2 (C.D. Cal. Oct. 16, 2013) (case concerning statute of limitations).  There is eminent and persuasive precedent supporting putative class actions for violations of copyright laws.  *See generally A&M Records, Inc. Napster,* 239 F.3d 1004 (9th Cir. 2001); *Keck v. Alibaba.com Hong King Ltd.*, 369 F. Supp. 3d 932 (N.D. Cal. 2019)).  There is also substantial authority recognizing the factual nature of these disputes.  *See MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005); *Columbia Pictures Indus., Inc. v. Fung,* 710 F.3d 1020 (9th Cir. 2013); *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 936, 942 (9th Cir. 2011); *Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004); *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996)).

Apart from Meta's sweeping and generic proclamation that copyright class actions should not proceed, it focuses its defense more specifically on the DMCA safe harbor.  However, as set forth below, the DMCA does not shield Meta from liability and Plaintiff has sufficiently pled claims for

---

[2] The *Hunley* court held an alleged infringer must "store the photographic images." 2022 WL 298570, at *1-2.  Distinguishable from this case, *Hunley* specifically pled that the third parties, using an embedding tool, displayed the copyrighted photos and videos, without storing them on their own servers or other storage devices.  *Id.* at *1.  The court ruled Instagram could not be secondarily liable for copyright infringement when there was no underlying copyright infringement.  *Id.* Notably, the district court also "advised Hunley to appeal to the Ninth Circuit" on this point.  *Id.*
[3] In *Harrington*, defendant Pinterest sought dismissal of the contributory infringement and violation of DMCA claims but not the direct copyright infringement claim.  2021 WL 4033031, at *2.

direct, contributory, and vicarious copyright infringement, and for violations of the Visual Artists' Rights Act ("VARA"), Lanham Act, Florida Deceptive and Unfair Trade Practices Act ("FDUTP"), and for unjust enrichment.

## I.      THE DMCA DOES NOT SHIELD META FROM LIABILITY.

Meta invokes DMCA safe harbor defense § 512(c) (limiting an OSP's liability for copyright infringement on its site under certain circumstances) and the limitations of § 512(m) (limiting an OSP's duty to seek out infringing activity).  To obtain these protections, Meta has the burden to establish it satisfied all DMCA statutory requirements.  *See Columbia Pictures*, 710 F.3d at 1039 ("Because the DMCA is an affirmative defense, [defendant] has the burden of establishing that he meets the statutory requirements.")  This includes *first* satisfying the threshold requirements found in 17 U.S.C. § 512(i) (requiring a reasonable repeat infringer policy and accommodation of standard technical measures).

If, and only if, Meta satisfies § 512(i), may it move on to try and establish the individual requirements of § 512(c), the specific safe harbor Meta invokes.  For instance, § 512(c) contains the additional requirements that an OSP not have, *inter alia*, knowledge of the infringement, the right and ability to control infringement, or a direct financial benefit from infringing activity.  Section 512(m) then provides that satisfying the elements of § 512(c) is not conditioned on an OSP policing its site for infringement (*i.e.* constructive knowledge cannot be established by an OSPs failure to monitor its site).  However, this does not apply to an OSP, like Meta, who has actual knowledge of the infringement at issue.  *UMG Recordings, Inc. v. Shelter Cap. Partners LLC.*, 718 F.3d 1006, 1029 (9th Cir. 2013).  Thus, Meta has failed to satisfy the eligibility requirements of 17 U.S.C. §§ 512(i) and 512(c), or that it is exempt under § 512(m) from monitoring its site for known infringement.  Meta is not entitled to any DMCA safe harbor protection at this stage.

### A.      Meta Does Not Satisfy the Threshold Criteria in 17 U.S.C. § 512(i) for *Any* DMCA Safe Harbor Protection.

As a threshold matter, to qualify for DMCA safe harbor protection under any section, a defendant must have adopted and reasonably implemented a Repeat Infringer policy and

accommodated, not interfered with, "standard technical measures."[4] 17 U.S.C. § 512(i); *Viacom Intern, Inc. v. YouTube, Inc.*, 676 F.3d 19, 27 (2d Cir. 2012).  Plaintiff alleges Meta did neither.

### 1.   *Meta Did Not Reasonably Implement a Repeat Infringer Policy.*

As Plaintiff alleges, Meta did not reasonably implement a Repeat Infringer policy.  Compl., ¶¶ 23, 135, 180, 215.  In response, Meta argues Plaintiff's allegations are insufficient because so-called "three-strike policies" are reasonable under the DMCA and the Complaint does not identify three or more instances of infringement by any Repeat Infringer.  Def. Mem. at 11.  Plaintiff has no burden and need not plead any of Meta's affirmative defenses.  But even still, Meta's argument fails for three reasons: (1) Meta does not implement a "three strike" rule; (2) the Court should consider takedown notices from other Creators to determine whether Meta's Repeat Infringer policy is reasonable; and (3) Meta cannot establish it removed the Repeat Infringers even after receiving three reports of infringement.  Def. Mem. 11.  All of these are factual inquiries that cannot be resolved at this stage.  Nevertheless, Plaintiff addresses Meta's arguments in turn.

#### a.   Meta does not employ a "three strikes" policy.

In Meta's cited cases, courts deemed a "three strike rule" reasonable where the OSP expressly established such a policy.  *See Viacom Intern, Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514, 527 (S.D.N.Y 2010); *Capital Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 500, 513 (S.D.N.Y. 2013).  However, as Plaintiff alleges, unlike the OSPs in Meta's "three strikes" cases, Meta does not employ an express "three strikes" policy at all.  Compl. ¶ 200.  Moreover, even the courts that determined a "three strike" policy was reasonable did so relying on facts obtained during discovery.  *See Rosen v. eBay, Inc.,* No. CV 13-6801-MWF (EX), 2018 WL 4815746, at *1 (C.D. Cal. Jan. 24, 2018) (relied on sworn testimony as to the reasonableness of eBay's repeat infringer policy)[5]; *Viacom*, 718 F.

---

[4] "Standard technical measures" means technical measures used by copyright owners to identify or protect copyrighted works, such as a watermark.  17 U.S.C. § 512(i)(2).
[5] Defendant cites *Rosen v. eBay, Inc.* ("*Rosen II*"), No. CV 16-9183-MWF (Ex), 2018 WL 4802101, at *6 (C.D. Cal. Jan. 24, 2018), an opinion on two motions to transfer that does not mention a "three strike" rule.  Def. Mem. at 11.  To the extent Defendant intended to cite *Rosen v. eBay, Inc.,* No. CV 13-6801 MWF EX, 2015 WL 1600081, at *9 (C.D. Cal. Jan. 16, 2015), this case also lacks any reference to a "three strike rule," but references the factual nature of determining whether a repeat infringer policy is reasonable. *Id.*

Supp. 2d at 527 (held at summary judgement that YouTube's express policy to remove repeat infringers after three strikes was reasonable); *Vimeo,* 972 F. Supp. 2d at 512-513 (relying on a fact intensive analysis, including deposition testimony, of Vimeo's evolving repeat infringer policy, which at one point included a three strike policy, but since evolved into a "Purgatory" tool).[6]  Here, Plaintiff alleges the specific language of Meta's Repeat Infringer policy, and it does not contain any "three strikes" provision.  Compl. ¶ 200.  Thus, just because some courts determined an implemented "three strikes" policy was reasonable, Meta implemented no such policy and this argument is irrelevant.

> ### b.    The Court must also consider the allegations of infringement notices sent by other Creators, not just Plaintiff.

Plaintiff's allegations regarding Repeat Infringers include infringement reports by other Creators to Meta.  *Id.* ¶¶ 23, 45, 62, 70, 103, 111 fn.41, 114, 123, 124, 128.   Section 512(i)(1)(A) requires an assessment of the OSP's policy overall, not just how the service provider treated a particular copyright holder (*i.e.,* Plaintiff).  *Perfect10, Inc. v. CCBill, LLC*, 488 F.3d 1102, 1113 (9th Cir. 2007) ("*CCBill*").  Therefore, assessing the reasonableness of Meta's Repeat Infringer policy requires an analysis of Meta's response to all of the Creators' takedown notices, not just Plaintiff's.  *See Ellison*, 357 F.3d at 1080 (AOL's repeat infringer policy was not reasonably implemented because copyright holders other than Ellison could have attempted to notify AOL); *CCBill*, 488 F.3d at 1113 ("[defendants'] actions towards copyright holders who are not a party to the litigation are relevant in determining whether [Defendants] reasonably implemented their repeat infringer policy.")

Here, Plaintiff alleges that other Creators reported the same Repeat Infringers she reported.  *Id.* ¶¶ 23, 45, 62, 70, 103, 111 fn.41, 114, 123, 124, 128.  Meta also maintains infringement reports from Creators, not just from Plaintiff, and can easily identify the total number of times Creators

---

[6]The *Vimeo* court further reasoned the defendant's copyright infringement enforcement mechanisms "advanced in step with the realities of its growing business, which supported the reasonableness of its implementation system." *Id.*  Vimeo, a much smaller OSP than Meta, has moved on from a "three strike" rule, to a more robust system because their business grew.  *Id.*

reported each infringer.  *Id.* ¶¶105, 107; *See CCBill*, 488 F.3d at 1110 (A service provider must maintain a vehicle to receive notices of potential infringement, design its system to be able to ascertain the identity of the users responsible for those files, and make some effort to record infringing users).  Under Plaintiff's plausible allegations, Meta cannot establish the reasonableness of its policy by arguing that Plaintiff, alone, did not report any single infringer more than three times.

c.    <u>Meta did not remove Repeat Infringers after three strikes.</u>

Meta cannot establish, at this stage, that it removed infringers after receiving three notices of infringement. In the Complaint, Plaintiff identified 101 Repeat Infringers, who collectively infringed her Creative Works more than one thousand times between June and August of 2021.  Compl. ¶¶ 109-124.  At least ten of those Repeat Infringers posted ten or more Counterfeiter Ads.  *Id.*  ¶ 123, fn. 51-60.   Thus, Meta cannot establish it removed Repeat Infringers after three instances of infringing activity and cannot establish it implemented a reasonable Repeat Infringer policy even under its own, inapposite "three strikes" case law.  Without establishing this threshold requirement of a reasonable Repeat Infringer policy, Meta is not eligible for protection from *any* of the DMCA safe harbor defenses.  17 U.S.C. § 512(i); *Viacom*, 676 F.3d at 27.  It is therefore unnecessary to analyze any other components of any of Meta's DMCA safe harbor defenses.

2.    *Meta interferes with standard technical measures.*

The second threshold DMCA qualification under 17 U.S.C. §512(i) required Meta not to interfere with the "standard technical measures" Plaintiff and the Creators uses to identify their works.  Meta fails again here and is again immediately ineligible for any of the DMCA safe harbor defenses.  Standard technical measures are tools, such as watermarks, copyright holders use to more easily identify their work. *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 744 (S.D.N.Y. 2012).  Plaintiff alleges Meta removed her watermarks, and other Creators' watermarks, from images used in Counterfeiter Ads.  Compl. ¶¶ 31, 98-100, 102-103.   Removing watermarks directly interferes with Plaintiff's and Creators' ability to protect their copyrighted works and disqualifies Meta from DMCA safe harbor protection.  Like its failure to reasonably implement Repeat Infringer policy, Meta also fails under the second, mandatory threshold requirement of 17 U.S.C. § 512(i) and

its entire DMCA defense fails without further analysis.

### B.   Meta Does Not Satisfy the Conditions of 17 U.S.C. § 512 (c).

Within the DMCA, Meta specifically asserts § 512(c) safe harbor protection, for which it flatly does not qualify.  This is because Meta cannot establish, "beyond controversy" that it: (1) only stored infringing content "at the direction of the user [here, advertiser];" (2) lacked actual or red flag knowledge of the infringing material; (3) acted expeditiously to remove infringing content; and (4) did not receive a financial benefit directly attributable to the infringing activity for which it had the right and ability to control.  *Atari Interactive, Inc. v. Redbubble, Inc.*, 515 F. Supp. 3d 1089, 1113 (N.D. Cal. 2021); 17 U.S.C. § 512(c).  Also, § 512(c) does not limit Plaintiff from seeking injunctive relief in any event.  17 U.S.C. §§ 512(c)(1), 512(j).

#### 1.   *Meta Did Not Merely Store Infringing Content "At the Direction of the User."*

This requirement dictates that Meta must have merely stored the infringing content on its systems at the direction of the counterfeiter advertisers and to have "played no role in making the infringing material accessible on its site.  *Mavrix Photographs, LLC v. Livejournal, Inc.,* 873 F.3d 1045, 1056 (9th Cir. 2017).  Meta cannot possibly satisfy this requirement in light of Plaintiff's plausible allegations.  As set forth below, Plaintiff alleges Meta played an active role in displaying and distributing infringing content.

Plaintiff alleges Meta played a role in every phase of the infringing activity at issue, from receiving an ad request to directing the ads to specific Facebook users to those Facebook users clicking on the ads.  Plaintiff specifically alleges Meta's roles were as follows:

**Role No. 1:** Meta peddled its advertising capabilities as *more capable* than its competitors at connecting ads to potential customers (*i.e.,* making the ads more accessible to users than they would be on other platforms).  Compl. ¶¶ 15, 81, 88, 152.

**Role No. 2:** Meta previewed and manually prescreened ads before they were published, thereby barring a § 512(c) Safe Harbor defense.  *Id.* ¶¶ 4, 87, 196; *see Marvix*, 873 F.3d at 1048-49 (accepting and publishing images after moderator review and approval is not storage at the direction of the user where moderators were agents of defendant);

**Role No. 3:** Meta knowingly published ads submitted by Repeat Infringers and Counterfeiter Ads. Compl. ¶¶ 3, 10, 11, 16, 22, 25.

**Role No. 4:** Meta targeted ads at specific Facebook users, employing its own data and resources. *Id*. ¶¶ 15, 88. Meta did this *without any input from the Counterfeiters*. *Id.*

Taken together, Meta played a significant role in displaying and distributing infringing content and cannot establish it merely stored infringing content "at the direction of the user." Failure to establish this element of § 512(c) eliminates this DMCA safe harbor defense.

### 2. *Meta Had Actual and Apparent Knowledge of the Infringing Content on its Site.*

Plaintiff alleges Meta had both actual and apparent knowledge of the infringing activity on Facebook, which also disqualifies Meta from §512(c) protection. *See, e.g.,* Compl. ¶ 11. Takedown notices are the most powerful evidence of an OSP's actual knowledge. *UMG*, 718 F.3d at 1020; *see In re Aimster Copyright Litig.*, 334 F.3d 643, 648 (7th Cir. 2003) ("The test is merely whether plaintiff can establish defendant knows its site is being used for infringement."). Here, Plaintiff submitted several takedown notices to Meta. Compl. ¶¶ 3, 10, 16, 22, 25 149-151, 159, 164, 202, 216. Indeed, Plaintiff alleges that from June to September of 2021, she reported sixty-five pages/accounts and hundreds of Counterfeiter Ads to Facebook; as of the date of the Complaint, those accounts were still active Facebook accounts. *Id.* Thus, Meta had actual knowledge of the specific infringing content and every infringer Plaintiff reported. *Id.* ¶ 11, 202.

Plaintiff also alleges Meta's apparent knowledge. Meta loses any safe harbor protection "if it was 'aware of facts or circumstances from which infringing activity is apparent' and did not 'act expeditiously to remove or disable access to the material.'" *Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 609 (9th Cir. 2018). Plaintiff specifically alleges Meta knew that, left unregulated, Repeat Infringers would continue to participate in infringing activity. Compl. ¶ 11, 202. Plaintiff further alleges Meta intentionally allowed Repeat Infringers to continue advertising to increase revenue. *Id.* ¶ 64. Plaintiff has sufficiently asserted both Meta's actual and apparent knowledge of infringement on Facebook. As a result, Meta's § 512(c) safe harbor defense fails.

### 3. *Meta did not expeditiously remove or disable access to infringing content.*

As Plaintiff alleges, Meta did not act expeditiously to respond to Plaintiff's takedown notices or remove infringing content, as required by 17 U.S.C. § 512(c).  To act expeditiously requires speed and efficiency.  Black's Law Dictionary, (10th ed. 2014).  Here, Plaintiff alleges Meta's response to takedown notices was slow, inefficient, incomplete, or non-existent.  Plaintiff sent multiple takedown notices—involving the same infringing content and Repeat Infringers—to Meta, but even after that, Facebook users were still able to interact with the Counterfeiter Ads and purchase infringing goods.  Compl. ¶¶ 99-103, 119.  Meta did not meaningfully respond to any of Plaintiff's notices.  *Id.* ¶¶ 113, 115, 203.  Plaintiff was forced to research and contact Meta's IP attorney before Meta took any responsive action.  *Id.*  Meta's IP attorney removed some of the Counterfeiter Ads, but not all of them.  *Id.*  Indeed, some of the Counterfeiter Ads Plaintiff reported are still accessible on Facebook.  *Id.* ¶ 119.  These allegations undermine Meta's assertion that it responds "expeditiously" to takedown notices.  Meta cannot establish this condition of the § 512(c) safe harbor and the defense again fails.

### 4. *Meta received a financial benefit directly attributable to the infringing activity.*

Meta also cannot assert DMCA protection under §512(c) because it received a financial benefit directly attributable to the infringing activity.  Under the DMCA, an OSP cannot, under any circumstances, receive a financial benefit directly from known infringing activity.  17 U.S.C. § 512(c), (1)(B), (d)(2).  Meta argues there is a carve out to this rule when the OSP offers a neutral product that has a substantial non-infringing use, such as ad revenue from non-infringing ads.  Def. Mem. at 15.  This argument fails, however, where Plaintiff's allegations show a defendant: (1) had knowledge beyond its product's characteristics; (2) knew that the product may be put to infringing uses; and (3) made statements or actions directed to promoting infringement.  *Columbia Pictures*, 710 F.3d at 1032; *see Perfect 10, Inc. v. Cybernet*, 213 F. Supp. 2d 1146, 1181 (C.D. Cal. 2002) ("*Cybernet*") (courts should consider "any such fees where the value of the service lies in providing access to infringing material.")

In *Cybernet*, the court determined the defendant's income was based on the number of new

users signing up from infringing sites and this established a direct relationship that precluded DMCA protection (*i.e.*, the more, new visitors an infringing site attracts, the more money defendant made). 213 F. Supp. 2d. at 1177, 1181. The court refused to read § 512 as endorsing business practices that would encourage content providers to turn a blind eye to the source of copyright infringement while continuing to knowingly profit, indirectly or not, from every single one of these same sources until a court ordered the provider to terminate each individual account. *Id.*

Here, like *Cybernet*, the more clicks or views Meta generates for an infringing ad, or the more ads it allows known Repeat Infringers to purchase, the more money it makes. Compl. ¶ 63, 85-86. Likewise, the more Counterfeiter friendly Meta is (*e.g.,* ignoring takedown notices, fostering and encouraging repeat infringement) the more Counterfeiters advertise on Facebook, and again the more money Meta makes. *Id.* ¶64, 69, 204, 216-217. Moreover, even after Meta learns an ad is infringing, it retains the revenue. *Id.* ¶ 204. Thus, while Meta may also receive revenue from non-infringing ads, its direct financial benefit from infringing activity is distinguishable from its non-infringing activity. Because Plaintiff alleges Meta received a direct financial benefit from infringing activity, Meta does not qualify for DMCA § 512(c) protection.

### 5. Meta had the right and ability to control the infringing activity on its site.

Plaintiff alleges Meta had the right and ability to control infringing activity on Facebook, which also bars DMCA protection. Specifically, Plaintiff alleges Meta had "the legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so." *Keck*, 369 F. Supp. 3d at 935 (*citing Williams v. Gaye*, 895 F.3d 1106, 1132 (9th Cir. 2018)); Compl. ¶¶ 47-54, 115, 166. Courts have held the ability to block users is enough to establish the "right and ability to control." *See A&M Records,* 239 F.3d at 1023 (online service's improved methods of blocking users "tantamount to an admission that defendant can, and sometimes does, police its service."). In *Napster*, the court found the defendant had the right to control access to its system because it reserved the right to terminate users. 239 F.3d at 1023. The court also considered Napster's song indices, which it could use to locate infringing material and which "as a practical matter" gave it the ability to stop infringement. *Id.* at 1023-24. The court therefore concluded that Napster had the practical ability to supervise infringement. *Id.*

Like Napster, Plaintiff alleges Meta can block infringing content and users.  Compl. ¶ 47-54, 115, 166.  Meta also has search capabilities like Napster, demonstrated by Meta's Ad Library.  *Id.* ¶¶ 115, 118.  Thus, Plaintiff plausibly alleges Meta's right and ability to control.

Other courts have held that the "right and ability to control" requires something more.  *Cybernet,* 213 F. Supp. 2d at 1181-82.  However, Plaintiffs' allegations show Meta's right and ability to control the infringing activity under any standard.  *Id.*  In *Cybernet,* the defendant's monitoring program, ability to block access, and history of blocking access demonstrated sufficient influence to qualify as a right and ability to control.[7]  213 F. Supp. 2d at 1181-82.  Here, Plaintiff alleges Meta had the right and ability to control the Counterfeiters and Repeat Infringers on Facebook, more so than even Napster and at least as much as Cybernet.  First, before advertisers can solicit Facebook users, Meta requires them to agree to the Advertising Terms and Conditions ("Terms").  Compl. ¶ 166.  The Terms give Meta the right to "monitor and otherwise investigate" links and ads to ensure compliance with Meta's policies, including the Repeat Infringer and Copyright Infringement policies, the Terms of Service, and the Commercial Terms.  *Id.* ¶¶ 49-54, 166-167.  These policies all provided Meta the ability to terminate users and advertisers for non-compliance and Meta used this power to police its site when it beneficial to the company.  Compl. ¶¶ 166; 71.

Second, Meta has a purported ad review and approval process involving both automatic and manual review, before and after ads are published.  *Id.* ¶ 4, 87, 196.  Meta controls the ad approval process through algorithms and human moderators who purport to review ad content for legality, offensiveness, and aesthetics.  *Id.* ¶ 4, 87; *see also Cybernet*, 213 F. Supp. 2d at 1182 ("[defendant] has a monitoring program in place… [defendant] has refused to allow sites to use its system until they comply with its dictates…Combined with its detailed policing of sites, these activities … establish … [defendant] has the right and ability to control the participating websites.); *Mavrix*, 873 F.3d at 1098 (identifying a "something more" requirement, which could include "instructions regard[ing] issues of layout, appearance, and content…").  Together, Plaintiff's allegations demonstrate Meta's right and ability to

---

[7] Cybernet's monitoring process, like Meta's ad application, review, and monitoring process, provided detailed instructions regarding layout, appearance, and content of publications.  *Id.*

control Counterfeiters and Repeat Infringers.

Moreover, just because a Facebook advertiser is involved in selecting the objective, audience, budget, format, and content for ads does not undermine Meta's involvement or control. Def. Mem. at 9. As Plaintiff alleges, Facebook advertisers only make these selections in a limited capacity based on the strict parameters specified and controlled by Meta. *See* Compl. ¶ 83-89; *see, e.g., Atari*, 515 F. Supp. 3d at 1106 ("[Defendant] argues that it avoids liability because it does not select the listing advertised or affix marks to the displays, but these arguments are unpersuasive. The party that selects listings … does so automatically based on parameters set by [defendant]."). In sum, Meta can terminate its users for infringement, and this alone is enough to establish a right and ability to control that disqualifies it for DMCA protection. *A&M Records*, 239 F.3d at 1023. But even under a *Cybernet* "something more" standard, Plaintiff alleges Meta's right and ability to control Counterfeiters, Repeat Infringers, and the infringing activity on Facebook. Meta's DMCA defense again fails.

### 6.     The DMCA Does Not Preclude Plaintiff from Seeking Injunctive Relief.

The DMCA safe harbor defense does not affect the question of ultimate liability itself. *Cybernet*, 213 F. Supp. 2d at 1174. Rather, it only potentially limits the relief available to a plaintiff, namely, monetary damages. *Id*. It does not foreclose claims for injunctive relief. *Id*. Thus, regardless of any DMCA defense, Plaintiff sufficiently alleges Meta's liability for direct, contributory, and vicarious copyright infringement and to injunctive relief pursuant to that liability.

### C.     § 512(m) Does Not Absolve Meta from Any Duty to Monitor for Infringement.

Meta correctly asserts that pursuant to § 512(m), it is not obligated to "affirmatively seek facts" regarding infringement on Facebook. Def. Mem. at 12; 17 U.S.C. § 512(m). Section 512(m) is not applicable, however, to instances where the OSP has actual knowledge of infringing activity, is willfully blind to it, or reserves the right, on its own accord, to police its site for infringement *See UMG*, 718 F.3d at 1029 ("[A] service provider cannot willfully bury its head in the sand to avoid obtaining [knowledge of infringement]."); *Napster,* 239 F.3d at 1023 ("Turning a blind eye to detectable acts of infringement for the sake of profit gives rise to liability."); *In re Aimster*, 334 F.3d at 650 ("[W]hether the defendants made a deliberate effort to avoid guilty

15

knowledge" is a fact question); *Shapiro v. Green Co., Inc.*, 316 F.2d 304, 309 ("[F]ailure to police the conduct of the primary infringer" leads to the imposition of vicarious liability for copyright infringement.)  Plaintiff plausibly alleges Meta was "willfully blind" because it was "aware of a high probability" of infringement and actual infringement on Facebook and "consciously avoided confirming" or limiting the infringement.  Compl. ¶¶  70-71, 202; *UMG*, 718 F.3d at 1029 (citing *U.S. v. Aina–Marshall,* 336 F.3d 167, 170 (2d Cir. 2003).

Meta cannot invoke § 512(m) protection at this stage because Plaintiff plausibly alleged Meta does nothing to stop or limit infringement despite having knowledge and the resources and technology, including advanced image scanning technology and image search functionality (which it routinely uses for self-serving purposes) to locate content it knows to be infringing or users it knows to be infringers. Compl. ¶¶ 23, 25, 63, 64, 115, 118, 120-21, 122, 124, 128,159, 201, 205.  *Id.* ¶¶ 115, 118, 120-21, 159.  Meta's position that, after submitting multiple takedown notices for her images, Plaintiff should still be required to submit hundreds more takedown notices, *for the same image*, is an egregious and incorrect interpretation of the DMCA and not one this Court should endorse.  *Id*. ¶¶ 20, 70-71, 141, 155, 169, 202.  *Id.*  Meta cannot therefore escape a duty to police for infringement through a blanket §512(m) assertion.

Moreover, Plaintiff alleged Meta expressly represented to its users that it proactively removes potentially infringing content before it is reported.  Compl. ¶ 9.  When an OSP reserves a right to police its site, through terms and conditions or otherwise, that "reserved right to police must be exercised *to the fullest extent*." *Napster*, 239 F.3d at 1023 (emphasis added).  The *Napster* court further noted that Napster's representations regarding "its improved methods of blocking users about whom rights holders complain … is tantamount to an admission that defendant can, and sometimes does, police its service." *Id*.  This is *precisely* what Plaintiff alleges here.  Compl. ¶ 166.

Meta did not monitor Facebook, "to the fullest extent" after Plaintiff informed it of specific instances of infringement of specific images by specific infringers.  Compl. ¶¶ 63, 122-24, 166.  Meta thus permitted detectable acts of infringement and violated its duty to monitor its site for infringement.  Meta cannot declare DMCA protection under 17 U.S.C. § 512(m).

## II.   META IS DIRECTLY LIABLE FOR COPYRIGHT INFRINGEMENT (COUNT I).

Plaintiff sufficiently alleges all elements of a direct infringement claim: (1) undisputed ownership of the allegedly infringed material; (2) violation of her exclusive rights to display, copy, distribute and create derivative works; and (3) causation or volitional conduct.   *Sid Avery and Assocs., Inc. v. Pixels.com, LLC,* 479 F. Supp. 3d 859, 866 (C.D. Cal. 2020) (setting forth the elements under 17 U.S.C. §501 and 17 U.S.C. § 106).   To seek dismissal, Meta only addresses the third element, "volitional conduct," claiming automatic processes or the display of user uploaded images does not constitute Meta's volitional conduct.   Def. Mem. 14.   Plaintiff's clear allegations and the law are to the direct contrary.

Regarding volitional conduct, "direct copyright liability for website owners arises when they are actively involved in the infringement."   *Sid Avery*, 479 F. Supp. 3d at 866.   To prove this element, a plaintiff "must provide some evidence showing the alleged infringer exercised control (other than by general operation of its website); selected any material for upload, download, transmission, or storage; or instigated any copying, storage, or distribution of the photos." *Id.*; *see e.g., Princeton Univ. Press v. Mich. Document Servs., Inc.,* 99 F.3d 1381, 1383–84 (6th Cir. 1996) (copy shop engages in volitional conduct by working with professor to print and sell "course packets" with infringing material to students.)

Plaintiff has pervasively alleged Meta's direct involvement in the infringement at issue. Plaintiff specifically alleges Meta's ad application, review, and publication process includes manual review by human moderators and targeted advertising, separate and apart from any effort by the Counterfeiters.   Compl. ¶¶ 4, 81-83, 87-89, 142, 143, 165, 196.   This demonstrates Meta's display, storage, or transmission of images to its users is not passive or automatic.   *Id.*; *see Sid Avery*, 479 F. Supp. 3d at 866 ("This human touch suggests that Pixels' transmission of images to its vendors may not be truly automatic.") (*citing Wolk.*, 840 F. Supp. 2d at 742 (finding no volitional conduct where "[t]here is no dispute that any reproduction, display or transmission of the Plaintiff's images by or through the KODAK Gallery website is an automated process with no human intervention by any employee of the Kodak Defendants")).   Plaintiff has sufficiently pled Defendant's conduct was

volitional and Plaintiff's claim for direct copyright infringement should proceed.[8]

**III.    META IS CONTRIBUTORILY LIABLE FOR COPYRIGHT INFRINGEMENT (COUNT II).**

Plaintiff also states a claim for Meta's contributory infringement for the same reasons the DMCA defense fails—Meta knew about the infringement on Facebook and materially contributed to it.  "[T]o substantiate a claim [for contributory infringement] [a plaintiff] must show that [defendant] knew or had reason to know of the infringing activity … and … materially contributed to it." *Ellison*, 357 F.3d at 1078.  As set forth below and in the Complaint, Plaintiff alleges just that.

**A.    Meta had Knowledge of Infringing Activity on Facebook.**

Meta is liable for contributory copyright infringement if it had the ability to monitor infringement and continued to supply ad services to users it (actually or constructively) knew or had reason to know were engaging in infringement.  *Louis Vuitton*, 658 F.3d at 942; *see generally Grokster*, 545 U.S. 913 (2005); *see Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 163-65 (4th Cir. 2012) (reversing summary judgment in defendant's favor where record showed Google continued to allow known infringers to advertise using different sponsored links); *Luxottica Group, S.p.A. v. Airport Mini Mall, LLC*, 932 F.3d 1303, 1314 (11th Cir. 2019) (concluding that actual or constructive knowledge could arise from "many sources, including steps defendant could have taken to investigate alleged infringement" after obtaining general knowledge of infringement.); *1-800 Contacts, Inc. v. Lens.com, Inc.,* 722 F.3d 1229, 1252-54 (10th Cir. 2013) (finding a company could be liable for contributory infringement if it "could have stopped the use of the ads," but failed to take "reasonable action to promptly halt the practice."); *Coach, Inc. v. Goodfellow*, 717 F.3d 498, 504-05 (6th Cir. 2013) (defendant liable for contributory infringement because it "had actual knowledge that the infringing activity was occurring," but "failed to deny access to offending [third parties] or take other reasonable measures to prevent the use of [defendant's resources] for unlawful purposes, and

---

[8] Regarding volitional conduct, Meta also argues the Court should follow *Harrison v. Facebook, Inc.*, No. C 19-01547 JSW, 2019 WL 11343562 (N.D. Cal. July 2, 2019).  Def. Mem. at 14.  *Harrison*, however, involved a *pro se* complaint against Facebook by a user who wanted the images she posted removed after her account was no longer accessible.  *Id.*. at *1-2.  This case is not relevant to Plaintiff's allegations, which assert Facebook itself was actively involved in posting and helping others to post Plaintiff's copyrighted works.  *See, e.g.,* Compl. ¶¶ 4, 81-83, 87-89, 142, 143, 165, 196

failed even to undertake a reasonable investigation."); *Atari*, 515 F. Supp. 3d at 1108 (balance of authorities show contributory infringement occurs when a service provider fails to take reasonable steps to prevent infringement while having general knowledge of such infringement).

Plaintiff alleges Meta had actual knowledge of infringement on Facebook through Plaintiff's and other Creators' takedown notices to Meta.  Compl. ¶¶ 3, 10, 16, 22, 23, 25 45, 62, 70, 102, 11 fn. 41, 114, 123, 124, 128, 149-151, 159, 164, 202, 216.  Plaintiff also alleges Meta had apparent knowledge of infringing activity on Facebook through the continued approval and publication of ads submitted by Repeat Infringers.  *Id.* ¶ 11, 202.  Thus, Plaintiff plausibly alleges Meta knew about the infringing activity on Facebook.  For these reasons, and those articulated in sections I(B)(2) of this brief, Plaintiff establishes Meta had actual and apparent knowledge of infringing activity on Facebook, thereby satisfying the knowledge element of Plaintiff's contributory infringement claim.

**B.** <u>**Meta Materially Contributed to the Infringement.**</u>

Meta also materially contributed to the infringing activity on Facebook.
[P]roviding a service that allows for the automatic distribution of all [OSP] postings, infringing and noninfringing, can constitute a material contribution when the [OSP] knows or should know of infringing activity on its system, yet continues to aid in the accomplishment of the direct infringer's purpose of publicly distributing the postings.

*Ellison*, 357 F.3d at 1078.  Here, Plaintiff alleges Meta knowingly targeted Counterfeiter Ads to its users, failed to reasonably implement a Repeat Infringer policy, publicly distributed infringing content, and induced infringement.  Compl. ¶¶ 13, 15, 34, 38, 76, 81-83, 139, 150, 182. C.  Thus, Meta aids Counterfeiters and Repeat Infringers in their direct infringement and this sufficiently establishes Meta's material contribution to copyright infringement on Facebook.

Additionally, Facebook users' access to infringing content raises a triable issue of material fact.  *See Ellison,* 357 F.3d at 1078 (holding an OSP allowing subscribers access to copyrighted works raised a triable issue regarding material contribution).  Plaintiff alleges Meta distributed infringing content to Facebook users, which establishes this triable issue of fact.  Compl. ¶ 99.

Meta also argues it did not materially contribute to infringement because Plaintiff did not allege Meta "induced infringement".  Def. Mem. at 15.  Even Meta acknowledges this is not actually the standard but just one "theory" that a plaintiff *could* allege to demonstrate a defendant's

contribution.  *Id.*  And moreover, Plaintiff did plainly allege Meta induced infringement.  Compl. ¶¶ 34, 38, 76, 150, 182.  Ultimately, Meta acknowledges inducement of infringement is a fact intensive inquiry and Plaintiff agrees.  Def. Mem. 15.  Plaintiff need not, but did, allege "inducement of infringement" where she pervasively pled Meta's material and direct contributions to the infringement here.  For these reasons, Plaintiff's claim for contributory infringement should proceed.

## IV.   META IS VICARIOUSLY LIABLE FOR COPYRIGHT INFRINGEMENT (COUNT III).

Plaintiff's vicarious liability claim should also proceed for the same reasons Meta's DMCA defense fails.  To allege vicarious copyright infringement liability, a plaintiff must plead: (1) the defendant exercised the requisite control over the direct infringer; and (2) the defendant derived a direct financial benefit from the direct infringement.  *Keck*, 369 F. Supp. 3d at 935.  Meta's knowledge of the infringement, or lack thereof, is irrelevant to a claim for vicarious liability.  *Adobe Sys., Inc. v. Canus Prods., Inc.*, 173 F. Supp. 2d 1044 (C.D. Cal. 2001).

### A.   Meta Exercised Control Over the Counterfeiters and Repeat Infringers.

Plaintiff sufficiently alleges Meta exercised control over Counterfeiters and Repeat Infringers because it had "both the legal right to stop or limit the directly infringing conduct, as well as a practical ability to do so." *Keck*, 369 F. Supp. 3d at 935.  First, Meta had the legal right to stop or limit directly infringing conduct.  In the online world, this is akin to the ability to terminate, block, or limit users.  *Keck,* 369 F. Supp. 3d at 935; *see e.g., A&M Records,* 239 F.3d at 1023.  In *Keck*, the court concluded that the defendant Alibaba had the right and ability to control its merchants because it could terminate a merchant's membership for repeated infringement, had the right to remove, modify, or reject unlawful content on the website and had the discretionary right to suspend access to the website.  *Id.*  Plaintiff alleged Meta had these same rights.  *See infra*, Section I(B)(5).  Therefore, Meta, like Alibaba, Napster, and Cybernet, which Plaintiff addressed in Section I(B)(5) of this brief, had the legal right to stop or limit the directly infringing conduct on Facebook.

Second, Meta had the practical ability to stop or limit directly infringing conduct.  The practical ability to stop or limit infringement does not require "antecedent prevention." *Keck*, 369, F. Supp. 3d at 937-38.  Rather, Meta must only have "the practical ability to police the infringing

activities of third parties.  *Id.*  The *Keck* court also analyzed this point, concluding that defendant Alibaba had the technology to proactively identify infringing material and that plaintiff repeatedly notified defendant of the infringing material, but that defendant "nonetheless failed to remove the infringing material.  *Id.*  Keck also alleged Alibaba permitted "repeat offenders" to continue to use the site despite knowledge of the offenders' infringing activity.  *Id.*  Here, Meta, like Alibaba, has the technology to proactively identify infringing material but failed to regulate Repeat Infringers. Compl. ¶ 120-121, 123-124.  Thus, Plaintiff, as in *Keck*, sufficiently alleged Meta had the practical ability to stop or limit directly infringing content.  Taken as a whole, Plaintiff has sufficiently alleged Meta's legal right to stop or limit the directly infringing conduct on Facebook, as well as its practical ability to do so.  This satisfies the right and ability to control element of vicarious liability for copyright infringement and the claim should proceed.

### B.    Meta Derives a Direct Financial Benefit from Infringing Activity on Facebook.

Plaintiff has also sufficiently alleged that Meta receives a direct financial benefit from infringing activity on Facebook.  The essential aspect of the "direct financial benefit inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of how substantial the benefit is in proportion to the defendant's overall profits." *Keck*, 369 F. Supp. 3d at 938.  Here, Plaintiff alleges Meta received direct revenue from Counterfeiter Ads and from permitting Repeat Infringers to continue to use the site.  Compl. ¶ 8, 64, 69, 72, 164, 168.  This satisfies the direct financial benefit element of Plaintiff's claim for vicarious copyright infringement.  For these reasons, and those in Sections I(B)(4) & (5) of this brief, Plaintiff sufficiently alleges Meta's vicarious liability for copyright infringement.

### V.    PLAINTIFF ALLEGES META VIOLATED THE VISUAL ARTISTS' RIGHTS ACT (COUNT IV).

Plaintiff has sufficiently alleged Meta violated her right to attribution under VARA by publishing ads that included her images, but not her name.  VARA grants authors the right to be "recognized by name as the author of work" or to prevent use of one's name on any work that has been distorted, mutilated, or modified in a way that would be prejudicial to the author's honor or reputation, and to prevent that distortion in the first instance.  *See Carter v. Helmsley-Spear, Inc.*, 71

F.3d 77, 81 (2d Cir. 1995) ("[Attribution] ensures that artists are correctly identified with the works of art they create.").  These rights are analogous to "moral rights," under the theory that the rights create a climate of artistic worth and honor that encourages authors to create.  *Id.* at 83.

Here, Plaintiff alleged examples of Counterfeiter Ads Facebook published.  Compl. ¶¶ 99, 103.  One alleged example displayed Plaintiff's "Python Image" and stated that the sculpture was "inspired by a serpent mirror created by the jewelry master Rene Lalique." *Id.* ¶¶ 101, 103.  The other examples of Counterfeiter Ads also do not identify Plaintiff as the creator.  *Id.* ¶¶ 99, 103.  This violates Plaintiff's right attribution and Plaintiff has alleged a valid VARA claim.

## VI.   THE COPYRIGHT ACT DOES NOT PREEMPT OR PRECLUDE COUNTS VI, VIII, & IX.

### A.   The Copyright Act Does Not Preclude Plaintiff's Lanham Act Claim.

It is well established that the Copyright Act does not preempt or preclude federal causes of action that protect rights outside the scope of the Copyright Act, even when both claims arise from the same conduct.  *See, e.g., Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1011 (9th Cir. 1994) ("one act" may result in "two wrongs" that violate "both the Copyright Act and the Lanham Act"); *See Williams v. Cavalli, No*. CV 14-06659-AB (JEMx), 2015 WL 1247065, *5 (C.D. Cal. Feb. 12, 2015) ("[A] defendant can simultaneously violate the Lanham Act and copyright law."); *MGA Entm't v. Harris*, CV 20-11548 JVS, 2021 WL 4732923, *6 (C.D. Cal. Aug. 27, 2021) ("[T]he federal Copyright Act does not preempt the federal Lanham Act, or vice versa.") (quoting *Alameda Films S A De C V. Authors Rights Restoration Corp*., 331 F.3d 472, 482 (5th Cir. 2003)) (denying motion to dismiss Lanham Act False Designation of Origin claim).  Here, Plaintiff's Lanham Act claim alleges that Meta's use of the Counterfeiter Ads created the false and deceptive impression that the products listed for sale in those ads were associated with and/or manufactured by Plaintiff. Compl. ¶¶ 99,103,187.  This is "passing off," a specific type of activity that is at the core of the Lanham Act.  *See, e.g.*, *Coats v. Holbrook*, 2 Sand. Ch. 586, 594 (N.Y. 1845) (holding the Lanham Act is grounded in the fundamental principle that "no person has the right to pass off his goods as those of another").  The allegations of "passing off" also distinguish this case from those cited in Defendant's Motion, such as *Dastar*, which addressed "reverse passing off."  *See Williams*, 2015

WL 1247065, at *5 ("Since Chapa alleges passing off, rather than reverse passing off, *Dastar* does not preclude Chapa's Lanham Act claim.").[9]

In *Dastar*, the court expressly distinguished reverse passing off from claims of passing off goods under the name or likeness of the plaintiff:

> If, moreover, the producer of a video that substantially copied the Crusade series were, in advertising or promotion, to give purchasers the impression that the video was quite different from that series, *then one or more of the respondents might have a cause of action . . . for misrepresentation under the 'misrepresents the nature, characteristics [or] qualities' provision of § 43(a)(1)(B). . . .*

539 U.S. at 38 (emphasis added).[10]

The Ninth Circuit and other courts have repeatedly found that "passing off" cases may include parallel Copyright Act and Lanham Act claims. *See, e.g.*, *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1144 (9th Cir. 2008)  ("[I]f the film company had misrepresented, in advertising or promotion, that the contents of the video were significantly different from the series that it copied, it would have a Lanham Act claim for misrepresenting the 'nature, characteristics [or] qualities' of its goods."); *Craigslist Inc.*, 942 F. Supp. 2d at 978 (explaining that "a regular 'passing off' claim–does not raise the 'perpetual patent and copyright' concerns that the Supreme Court identified in *Dastar*, because it relates to Defendants' content.") (citation omitted).  Meta has provided no basis for precluding Plaintiff's Lanham Act claim, and the Court should allow the claim to proceed.

---

[9]  Reverse passing off occurs when a defendant falsely represents that goods or services of another are those of the defendant.  *See Craigslist Inc. v. 3Taps Inc.*, 942 F. Supp. 2d 962, 978 (N.D. Cal. 2013) ("[*Dastar*] involved a 'reverse passing off' claim, an allegation that the seller has 'misrepresent[ed] someone else's goods or services as his own.'") (citing *Dastar Corp v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 27 n.1 (2003)).

[10]  Meta's other cases on this point are also distinguishable.  *Focal Point Films*, *Friedman*, and *Grady* all involved authorship disputes.  *See Focal Point Films, LLC v. Sandhu*, No. 19-cv-02898-JCS, 2019 WL 7020209, at *6, 16 (N.D. Cal. Dec. 20, 2019) (explaining that the gravamen of the plaintiff's claim was the defendant's failure to credit the plaintiff "as his co-author."); *Friedman v. Zimmer*, No. CV 15-502 GHK (Ex), 2015 WL 6164787, at *1 (C.D. Cal. July 10, 2015) ("Plaintiff alleges that the Moving Defendants violated the Lanham Act by misrepresenting the authorship of the Film's score in advertising and promotion for the Film."); *Grady v. Scholastic Inc.*, No. CV 12-07992-GAF (JCGx), 2013 WL 12132199, at *6 (C.D. Cal. Jan. 31, 2013) (plaintiff alleged the defendant had failed to "obtain her consent to use her material" and "to afford her appropriate credit in marketing."). *Sybersound Records, Inc. v. UAV Corp.*, is also inapposite as it addressed the licensing and royalty payment status of the defendant's own goods. 517 F.3d 1137, 1141 (9th Cir. 2008).

**B.      The Copyright Act Does Not Preempt Plaintiff's FDUTPA Claim.**

Similarly, the Copyright Act does not preempt state law claims that protect rights "qualitatively different from copyright rights." *Polar Bear Prod. v. Timex Corp.*, 384 F.3d 700, 721 (9th Cir. 2004); *see also Butler v. Target Corp.*, 323 F. Supp. 2d 1052, 1056 (C.D. Cal. 2004) ("A state cause of action is not preempted if it has an 'extra element' which changes the nature of the action."). "If an extra element is required instead of or in addition to the acts of reproduction, performance, distribution, or display, in order to constitute a state-created cause of action, then the right does not lie within the general scope of copyright and there is no preemption." *Foley v. Luster*, 249 F.3d 1281, 1285 (11th Cir. 2001). That is exactly the case here.

The FDUTPA requires a "deceptive act or unfair practice by defendants." *Ediciones Musicales Y Representaciones Internacionales, S.A. v. Matea San Martin*, 582 F. Supp. 2d 1358, 1361 (S.D. Fla. 2008). Plaintiff alleges Meta used "unfair, unconscionable, and deceptive trade practices, specifically targeted at misleading and confusing consumers" and that users "lured by Facebook ads targeted directly at them, purchase Counterfeit products and receive cheap knockoffs of the advertised product, or nothing at all." Compl. ¶¶ 209-21. Plaintiff's FDUTPA claim therefore involves an additional legal element and seeks to protect rights beyond the scope of the Copyright Act. *See Donald Frederick Evans Assocs., Inc. v. Continental Homes, Inc.*, 785 F.2d 897, 914 (11th Cir. 1986) (explaining that "to prevail on its unfair competition claim under Florida common law, in this case, it must prove elements other than those mandated in an action under the Copyright Act.").[11] The Copyright Act does not preempt Plaintiff's alleged FDUTPA claim.

**C.      The Copyright Act Does Not Preempt Plaintiff's Unjust Enrichment Claim.**

Defendant's Motion ignores the fact that "[u]njust enrichment claims are not categorically preempted by the Copyright Act." *Best Carpet Values, Inc. v. Google LLC*, No. 5:20-cv-04700-EJD,

---

[11] Moreover, none of the authorities Meta cites analyze whether 17 U.S.C. § 301 (setting the scope of federal preemption) preempts a FDUTPA claim. *See Ryan v. Editions Ltd. W. Inc.*, 417 Fed. Appx. 699 (9th Cir. 2011) (analyzing unfair competition based on the California Business Professions Code § 17200); *Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1211 n.1 (9th Cir. 1998) (same); *Media.net Advertising FZ-LLC v. NetSeer, Inc.*, 156 F. Supp. 3d 1052, 1075 (N.D. Cal. 2016) (assessing California UCL claim); *Summit Mach. Tool Mfg. Corp. v. Victor CNC Sys., Inc.*, 7 F.3d 1434, 1440 (9th Cir. 1993) (analyzing California unfair competition claims).

2021 WL 4355337, at * 8 (N.D. Cal. Sep. 24, 2021).  Unlike the Copyright Act, a claim of unjust enrichment requires a showing of: (1) a receipt of a benefit; and (2) unjustified retention of that benefit at another's expense.  *Kantemirov v. Goldine*, No. C05-01362 HRL, 2005 WL 1593533, at *5 (N.D. Cal. June 29, 2005).

Plaintiff alleges, *inter alia*, that Meta retains revenue from Counterfeiter Ads and "continues to earn revenue from Counterfeiters even after it has knowledge that the Counterfeiter is a Repeat Infringer."  Compl. ¶¶ 216-18.  These allegations amount to an unjustified profiting scheme that is "qualitatively different from a copyright claim." *Best Carpet Values, Inc.,* 2021 WL 4355337, at * 8.  An integral component of Plaintiff's unjust enrichment claim is thus "separate and separable" from the Defendant's unauthorized copying and is not preempted by the Copyright Act.  *See O'Brien v. PopSugar Inc.,* No. 18-cv-04405-HSG, 2019 WL 462973, at *3 (N.D. Cal. Feb. 6, 2019) (holding "unjust enrichment claim is separate and separable from the unauthorized used [sic] of Plaintiffs' photographs [and therefore] Plaintiffs' unjust enrichment claim is not preempted by the Copyright Act.").

## VII.   PLAINTIFF AGREES TO DISMISS COUNTS V & VII WITHOUT PREJUDICE.

Plaintiff hereby agrees to dismiss Count V and Count VII without prejudice while maintaining all factual allegations made in direct or indirect relation to either claim.

## VIII.   CONCLUSION

For the reasons set forth above, the Court should deny Meta's Motion to Dismiss Plaintiff's Complaint in its entirety.

Dated: July 25, 2022

Respectfully submitted,

*/s/ Brian C. Gudmundson*
BRIAN C. GUDMUNDSON
brian.gudmundson@zimmreed.com
RACHEL K. TACK
rachel.tack@zimmreed.com
MICHAEL J. LAIRD
michael.laird@zimmreed.com
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, Minnesota 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0400

ARIELLE M. CANEPA
arielle.canepa@zimmreed.com
**ZIMMERMAN REED LLP**
6420 Wilshire Blvd., Suite 1080
Los Angeles, California 90048
Telephone: (877) 500-8780
Facsimile: (877) 500-8781

Jonathan L. Hardt (TX 24039906)
(*pro hac vice* forthcoming)
**ROZIER HARDT MCDONOUGH PLLC**
712 W. 14th Street, Suite C
Austin, Texas 78701
Telephone: (210) 289-7541
hardt@rhmtrial.com

James F. McDonough, III
(*pro hac vice* forthcoming)
Jonathan R. Miller
(*pro hac vice* forthcoming)
Travis E. Lynch (SBN 335684)
**ROZIER HARDT MCDONOUGH PLLC**
3621 Vinings Slope, Suite 4300
Atlanta, Georgia 30339
Telephone: (470) 480-9505
jim@rhmtrial.com
miller@rhmtrial.com
lynch@rhmtrial.com

***Attorneys for Plaintiff***