RANDI W. SINGER (Bar No. 320587)
randi.singer@weil.com
TODD LARSON (admitted *pro hac vice*)
todd.larson@weil.com
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

DAVID R. SINGH (Bar No. 300840)
david.singh@weil.com
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway, 4th Floor
Redwood Shores, CA 94065-1134
Telephone: (650) 802-3000
Facsimile: (650) 802-3100

Attorneys for Defendant,
*Meta Platforms, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| JENNIFER L. COOK, d/b/a JL Cook, JL Cook Sculptor and SNAKEARTS.COM,<br><br>        Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC., f/k/a FACEBOOK, INC.,<br><br>        Defendant. | Case No. 4:22-cv-02485-YGR<br><br>**META PLATFORMS, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS THE COMPLAINT PURSUANT TO FED. R. CIV. 12(B)(6)**<br><br>Date:   September 13 2022<br>Time:  2:00 p.m.<br>Dept.:  Courtroom 1 – 4th Floor<br>Judge:  Honorable Yvonne Gonzalez Rogers |

1

**TABLE OF CONTENTS**

2

**Page**

3   PRELIMINARY STATEMENT ...........................................................................................1

4   ARGUMENT ....................................................................................................................2

5   I.      Plaintiff Fails to Establish that Meta Cannot Avail Itself of the DMCA Safe Harbor .....2

6           A.      Meta Satisfies All the Conditions of 17 U.S.C. § 512(c) to Qualify for the
                   DMCA Safe Harbor .................................................................................2

7                  1.      Plaintiff's Own Allegations Make Clear that the Allegedly
                           Infringing Content was Posted at the Direction of Users, Not
8                          Meta ...........................................................................................2

9                  2.      Plaintiff Fails to Satisfactorily Allege that Meta Has Knowledge
                           of Infringing Content and Did Not Expeditiously Remove It..................4

10                 3.      Plaintiff Fails to Adequately Allege that Meta Earns a Direct
11                         Financial Benefit from and Has the Right and Ability to Control
                           the Allegedly Infringing Content .................................................5

12          B.      Meta Also Satisfies the Eligibility Requirements of 17 U.S.C. § 512(i) .............7

13                 1.      Meta Has a Repeat Infringer Policy and Plaintiff Fails to
                           Sufficiently Allege Any Violations of Court-Endorsed
14                         Reasonable Policies ....................................................................7

15                 2.      Plaintiff Fails to Show that Meta Interferes With Standard
                           Technical Measures ....................................................................8

16          C.      Section 512(m) Is Not a DMCA Requirement and Meta Is Not Required
17                 to Monitor Its Platform for Infringement.........................................................9

18          D.      Plaintiff's Requested Injunctive Relief Is Unavailable and Moot .....................10

19   II.     Plaintiff Fails to Show that Meta Is Directly, Contributorily, or Vicariously Liable for
            the Alleged Copyright Infringement...................................................................................11

20          A.      Meta Is Not Directly Liable for Copyright Infringement ..................................11

21          B.      Meta Is Not Contributorily Liable for Copyright Infringement.........................12

22          C.      Meta Is Not Vicariously Liable for Copyright Infringement..............................12

23   III.    Plaintiff Fails to State a Claim for a Violation of VARA............................................13

     IV.     The Copyright Act Forecloses Plaintiff's Remaining Claims ........................................14

24          A.      The Copyright Act Precludes Plaintiff's Lanham Act Claim ...........................14

25          B.      The Copyright Act Preempts Plaintiff's FDUTPA Claim .................................15

26          C.      The Copyright Act Preempts Plaintiff's Unjust Enrichment Claim ...................15

27   V.      Counts V and VII Should Be Dismissed with Prejudice ..............................................15

     CONCLUSION.....................................................................................................................15

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1-800 Contacts, Inc. v. Lens.com, Inc.*,
    722 F.3d 1229 (10th Cir. 2013) ................................................................. 12

*A&M Recs., Inc. v. Napster, Inc.*,
    239 F.3d 1004 (9th Cir. 2001) ...........................................................*passim*

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................ 8

*Atari Interactive, Inc. v. Redbubble, Inc.*
    515 F. Supp. 3d 1089 (N.D. Cal 2021) ........................................ 6, 7, 12

*Best Carpet Values, Inc. v. Google LLC*
    No. 20-cv-04700-EJD, 2021 WL 4355337 (N.D. Cal. Sept. 24, 2021)........................... 15

*Capitol Records, LLC v. Vimeo, LLC*,
    972 F. Supp. 2d 500 (S.D.N.Y. 2013)........................................... 4, 8

*Carter v. Helmsley-Spear, Inc.*,
    71 F.3d 77 (2d Cir. 1995)................................................................ 13

*Coach, Inc. v. Goodfellow*,
    717 F.3d 498 (6th Cir. 2013) ......................................................... 12

*Columbia Pictures Indus., Inc. v. Fung*,
    710 F.3d 1020 (9th Cir. 2013) ................................................. 2, 5, 13

*Corbis Corp. v. Amazon.com, Inc.*,
    351 F. Supp. 2d 1090 (W.D. Wash. 2004)....................................... 7

*Craigslist Inc. v. 3Taps Inc.*
    942 F. Supp. 2d 962 (N.D. Cal. 2013) ............................................. 14

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
    539 U.S. 23 (2003).......................................................................... 14

*Davis v. Pinterest, Inc.*,
    No. 19-cv-07650-HSG, 2022 WL 1316566 (N.D. Cal. May 3, 2022) ............................... 3

*Donald Frederick Evans & Assocs., Inc. v. Cont'l Homes, Inc.*,
    785 F.2d 897 (11th Cir. 1986) ....................................................... 15

*Downs v. Oath Inc.*,
    385 F. Supp. 3d 298 (S.D.N.Y. 2019)............................................. 3

*Ellison v. Robertson*,
   357 F.3d 1072 (9th Cir. 2004) ................................................................................................ 2

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,
   844 F.3d 79 (2d Cir. 2016)...................................................................................................... 8

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000)............................................................................................................... 10

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
   76 F.3d 259 (9th Cir. 1996) ..................................................................................................... 2

*Harrison v. Facebook, Inc.*,
   No. C 19-01547 JSW, 2019 WL 11343562 (N.D. Cal. July 2, 2019) ............................. 12

*Hunley v. Instagram, LLC*,
   No. 21-CV-03778-CRB, 2022 WL 298570 (N.D. Cal. Feb. 1, 2022) ................................ 2

*Io Grp. Inc. v. Veoh Networks, Inc.*,
   586 F. Supp. 2d 1132 (N.D. Cal. 2008) ................................................................................ 4

*Keck v. Alibaba.com Hong Kong Ltd.*,
   369 F. Supp. 3d 932 (N.D. Cal. 2019) ........................................................................ 2, 6, 13

*Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*,
   658 F.3d 936 (9th Cir. 2011) ............................................................................................ 2, 12

*Luxottica Grp., S.p.A. v. Airport Mini Mall, LLC*,
   932 F.3d 1303 (11th Cir. 2019) ............................................................................................ 12

*Mavrix Photographs, LLC v. Livejournal, Inc.*
   873 F.3d 1045 (9th Cir. 2017) ..................................................................................... 3, 4, 5, 6

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
   545 U.S. 913 (2005)............................................................................................................ 2, 12

*O'Brien v. PopSugar Inc.*
   No. 18-cv-04405-HSG, 2019 WL 462973 (N.D. Cal. Feb. 6, 2019)................................ 15

*Olem Shoe Corp. v. Wash. Shoe Co.*,
   No. 09-23494-CIV, 2011 WL 6202282 (S.D. Fla. Dec. 1, 2011)..................................... 15

*Pegasus Imaging Corp. v. Northrop Grumman Corp.*,
   No. 07-CV-1937-T-27EAJ, 2008 WL 5099691 (M.D. Fla. Nov. 25, 2008) .................... 15

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
   213 F. Supp. 2d 1146 (C.D. Cal. 2002) ......................................................................... 5, 6, 10

*Perfect 10, Inc. v. Giganews, Inc.*,
   847 F.3d 657 (9th Cir. 2017) ................................................................................................. 13

*Perfect 10, Inc. v. Visa Int'l Serv., Ass'n,*
    494 F.3d 788 (9th Cir. 2007) ......................................................... 13

*Rosen v. eBay, Inc.*
    No. CV 16-9183-MWF (Ex), 2018 WL 4802101 (C.D. Cal. Jan. 24, 2018) ..................................... 7

*Rosetta Stone Ltd. v. Google, Inc.,*
    676 F.3d 144 (4th Cir. 2012) ......................................................... 12

*Sid Avery and Assocs., Inc. v. Pixels.com, LLC,*
    479 F. Supp. 3d 859 (C.D. Cal. 2020) .................................... 11, 12

*Silberman v. Innovation Luggage, Inc.,*
    No. 01 Civ. 7109 (GEL), 2003 WL 1787123 (S.D.N.Y. Apr. 3, 2003) ......................................... 14

*Sybersound Records, Inc. v. UAV Corp.,*
    517 F.3d 1137 (9th Cir. 2008) ...................................................... 14

*UMG Recordings, Inc. v. Shelter Cap. Partners LLC,*
    718 F. 3d 1006 (9th Cir. 2013) ................................................ 3, 6, 9

*Ventura Content, Ltd. v. Motherless, Inc.,*
    885 F.3d 597 (9th Cir. 2018) ......................................................... 3, 7

*Viacom Int'l, Inc. v. YouTube, Inc.,*
    676 F.3d 19 (2d Cir. 2012)............................................................... 9

*Williams v. Cavalli S.p.A.*
    No. CV 14-06659-AB (JeMx), 2015 WL 1247065 (C.D. Cal. Feb. 12, 2015) ............................. 14

*Wolk v. Kodak Imaging Network, Inc.*
    840 F. Supp. 2d 724 (S.D.N.Y. 2012)........................................ 9, 11

*Wolk v. Kodak Imaging Network, Inc.,*
    No. 10 Civ. 4135(RWS), 2011 WL 940056 (S.D.N.Y. Mar. 17, 2011) .......................................... 10

**Statutes**

17 U.S.C. § 106....................................................................................... 15

17 U.S.C. § 512.................................................................................*passim*

**Other Authorities**

4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12B.02[B][3][a]
    (2022)............................................................................................... 8

## PRELIMINARY STATEMENT

Meta's opening brief demonstrated it operates a notice-and-takedown system that, even taking the Complaint at its word, worked precisely as it was supposed to under the Digital Millennium Copyright Act ("DMCA").  Plaintiff's opposition struggles to salvage the Complaint through a series of legal misinterpretations, including that the DMCA requires Meta to terminate entire accounts immediately once Plaintiff identifies any piece of infringing content (it doesn't); dictates how "strikes" must be counted (it doesn't); and requires Meta to prevent anyone from uploading reported content ever again (again, it doesn't).  Plaintiff also suggests Meta's role in enforcing its terms of service and displaying advertiser-selected images to users—something online platforms do regularly—disqualifies Meta from safe-harbor protection. Each of these contentions is wrong under the plain language of the DMCA and case law interpreting it.  Copyright law balances the obligations of online platforms and rights owners, providing that copyright owners are the ones who must identify infringements of their works on online platforms.  Plaintiff's opposition contravenes this well-established law and seeks to shift her obligations to Meta by, among other shortcomings, repeatedly relying on non-DMCA cases such as *Napster* and legally irrelevant trademark cases.  And she fails (as does the Complaint) to identify any user that transgressed the limits consistently accepted as reasonable under DMCA case law.

Plaintiff's claims suffer from fatal pleading defects that her opposition does not save.  The direct infringement claim fails because the Complaint is devoid of allegations that Meta (as opposed to third-party users) posted the allegedly infringing content or acted on it in any way not directed by the users who chose to post it.  Her contributory infringement claim fails because the allegations make clear that Meta removed allegedly infringing content when it was reported. And Plaintiff fails to identify a sufficiently direct financial benefit Meta earned from infringing content it had the right and ability to control, as required for vicarious infringement.  Plaintiff's VARA claim is inapplicable in cases like this that involve digital reproductions.  Three other claims (false designation of origin, Florida Deceptive and Unfair Trade Practices Act, and unjust enrichment) duplicate and are thus are preempted or precluded by the copyright infringement claims.  Plaintiff also withdrew her DMCA and injunctive relief claims without even trying to defend them, an acknowledgement they were legally insufficient.  Plaintiff's Complaint should be dismissed in its entirety with prejudice.

1

## <u>ARGUMENT</u>

2
3
4
5
6
7
8
9
10

As a threshold matter, in its opening brief, Meta explained that including class allegations does not save the Complaint from dismissal under Rule 12.  Dkt. 24 ("Mot.") 5-6.  Meta did not, as Plaintiff erroneously argues, proclaim that *no* copyright class action can proceed.  Dkt. 28 ("Opp.") 5.  Meta's point is much simpler: an otherwise deficient claim cannot proceed just because it contains a class allegation.  *See, e.g.*, *Hunley v. Instagram, LLC*, No. 21-CV-03778-CRB, 2022 WL 298570, at *1-2 (N.D. Cal. Feb. 1, 2022) (dismissing purported class action where named plaintiff failed to state a claim). The sole copyright class action Plaintiff cites that advanced past the motion to dismiss stage did so because the underlying claims were properly pled, not because it was a class action.[1]  *See Keck v. Alibaba.com Hong Kong Ltd.*, 369 F. Supp. 3d 932, 935 (N.D. Cal. 2019).

11
12

## I.    PLAINTIFF FAILS TO ESTABLISH THAT META CANNOT AVAIL ITSELF OF THE DMCA SAFE HARBOR

13
14
15
16

Meta's opening brief showed the DMCA safe harbor shields Meta from copyright infringement claims for content third parties post on its platform.  *See* Mot. 5-13, 17 U.S.C. § 512(c).  Plaintiff does not dispute that Meta qualifies as a "service provider" under the DMCA, *see* Opp. 1, and her challenges to the other DMCA safe harbor protection prerequisites fail as a matter of law.

17
18

### A.    Meta Satisfies All the Conditions of 17 U.S.C. § 512(c) to Qualify for the DMCA Safe Harbor

19

#### 1.    Plaintiff's Own Allegations Make Clear that the Allegedly Infringing Content was Posted at the Direction of Users, Not Meta

20
21
22
23
24

The DMCA applies to the storage of content on a platform "at the direction of [the] user[s]."  17 U.S.C. § 512(c)(1).  The Complaint, at its core, is rooted in exactly that: the "storage of infringing images on [Meta's] computers or systems," Compl. ¶ 22, that are "locate[d]" and "st[olen]" by third-party users from Plaintiff's website, *id.* ¶ 58, and then "used . . . in Counterfeiter Ads on Facebook," *id.* ¶ 96.  Plaintiff's assertion that Meta did not "merely" store the infringing material at the direction of users

25

26
27
28

[1] Only two of the cases Plaintiff cites in this context actually were class actions—*Keck* and *Grokster*. The rest did not involve class claims.  *See A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001); *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005); *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020 (9th Cir. 2013); *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936 (9th Cir. 2011); *Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004); *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996).

because it "played a significant role in displaying and distributing infringing content" by prescreening the ads, targeting them at consumers based on their interests, and using human review for technical specifications and legality, Opp. 10-11, is wrong as a matter of law.

All online platforms display user-uploaded content to their users; this is what websites do.  If mere display to other users were enough to lose the DMCA safe harbor, the safe harbor would be completely illusory and every online platform would be an infringer.  *See UMG Recordings, Inc. v. Shelter Cap. Partners LLC*, 718 F. 3d 1006, 1017-18 (9th Cir. 2013) ("By its terms, § 512(c) presupposes that service providers will provide access to users' stored material, and we would thus contravene the statute if we held that such access disqualified Veoh from the safe harbor.").  Nor does basic review of user-uploaded content or using automated algorithms to target it to those likely to find it useful disqualify platforms from safe harbor protection.  Courts have held that "access-facilitating processes" such as Meta's algorithmic targeting of content to other users and its approval of the text to photo ratio and legality do *not* mean the content is posted at the direction of the platform rather than the user.  *See, e.g.*, *Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 605 (9th Cir. 2018) (finding that storage was at the direction of the user for a website that screened out illegal content and applied search tags to uploads); *Davis v. Pinterest, Inc.*, No. 19-cv-07650-HSG, 2022 WL 1316566, at *13-15 (N.D. Cal. May 3, 2022) (DMCA applied where website optimized image load speed and displayed images using algorithms based on user preferences); *Shelter Cap.*, 718 F.3d at 1016 (DMCA applied where website was breaking up the files for faster viewing and converting them to a Flash format); *Downs v. Oath Inc.*, 385 F. Supp. 3d 298, 305 (S.D.N.Y. 2019) (review and addition of content tags allowed under DMCA).

In support of her incorrect proposition that Meta's role in distributing the allegedly infringing content is safe-harbor-disqualifying, Plaintiff cites only *Mavrix Photographs, LLC v. Livejournal, Inc.*, which held "extensive, manual, and substantive activities" may mean content is not stored at the direction of the user for purposes of § 512(c).  873 F.3d 1045, 1056 (9th Cir. 2017).  In *Mavrix*, moderators reviewed "the substance of posts," and "only those posts relevant to new and exciting celebrity gossip [were] approved." *Id.*  In contrast, the only review alleged here is "for aesthetics (i.e., the text to photo ratio) and, in some cases, legality"—*i.e.*, ensuring basic compliance with Meta's technical requirements and terms of service.  Compl. ¶ 87.  That falls far short of the active substantive screening in *Mavrix*,

where the defendant rejected two-thirds of submitted content and effectively decided for itself, as an editorial matter, what content would be on its website.  873 F.3d at 1056.  The level of Meta's alleged involvement here ("automatically show[ing] ads to people who are most likely to find the ads relevant," Compl. ¶¶ 81-83, 87, 89), has been accepted by the Ninth Circuit and does not make Meta (versus its users) "responsible for the presence of the infringing content" as alleged.  *Id.* ¶ 196.

### 2.   Plaintiff Fails to Satisfactorily Allege that Meta Has Knowledge of Infringing Content and Did Not Expeditiously Remove It

As discussed in Meta's opening brief, Plaintiff fails to allege that Meta did not take down any allegedly infringing content once Plaintiff reported it to Meta.  *See* Mot. 7-8; Compl. ¶¶ 113-18.  Plaintiff tries to save the claim by asserting that "Meta did not meaningfully respond to any of Plaintiff's notices," Opp. 12, but the Complaint concedes that Meta removed all the reported content, in some cases in "less than two hours," Compl. ¶ 113-18, which is far less than what courts have held is expeditious, *see Io Grp. Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1150 (N.D. Cal. 2008) (a few days); *Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 500, 535-36 (S.D.N.Y. 2013) (three and a half weeks).  Indeed, the Complaint fails to allege a single instance when Meta did not expeditiously remove specific reported content under accepted standards, focusing instead on instances of the images appearing in *different* ads placed by the reported accounts, or in ads placed by other parties altogether, without any allegation that Plaintiff ever reported these other infringements.  *See, e.g.,* Compl. ¶ 113 (conceding noticed ads were removed, and the content "reappeared" in *other* ads with the same images); *id.* ¶ 116 (noticed ads removed within two hours but "more ads popped up" later).

Plaintiff's opposition doubles down on this mistake, continuing to conflate infringing *content* and infringing *accounts*—i.e., Plaintiff argues that failure to terminate the account of an alleged infringer equates to failure to expeditiously remove infringing content.  *See* Opp. 11 ("[A]s of the date of the Complaint, those accounts were still active Facebook accounts.").  As Meta explained in its opening brief, the DMCA requires that Meta remove infringing *content* upon learning of it, not the *account* that posted it.  *See* Mot. 7-8.  The law requires Meta to disable the account only if it qualifies as a repeat infringer under Meta's policy, which (as noted below) Plaintiff fails to properly allege.  *See infra* I.B.1.

Plaintiff's argument that Meta has "apparent" knowledge of any future infringement once it

receives the first report, Opp. 11, fails for similar reasons.  For knowledge sufficient to defeat the safe harbor, a service provider must be aware of facts that made the *specific* infringing content immediately obvious to a non-expert.  *Mavrix*, 873 F.3d at 1057.  Plaintiff does not plausibly allege Meta knew of specific infringements before they were reported; instead, Plaintiff incorrectly asserts Meta should have known about infringing ads because she had previously reported the infringing *account,* or other infringing ads, using the same image, and Meta was thus required to "regulate" the reported parties and images to prevent future infringement.  Compl. ¶¶ 118, 120-21; Opp. 11.  But that is not how the law works.  As explained in depth below, the DMCA explicitly states Meta is not required to affirmatively seek out infringement or otherwise monitor its Facebook platform.  17 U.S.C. § 512(m)(1); *see infra* I.C.

### 3.   Plaintiff Fails to Adequately Allege that Meta Earns a Direct Financial Benefit from and Has the Right and Ability to Control the Allegedly Infringing Content

Meta's opening brief explained why any alleged benefit from infringing content is insufficient to defeat the DMCA safe harbor: because Meta profits from advertising generally and not from infringing content specifically.  *See* Mot. 9-10; Compl. ¶¶ 4, 15 (admitting that Meta receives income from all advertisements, not just infringing ones); *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1181 (C.D. Cal. 2002) (quoting the legislative history of 17 U.S.C. § 512, which states, "In general, a service provider conducting a legitimate business would not be considered to receive a 'financial benefit directly attributable to the infringing activity' where the infringer makes the same kind of payment as non-infringing users of the provider's service.").

The two cases Plaintiff cites in opposition highlight this very distinction and thus cut directly against her argument.  In those cases, the service providers were engaged in rampant inducement of infringement or profited almost exclusively from infringement.  *See Fung*, 710 F.3d at 1044-45 (holding the "vast amount" of infringement suggested that revenue stemmed from this infringement); *Cybernet*, 213 F. Supp. 2d at 1173 (finding "the fortunes of [infringing] sites and Cybernet are sufficiently tied to create the requisite direct financial benefit").  Plaintiff fails to allege any such nefarious behavior or fundamental reliance on infringement by Meta, contending only that it makes money from the infringing ads no different than any other ads.  *See, e.g.*, Compl. ¶ 168.

Plaintiff also fails to properly allege that Meta has the requisite "right and ability to control"

infringement that would jeopardize the DMCA safe harbor.  First, she wrongly defines such control as the mere ability to block user accounts and content, *see* Compl. ¶¶ 164-65, relying on two non-DMCA cases—*Napster*, 239 F.3d at 1004, and *Keck*, 369 F. Supp. 3d at 936—that addressed vicarious infringement claims, Opp. 13-14.  It is well established in the Ninth Circuit that right and ability to control under the DMCA is a different standard and requires "something more" than the mere "ability to remove or block access to materials posted on a service provider's website."  *Mavrix*, 873 F.3d at 1059.  As discussed in Meta's opening brief, that means the service provider must exercise a "substantial influence on the activities of users."  *See* Mot. 8-9; *see also Shelter Cap.*, 718 F.3d at 1030.  Plaintiff argues that she alleged a "substantial influence" in paragraphs 4 and 87 of the Complaint, Opp. 14, but those paragraphs merely contain unsupported and conclusory allegations that Facebook uses "algorithms that approve and deny ads based on the ads' content, human moderators that further review ads, for both legality and aesthetics prior to and after the ads are published, and other algorithms that connect ads to specifics users, without the assistance or input of the advertiser," Compl. ¶ 4.  Elsewhere, however, Plaintiff concedes the advertiser has considerable input and "selects the objective," "selects an audience," "decide[s] where to run the ad," and "set[s] up a budget."  *Id.* ¶ 83.  And in any event, using algorithms, or even some human review, to ensure the proper "text to photo ratio" or compliance with legal requirements in Meta's terms, *id.* ¶ 87, does not as a matter of law constitute the requisite "substantial influence" over which content users create and post to Facebook, *Mavrix*, 873 F.3d at 1058-59.  Rather, these facts merely reflect Meta's legally insufficient ability to remove user-selected content or block access to Meta's service, as well as Meta's algorithmic targeting of content to other users, which courts have never considered relevant to the service's ability to control infringing content.

Plaintiff's quoted language from *Cybernet* is unavailing.  The defendant there shaped and curated user content to an extreme degree, far beyond the mere algorithmic display to others alleged here.  213 F. Supp. 2d at 1173, 1182 (explaining that Cybernet "prescreen[ed] sites, g[ave] them extensive advice, prohibit[ed] the proliferation of identical sites," and provided "detailed instructions regard[ing] issues of layout, appearance, and content'").  *Atari Interactive, Inc. v. Redbubble, Inc.*, is also inapposite, both because Plaintiff cites to a discussion of trademark infringement and because the right and ability to control is discussed in the context of the vicarious liability standard, not the DMCA standard.  *See* 515

F. Supp. 3d 1089, 1115 (N.D. Cal. 2021); *see also* Opp. 15 (citing 515 F. Supp. 3d at 1106).

**B.    Meta Also Satisfies the Eligibility Requirements of 17 U.S.C. § 512(i)**

**1.    Meta Has a Repeat Infringer Policy and Plaintiff Fails to Sufficiently Allege Any Violations of Court-Endorsed Reasonable Policies**

The Complaint explicitly acknowledges that Meta has a repeat infringer policy and that it informs the public of this policy, as the DMCA requires.  Compl. ¶¶ 54, 200 (quoting the repeat infringer policy). Plaintiff's opposition seeks to impose additional requirements not found in the law, asserting in particular that Meta does not inform its users of the specific aspects of the policy.  Opp. 7.  But the Ninth Circuit has squarely rejected such attempts, holding the DMCA does not require "that the policy details must be written, just that the site must inform subscribers of 'a policy' of terminating repeat infringers in appropriate circumstances." *Ventura Content*, 885 F.3d at 615-16; *see also Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1102 (W.D. Wash. 2004) ("The statute does not suggest what criteria should be considered by a service provider, much less require the service provider to reveal its decision-making criteria to the user.").  Plaintiff's attempts to distinguish the cases cited in Meta's opening brief as only endorsing three-strike policies where they are express, or following discovery, are unavailing; *Rosen v. eBay, Inc.*, for example, approved such a policy as reasonable on a motion to dismiss, and the policy did not include express language about three strikes.  *See* No. CV 16-9183-MWF (Ex), 2018 WL 4802101, at *3, 6 (C.D. Cal. Jan. 24, 2018).

Plaintiff asks the Court to find that Meta did not reasonably implement its repeat infringer policy because it did not terminate third-party accounts after a single reported infringement—a "one strike" policy no court has ever mandated. *Id.* ¶¶ 23, 45, 122.  Plaintiff also asks the Court to ignore as irrelevant case law addressing three-strike policies because Meta's public policy does not specify three strikes. Opp. 7-8, Compl. ¶ 200.  But that is not what matters.  A close reading of the allegations shows that Plaintiff has not alleged any instances where a single Facebook account violated the three-strike limit that courts have blessed as reasonable, whether an explicit aspect of Meta's policy or not. *See* Compl. ¶¶ 111, 114, 117.  Plaintiff does not—and cannot—cite any cases saying that challenges to the specifics of a repeat infringer policy automatically entitle a plaintiff to proceed to discovery.

Plaintiff's opposition makes clear that her only other challenge to the reasonable implementation

of Meta's repeat infringer policy misconstrues what constitutes a strike under copyright law.  Plaintiff repeatedly refers to the number of allegedly infringing *posts* that were reported, *see* Opp. 9, but as Meta explained, courts have found policies in which a strike refers to a separate reporting event, not the number of pieces of infringing content in each report, to be reasonable, *see* Mot. 11-12.  Courts have also held it is reasonable for service providers to treat multiple notices received even within a few days of each other as a single strike because the goal is to punish those who show repeated infringing activity over time, not those who infringe on one or two occasions and then correct their behavior.  *See EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 90 (2d Cir. 2016) ("[A] 'repeat infringer' requirement is meant to deter those 'who repeatedly <u>or</u> flagrantly abuse their access to the Internet through disrespect for the intellectual property rights of others.'" (quoting S. Rep. 105–190, at 52 (1998)); *see also, e.g.*, *Vimeo*, 972 F. Supp. 2d at 516 (counting all reports within three days as a single strike).  If each infringement reported within a limited period was required to be treated as an individual strike, intellectual property owners would essentially have the power to immediately terminate the accounts of any user who made a mistake.

Plaintiff cannot save her claim with rank speculation that other copyright owners *may* have submitted takedown notices against the same accounts she reported, potentially increasing the strike count above acceptable levels.  Compl. ¶¶ 62, 103, 123-24.  This blatant speculation is exactly what is foreclosed by the federal plausibility standard for pleadings.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged . . . [I]t asks for more than a sheer possibility that a defendant has acted unlawfully." (citation omitted)).

### 2.     Plaintiff Fails to Show that Meta Interferes With Standard Technical Measures

Plaintiff's assertion that Meta has interfered with standard technical measures relies on conclusory allegations that third-parties "or Facebook" removed watermarks from the images that third-party advertisers chose to use in the ads.  Compl. ¶ 31; Opp. 9.  Conspicuously absent is any legal support for the proposition that watermarks have been adopted as a standard technical measure. They have not. *See* 17 U.S.C. § 512(i)(2)(A); *see also* 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*

§ 12B.02[B][3][a] (2022) ("Even as of many years after enactment of the Online Copyright Infringement Liability Limitation Act, it is unclear whether there is any such thing as 'standard technical measures.'"). Even if watermarks did qualify as a standard technical measure, there is no plausible allegation that Meta offers software that removes watermarks or that *Meta* is removing watermarks from the images at issue. Indeed, as Plaintiff admits elsewhere, the allegedly watermark-less images are uploaded directly to the Facebook platform by the *users* who allegedly pilfer them from her website.  *See* Compl. ¶¶ 31, 58-64, 96, 101-04, 109.  The lone case Plaintiff cites to support her argument, *Wolk v. Kodak Imaging Network, Inc.*, held that even though the defendant's photo-editing software allowed users to remove watermarks (and Plaintiff does not even allege that Meta offers such technology), "it is not [the defendant], but rather users, who would use the editing tools to attempt to circumvent copyright protection measures," so the defendant had in fact accommodated watermarks when present.  840 F. Supp. 2d 724, 745 (S.D.N.Y. 2012).

## C.     Section 512(m) Is Not a DMCA Requirement and Meta Is Not Required to Monitor Its Platform for Infringement

Plaintiff mistakenly refers to § 512(m) as an affirmative obligation to monitor Facebook "to the fullest extent" and contends that Meta must find any and all infringement related to Plaintiff's copyrighted works.  Opp. 16.  But as Meta has explained, that is exactly backwards: § 512(m) clarifies that the DMCA does *not* require Meta to "monitor[] its service or affirmatively seek[] facts indicating infringing activity."  17 U.S.C. § 512(m)(1); *see also* Mot. 12.  Contrary to Plaintiff's assertions, Meta has no duty to affirmatively monitor Facebook's billions of pieces of content for the needle in the haystack that may infringe the artwork of one artist.  *See Shelter Cap.*, 718 F.3d at 1029 (holding that "§ 512(m) provides that § 512(c)'s safe harbor protection may not be conditioned on 'a service provider monitoring its service or affirmatively seeking facts indicating infringing activity'").  Plaintiff's attempt to invoke "willful blindness" cannot get around the plain language of § 512(m) and the cases interpreting it: "§ 512(m) is incompatible with a broad common law duty to monitor or otherwise seek out infringing activity based on general awareness that infringement may be occurring."  *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 35 (2d Cir. 2012).  Nor does § 512(m) evaporate, as Plaintiff now contends, if Meta "reserves a right to police its site" and then does not police it to the "fullest extent."  Opp. 16.  The only

1    case Plaintiff cites for this proposition is *Napster*, which, again, did not address the DMCA—much less

2    section 512(m))—and instead discussed the ability of Napster (which did not enjoy DMCA protection)

3    to terminate infringing accounts under the vicarious liability standard.  239 F.3d at 1023.

4          **D.      Plaintiff's Requested Injunctive Relief Is Unavailable and Moot**

5          Plaintiff asserts that because she seeks injunctive relief, the DMCA does not bar her copyright

6    infringement claims.  Opp. 10, 15.  The only case Plaintiff cites to support her request is *Cybernet*, which

7    does not address the § 512(j) framework for injunctions under the DMCA and involved trademark

8    infringement and other claims that permitted an altogether different type of injunction.  213 F. Supp. 2d

9    at 1152, 1165, 1174.  And courts have rejected this argument for reasons that apply equally here.  The

10   DMCA only provides three options for an injunction: (i) to "restrain[] the service provider from

11   providing access to infringing material or activity residing at a particular online site"; (ii) to "restrain[]

12   the service provider from providing access to a subscriber or account holder of the service provider's

13   system or network who is engaging in infringing activity"; or (iii) to provide "[s]uch other injunctive

14   relief as the court may-consider necessary to prevent or restrain infringement of copyrighted material

15   specified in the order of the court at a particular online location."  17 U.S.C. § 512(j)(1)(A).  Plaintiff

16   fails to identify any specific reported infringement that is still up on Facebook, foreclosing the first and

17   third options.  *See* Compl. ¶¶ 111-18.  Plaintiff also fails to allege any specific third-party account holder

18   on Facebook who is still infringing her copyrights, foreclosing the second option.  *See id.*

19         The only injunctive relief Plaintiff presumptively might seek would be to force Meta to disable

20   the accounts of prior infringers, but that would be completely at odds with the DMCA's repeat infringer

21   policy requirement (of which Plaintiff fails to show any account in violation) and would effectively

22   mandate a one-strike policy that the DMCA does not contemplate.  *See* 17 U.S.C. § 512(i)(1)(A); *FDA*

23   *v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("A court must ... interpret the statute

24   as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious

25   whole." (citations omitted)).  To the extent Plaintiff seeks some more general injunction against Meta

26   that would prevent it from hosting any content that infringes Plaintiff's copyrights, that too is at odds

27   with the statute (§ 512(c) and 512(m) in particular) and outside what § 512(j) permits.  *See, e.g.*, *Wolk v.*

28   *Kodak Imaging Network, Inc.*, No. 10 Civ. 4135(RWS), 2011 WL 940056, at *8 (S.D.N.Y. Mar. 17,

1    2011) ("Plaintiff's argument is that she need not provide specific online locations for infringements of

2    her copyrights. Rather, Photobucket is to search for infringing activity itself, a task which both parties

3    acknowledge to be burdensome. The injunctive relief Plaintiff seeks does not comport to §

4    512(j)(1)(A)(iii)."). In short, because Plaintiff fails to identify any specific infringing material remaining

5    on Facebook or any repeat infringer whose Facebook account should have been terminated but was not,

6    Plaintiff's injunctive relief claim under § 512(j) is moot.

7
     ## II.    PLAINTIFF FAILS TO SHOW THAT META IS DIRECTLY, CONTRIBUTORILY, OR
8    VICARIOUSLY LIABLE FOR THE ALLEGED COPYRIGHT INFRINGEMENT

9            Even if Meta were not able to avail itself of the DMCA safe harbor in this case (and it can), that

10   does not mean that Meta is automatically liable for copyright infringement. 17 U.S.C. § 512(l).

11           ### A.    Meta Is Not Directly Liable for Copyright Infringement

12           Meta's opening brief explained Meta is not directly liable for the user-generated content at issue

13   because it does not engage in the requisite volitional conduct. Mot. 13-14. Plaintiff's opposition relies

14   entirely upon a wholly inapposite case involving a print-on-demand website that offered customers the

15   opportunity to purchase merchandise offered by third-party contributors. Opp. 17 (citing *Sid Avery and*

16   *Assocs., Inc. v. Pixels.com, LLC*, 479 F. Supp. 3d 859, 862-63 (C.D. Cal. 2020)). The court held there

17   was no volitional conduct by Pixels with respect to the infringing images available to be printed because

18   it did not select or upload the images to its website, even though it did review the images for pornographic

19   content, because "this kind of screening does not establish control over user content." *Id.* at 866 (citing

20   *Ventura Content*, 885 F.3d at 613). The court denied summary judgment only because there were factual

21   issues about "whether Pixels' subsequent role in marketing, manufacturing, and distributing infringing

22   *products*"—not the advertising images—"involves 'volitional' conduct." *Id.* (emphasis added). This

23   reasoning is inapplicable here because Meta does not, even by allegation, "manufacture" or "distribute"

24   any infringing products; it merely hosts images uploaded by the sellers, who offer the products on

25   completely unrelated websites. Meta is thus more akin to the passive service provider in *Wolk*, where

26   the "reproduction, display, or transmission of the Plaintiff's images by or through the [defendant's]

27   website [was] an automated process with no human intervention by any employee of [defendant]." 840

28   F. Supp. 2d at 742; *see also* Compl. ¶ 81 (asserting that Meta will "automatically show ads to people").

It is well established in this court that Facebook is a platform on which third party users post all kinds of content and Meta is "a passive host to [that] content." *Harrison v. Facebook, Inc.*, No. C 19-01547 JSW, 2019 WL 11343562, at *2 (N.D. Cal. July 2, 2019). As explained above, Meta's only alleged role with advertising images comes *after* selection by the advertiser, and is merely to screen it for basic requirements like text-to-photo ratio and legality and then automatically display it to target audiences. *See supra* I.A.1; *see also* Compl. ¶¶ 81-87. The *Pixels* court explicitly foreclosed such technical or legal review by a service provider constituting volition. 479 F. Supp. 3d at 866.

### B.    Meta Is Not Contributorily Liable for Copyright Infringement

Plaintiff also fails to properly allege that Meta is contributorily liable for copyright infringement. Plaintiff concedes that Meta did not induce the alleged infringement and does not dispute that Meta's advertising tool has substantial noninfringing uses. Opp. 19-20. Thus, as a matter of law, the tool cannot be used to impute knowledge of specific infringement carried out with the tool. Mot. 15. In her opposition, Plaintiff tries to salvage the claim by citing various inapposite cases involving contributory trademark infringement, articulates an incorrect standard for contributory copyright infringement, and then argues she has sufficiently alleged facts to meet this incorrect standard. *See* Opp. 18-19.[2] The only copyright case Plaintiff cites is *Grokster*, which involved file-sharing software that induced infringement, but is inapplicable here because Plaintiff already conceded Meta did not induce infringement. 545 U.S. at 934-35; Opp. 18-20. And as stated in Meta's opening brief, Plaintiff fails to allege that a single specifically reported piece of allegedly infringing content is still available on Facebook. *See* Compl. ¶¶ 111-18; *see also* Mot. 14-15.

### C.    Meta Is Not Vicariously Liable for Copyright Infringement

Meta's opening brief set forth the standard for vicarious copyright infringement, noting that Plaintiff would have had to establish that Meta both retains a direct financial benefit from the alleged

---

[2] *Akanoc*, 658 F.3d at 942 ("To prevail on its claim of contributory trademark infringement. . ."); *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 163-65 (4th Cir. 2012) (challenging "summary judgment in favor of Google on the contributory trademark infringement claim."); *Luxottica Grp., S.p.A. v. Airport Mini Mall, LLC*, 932 F.3d 1303, 1314 (11th Cir. 2019) ("The defendants articulate *Tiffany*'s legal standard for contributory trademark infringement . . ."); *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1252-54 (10th Cir. 2013) ("Accordingly, we focus only on those principles without deciding whether the ads themselves directly infringed 1–800's mark."); *Coach, Inc. v. Goodfellow*, 717 F.3d 498, 504-05 (6th Cir. 2013) ("[S]upport a finding of contributory liability under *Inwood*"); *Atari*, 515 F. Supp. 3d at 1108 ("A service provider contributorily infringes a trademark when . . .").

1  infringement and has the right and ability to control it.  *See* Mot. 16.  A direct "[f]inancial benefit exists

2  where the availability of infringing material acts as a draw for customers."  *Perfect 10, Inc. v. Giganews,*

3  *Inc.*, 847 F.3d 657, 673 (9th Cir. 2017).  Meta is far from the vicariously liable platforms in *Fung* and

4  *Napster*, which were essentially designed to attract users by sharing infringing content.  *See Fung*, 710

5  F.3d at 1035 ("Fung offered his services with the object of promoting their use to infringe copyrighted

6  material."); *Napster*, 239 F.3d at 1023 (concluding that Napster's infringing material acted as a draw for

7  customers).  Plaintiff's citation to *Keck* to argue hosting any content for a fee automatically confers a

8  direct financial benefit, Opp. 21, is unavailing because *Keck* involved a product marketplace and

9  plausible allegations that the infringing goods allegedly offered and sold were a draw for customers, 369

10  F. Supp. 3d at 938.  There are no allegations that the availability of *advertisements* containing infringing

11  photographs draws customers to Facebook, and the Ninth Circuit has held that hosting content for a fee,

12  agnostic as to whether it is infringing as is the case here, is not a direct financial benefit.  *See supra* I.A.3.

13          In addition, Meta lacked the right and ability to control the sale of allegedly infringing sculptures

14  on third-party websites.  Plaintiff does not allege that Meta had control over those infringing sculptures

15  or their sellers, nor could she because the Ninth Circuit has held that a defendant cannot be held liable

16  for vicarious copyright infringement when it "cannot take away the tools the [direct infringers] use to

17  reproduce, alter, and distribute the infringing [works] over the Internet."  *Perfect 10, Inc. v. Visa Int'l*

18  *Serv., Ass'n*, 494 F.3d 788, 804 (9th Cir. 2007).  As in *Visa*, Meta "can only take away the means the

19  [direct infringers] currently use to sell them."  *Id.*  Plaintiff also admits that the infringing works are sold

20  through third-party websites, Compl. ¶ 104, unlike the cases she cites, in which allegedly infringing

21  products were sold directly on the defendant's e-commerce platform, *see Keck*, 369 F. Supp. 3d at 935-

22  38.  Terminating the Facebook accounts of the advertisers will not stop their infringing activities.

23  **III.    PLAINTIFF FAILS TO STATE A CLAIM FOR A VIOLATION OF VARA**

24          Meta's opening brief established that VARA does not protect photographs.  *See* Mot. 16-17.

25  Plaintiff does not address this argument, simply asserting VARA grants authors the right to be recognized

26  by name as the author of the work, Opp. 21-22, and citing an inapposite case involving a sculptural work

27  in the lobby of a building, *Carter v. Helmsley-Spear, Inc.*, 71 F.3d. 77 (2d Cir. 1995).  This citation does

28  not cure the fundamental flaw in Plaintiff's claim: the right of attribution, like all the rights VARA

1   protects, is limited to works of visual art and does not extend to photographs of sculptural works.  *See*

2   *Silberman v. Innovation Luggage, Inc.*, No. 01 Civ. 7109 (GEL), 2003 WL 1787123, at *5 (S.D.N.Y.

3   Apr. 3, 2003) (VARA does not apply to photos or reproductions of original artwork).

4   **IV.     THE COPYRIGHT ACT FORECLOSES PLAINTIFF'S REMAINING CLAIMS**

5           **A.     The Copyright Act Precludes Plaintiff's Lanham Act Claim**

6           Meta pointed out in its opening brief that Plaintiff fails to allege Meta itself (as opposed to the

7   third parties who posted the ads) issued any false statement, which is a sufficient basis to dismiss

8   Plaintiff's Lanham Act claim.  Mot. 18-19.  Plaintiff does not address this argument or Meta's argument

9   that her claim is really about authorship of reproductions, which is squarely precluded by the Copyright

10  Act under *Dastar*.  Mot. 17-19;  *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 32-33

11  (2003).  Rather than directly engage with the *Dastar* framework, Plaintiff generally contends that the

12  Copyright Act does not preempt the Lanham Act and then argues that her claim is one for "passing off."

13  Opp. 22 (citing *Coats v. Holbrook*, 2 Sand. Ch. 586, 594 (N.Y. 1845), a state court case that predates the

14  Lanham Act by a century, and claiming that it "hold[s] the Lanham Act is grounded in the fundamental

15  principle that 'no person has the right to pass off his goods as those of another.'").  But the Complaint is

16  clear that the essence of Plaintiff's Lanham Act claim is that "using images of the Creative Works or

17  Registered Works"—i.e., offering *infringing copies*—is what "caused actual confusion."  Compl. ¶ 189.

18          The cases Plaintiff cites are distinguishable.  *Williams v. Cavalli S.p.A.* involved allegations that

19  aspects of a copyrighted mural were uniquely associated with plaintiff and thus served a source-

20  identifying function.  No. CV 14-06659-AB (JEMx), 2015 WL 1247065, at *5 (C.D. Cal. Feb. 12, 2015).

21  The Complaint does not contain any analogous allegations; to the contrary, text in one post in paragraph

22  103 discloses that the artwork was "inspired" not by Plaintiff, but "jewelry master Rene Lalique."

23  *Craigslist Inc. v. 3Taps Inc.* is distinguishable because it had an allegation that defendants used plaintiff's

24  trademark, unlike Plaintiff's Complaint and unlike *Dastar*, which "did not include allegations that Dastar

25  used Fox's trademarks in any way."  942 F. Supp. 2d 962, 978 (N.D. Cal. 2013).  And the *Sybersound*

26  *Records v. UAV Corp.* court dismissed the Lanham Act claim, declining to construe the Lanham Act to

27  cover misrepresentations about copyright authorization.  517 F.3d 1137, 1144 (9th Cir. 2008).  Plaintiff's

28  alleged harm is not based on the use of source-identifying imagery or Plaintiff's name; it is based third

1  parties sharing photos of her works, which is a copyright infringement claim.  Compl. ¶ 190; 17 U.S.C.

2  § 106(1), (3) (granting copyright owner exclusive right to reproduce and distribute the work).  Thus, her

3  claim is precluded.

### B.    The Copyright Act Preempts Plaintiff's FDUTPA Claim

5  Plaintiff's FDUTPA claim is undisputedly based on "hav[ing her] ownership rights violated."

6  Compl. ¶ 209.  Courts have held FDUTPA claims preempted where "the only unfair or deceptive practice

7  is the same conduct which forms the basis of the plaintiff's copyright claim."  *Pegasus Imaging Corp.*

8  *v. Northrop Grumman Corp.*, No. 07-CV-1937-T-27EAJ, 2008 WL 5099691, at *5 (M.D. Fla. Nov. 25,

9  2008); *see also Olem Shoe Corp. v. Wash. Shoe Co.*, No. 09-23494-CIV, 2011 WL 6202282, at *23

10  (S.D. Fla. Dec. 1, 2011).  Even if displaying ads containing allegedly infringing content is "unfair", Opp.

11  24, "display" is a right granted by the Copyright Act, and thus cannot provide the additional element

12  required for a non-preempted FDUTPA claim, *Donald Frederick Evans & Assocs., Inc. v. Cont'l Homes,*

13  *Inc.*, 785 F.2d 897, 914 (11th Cir. 1986).

### C.    The Copyright Act Preempts Plaintiff's Unjust Enrichment Claim

15  Plaintiff did not dispute that her unjust enrichment claim that Meta "continues to earn revenue

16  from Counterfeiters," Opp. 25, is the same thing as allegedly profiting from copyright infringement,

17  Mot. 20.  The cited cases supposedly differentiating it are wholly inapposite here.  *Best Carpet Values,*

18  *Inc. v. Google LLC* had no claim for copyright infringement, but instead claimed that Google allegedly

19  "covered up or obscured a portion of Plaintiffs' websites from Android phone users for financial benefit."

20  No. 20-cv-04700-EJD, 2021 WL 4355337, at *8 (N.D. Cal. Sept. 24, 2021).  In *O'Brien v. PopSugar*

21  *Inc.*, the copying also allegedly co-opted plaintiffs' likenesses and identities.  No. 18-cv-04405-HSG,

22  2019 WL 462973, at *3 (N.D. Cal. Feb. 6, 2019).  There are no such additional allegations as to the ad

23  images at issue, which, at root, involve the alleged copying and display of copyrighted images.

## V.    COUNTS V AND VII SHOULD BE DISMISSED WITH PREJUDICE

25  Plaintiff agrees to dismiss Counts V and VII.  Opp. 25.  This dismissal should be *with* prejudice.

### CONCLUSION

27  For the reasons set out in Meta's opening brief and further above, Plaintiff's Complaint should

28  be dismissed in its entirety with prejudice for failure to state a claim.

Dated: August 9, 2022

Respectfully submitted,

WEIL, GOTSHAL & MANGES LLP


By: _/s/ Randi W. Singer_____
          RANDI W. SINGER

Attorneys for Defendant,
*Meta Platforms, Inc.*