1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JENNIFER L. COOK | Case No.: 4:22-cv-02485-YGR |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS** |
| vs. | |
| META PLATFORMS INC., | Dkt. No.: 24 |
| Defendant. | |

Before the Court is defendant Meta Platform Inc.'s ("Meta") motion to dismiss. Plaintiff Jennifer Cook brings claims for direct, contributory, and vicarious copyright infringement (Claims 1-3), as well as for violation of the Visual Artists Rights Act ("VARA"), 17 U.S.C. section 106A (Claim 4), the Lanham Act, 15 U.S.C. section 1125 (Claim 6), the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Florida Statute section 501.201, *et seq.* (Claim 8), and for unjust enrichment (Claim 9). Defendant Meta owns the social media website Facebook. (Dkt. No. 1, Complaint at ¶ 32.) Plaintiff voluntarily dismissed Claim 5, for injunctive relief, and Claim 7, for violation of the Digital Millennium Copyright Act ("DMCA"). (Dkt. No. 28 at 25.)

# I.     BACKGROUND

The complaint alleges the following facts relevant to this Court's decision:

Defendant owns the social media website Facebook. Plaintiff alleges defendant allows advertisers to post advertisements on Facebook that violate her copyrights. She alleges that Facebook not only allows advertisers to post the infringing advertisements on its site, but also helps advertisers target their infringing advertisements to a preferred audience. Plaintiff alleges that she

has informed Facebook of this copyright infringement and that Facebook has not fulfilled its legal responsibilities to respond and stop the infringement.  The Court addresses each aspect of the allegations in more detail below.

**Facebook's Targeted Advertising Process**

Facebook's primary source of revenue is selling advertisement space to advertisers.  (*Id.* at ¶ 77.)  Facebook's advertising business is highly profitable because it uses data Facebook collects about Facebook users to target advertisements to users that are most likely to be attracted to them. (*Id.* at ¶¶ 78-81.)  For example, Facebook has data about users' age, religion, ethnicity, politics, familial status, and interests. (*Id.* at ¶ 78.)

Advertisers tell Facebook who they are trying to reach, such as a particular age group or people with a particular interest, and Facebook directs their ads.  Facebook does this without sharing the personal information of users with the advertiser.  (*Id.* at ¶ 47.)  Facebook continuously monitors advertisements after they are published.  (*Id.* at ¶ 89.)  When advertisements are not as successful as desired, Facebook "can adjust the ad to obtain more desirable results," including by changing the audience to whom the ad is targeted.  (*Id.* at ¶ 88.)

Advertisers provide Facebook with the images and content of advertisements.  Facebook then "stores images" of the advertisements on its computers and/or systems and communicates those images to its users and the public.  (*Id.* at ¶ 142.)  Facebook "approves" every advertisement.  (*Id.* at ¶ 165.)  This includes "manual review by human moderators" for "legality and aesthetics."  (*Id.* at ¶¶ 4, 87.)   For example, Facebook reviews advertisements for "things like discrimination and design issues (*i.e.*, an improper text to image ratio)."  (*Id.* at ¶ 143.)

Facebook's terms of service for advertisers require users to represent and warrant that their access or use of Facebook for business or commercial purposes complies with all laws and regulations, including copyright law.  (*Id.* at ¶¶ 51-53.)  They also have a policy regarding repeat infringers, which states that Facebook will remove content and bad actors when reported, "where appropriate."  (*Id.* at ¶ 54.)  Facebook has an official process through which copyright owners can report copyright infringement.  (*Id.* at ¶ 111.)  These notices are called "DMCA notices" because the DMCA outlines the process for such notices.

United States District Court
Northern District of California

**Plaintiff's Experience**

Plaintiff is an artist.  Her works include sculptures of snakes for which she holds registered copyrights.  (*Id.* at ¶ 90.)  She sells renditions of these sculptures to the public from her website and on the online commerce store Etsy.  (*Id.* at ¶¶ 92-95.)  She posted photographs she took of her sculptures on these websites with watermarks showing her website URL, her name, and other identifiers.  (*Id.* at ¶¶ 96-102.)

Advertisers began publishing advertisements on Facebook using plaintiff's photographs of her work.  (*Id.* at ¶ 103.)  Generally, they removed the watermarks and other identifying information. These advertisers sell poor quality copies of plaintiff's original work or provide no product at all to paying customers.  (*Id.* at ¶¶ 100-101.)  The resemblance to plaintiff's products deceives consumers. Some have contacted plaintiff after receiving knockoffs and requested refunds.  (*Id.* at ¶ 103.)  Since 2021, plaintiff has identified hundreds of advertisements using images of her work on Facebook. She has never advertised her own work on Facebook.  (*Id.* at ¶ 109.)

Plaintiff alleges that she submitted DMCA notices to Facebook on multiple occasions starting in June of 2021 and that Facebook did not respond.  On June 29, nearly four weeks after her first DMCA notice, plaintiff researched other ways to contact Facebook.  (*Id.* at ¶ 203.)  She then contacted one of Facebook's intellectual property ("IP") attorneys, Allan Lo, and reported the same infringing advertisements and accounts she had reported in her DMCA notices.  (*Id.* at ¶ 113.) Only then did Facebook remove the infringing content.  (*Id.* at ¶ 1.)  It did so within twenty-four hours. (*Id.*)

Within ten days, the same stolen images from the advertisements she had previously reported were used on Facebook, sometimes by accounts plaintiff had already reported.  (*Id.* at ¶ 112.) Plaintiff submitted additional DMCA notices on June 30, 2021, multiple dates in July, and August 4. (*Id.*  at ¶¶ 113-114.)  These identified over two-dozen accounts.  (*Id.* at ¶ 114.)  Facebook did not act. (*Id.* at ¶ 115.)

On August 23, plaintiff again contacted Lo.  (*Id.*)  In that communication, she specifically identified seven of the dozens of accounts she had reported through DMCA notices since her last

round of communication with Lo.  (*Id.* at ¶ 115.)  That same day, Facebook removed the infringing

advertisements posted by the accounts plaintiff had reported to Lo.  (*Id.* at ¶ 116.)

Infringing advertisements containing the exact same images plaintiff had reported to

Facebook through DMCA notices and to Lo continued to appear on Facebook and plaintiff continued

to file DMCA notices.  (*Id.* at ¶ 117.)  The complaint does not specify if or how Facebook responded

to these notices.

## II.      LEGAL STANDARD

The standard for a motion to dismiss, as well as its burdens and inferences, is well-known and

not in dispute.

## III.     ANALYSIS

### A.      DMCA Safe Harbor Protection

Defendant claims it is entitled to limitation of liability from plaintiff's claims under the

DMCA, 17 U.S.C. section 512.  Specifically, it seeks protection under the safe harbor in section

512(c).  Defendant has the burden of establishing it meets the statutory requirements for the safe

harbor.  *Adobe Sys. Inc. v. Christenson*, 809 F.3d 1071, 1079 (9th Cir. 2015).

As background, the DMCA requires platforms to have a "notice and takedown protocol,"

through which a copyright owner who suspects her copyright is being infringed may notify the

service provider of potential infringing activity occurring on its network.   A service provider that

fails to take down properly noticed material exposes itself to copyright liability.

The DMCA also provides certain safe harbors from copyright liability to compliant

platforms.  *Id.* at 1015.   These are detailed in sections 512(a) through 512(d).  For a safe harbor to

apply, the platform must be able to show it meets the criteria set in section 512(i), as well as in the

applicable subsection (here, section 512(c)).

Under section 512(c)(2)(C), Meta must, "upon notification of claimed infringement as

described in paragraph (3), respond[] expeditiously to remove, or disable access to, the material that

is claimed to be infringing or to be the subject of infringing activity."  "Paragraph 3" provides the

requirements for a copyright holder to notify a platform of infringement.  Section 512(c)(3).

Relevant here, these include that the notice be sent to the platform's "designated agent."  Section

1   512(c)(3)(A).  This is known as a "DMCA Notice."  In summary, one of the requirements for safe

2   harbor (c) is that if a copyright holder provides notice of infringement in accordance with the

3   procedures set by section 512(c)(3), a platform must respond expeditiously to remove or disable the

4   infringing material.

5       Defendant argues that, under the facts alleged, Facebook responded "expeditiously" as

6   required for safe harbor protection because when plaintiff reached out to Facebook's IP counsel, Lo,

7   Facebook removed the infringing content within 24 hours.  (Dkt. No. 24 at 8.)  The Court disagrees

8   with Meta's characterization of the complaint.  The response from Facebook's IP counsel does not

9   meet the basic requirements of section (c)(2)(C).  That subsection requires platforms to respond

10  expeditiously to *DMCA notices* sent to a platform's designated agent.  The complaint alleges that

11  plaintiff sent DMCA notices on multiple occasions regarding multiple accounts and acts of

12  infringement and that defendant did not respond.  It was only after plaintiff took the additional step

13  of contacting Lo that the infringing content was removed.  Indeed, plaintiff alleges that only content

14  that she reported to Lo was removed.  With respect to content that she noticed through Facebook's

15  official DMCA process, but did not report to Lo, such content was not addressed.  (Comp. at ¶¶ 115-

16  116.)  Finding Meta has not met this requirement for safe harbor eligibility, the Court does not

17  address arguments regarding the other requirements for safe harbor protection at this time.

18      **B.     Claim 1: Direct Copyright Infringement**

19      Defendant argues that plaintiff has not alleged Meta engaged in volitional conduct as required

20  to plead a claim of direct copyright liability.  Rather, "Meta merely offered a neutral and automated

21  advertising tool that third-party sellers used to display content of their own choosing, a tool that

22  'inputs information into its algorithm' to 'automatically show ads to people.'"  (Dkt. No. 24, Motion

23  at 14 (citing Comp. at ¶¶ 16, 81, 83, 196).)  Plaintiff responds that the complaint alleges that Meta

24  engages in two forms of volitional conduct: (1) image review and alteration, at least some of which is

25  done by human moderators, and (2) "targeted advertising" of advertisements containing infringing

26  content by way of an algorithm.  (Dkt. No. 28 at 17.)

27

28

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 1.    Content Review

With respect to the first theory, plaintiff alleges that Facebook's advertisement approval process includes scanning advertisements, sometimes with human moderators, for legality and design issues (specifically, "text and image ratio").  (Comp. at ¶¶ 4, 87 143.)

Regarding legality, the case around which plaintiff centers her arguments regarding volitional conduct, *Sid Avery and Assocs., Inc. v. Pixels.com, LLC*, explicitly states that review of images for inappropriate content (there, pornography) "does not establish control over user content."  *Sid Avery & Assocs., Inc. v. Pixels.com, LLC*, 479 F.Supp.3d 859, 866 (C.D. Cal. Aug. 18, 2020).  Ninth Circuit precedent supports this conclusion.  *See Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 613 (9th Cir. 2018) (holding that service providers removal of content that violates terms of use does not establish control); *VHT, Inc. v. Zillow Grp., Inc.,* 918 F.3d 723, 738 (9th Cir. 2019) (holding a platform's "behind-the-scenes technical work" on photos to meet size and resolution specifications is not volitional conduct).  Plaintiff makes no attempt to distinguish her allegation regarding Facebook's review of content or legality from these cases.

The image review conduct that was found to be volitional in *Sid Avery* is distinguishable.  In that case, the defendant allowed third-parties to post images on its website, and then worked with third-parties to put those images onto merchandise consumers could purchase.  After a consumer selected an image and product, the defendant would confirm that the image would show up clearly on the product.  The court found this to be volitional conduct.  *Sid Avery*, 479 F.Supp.3d at 865.  Defendant was participating in the creation of a copyright infringing product.  That is distinct from a platform taking basic steps to make sure content on its website is displayed correctly on a technical level, which is all that is alleged and at issue here.  This is insufficient to support a claim.

### 2.    Targeted Advertising

With respect to the second theory, defendant maintains that Facebook's targeted advertising process is entirely automated and cannot support a claim.  Advertisers upload their advertisement, input information about the audience they want to reach, and the amount of engagement they are seeking.  This information is then automatically applied to send the advertisements to the desired audience.  Defendant argues that this process is akin to that considered in *Perfect10, Inc. v.*

1   *Giganews, Inc.* in which the Ninth Circuit held that a platform that passively displayed images on a

2   message board at the direction of users was not directly liable for copyright infringement.  *Perfect*

3   *10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 673 (9th Cir.), *cert. denied*, 138 S.Ct. 504 (2017).

4          The Court finds the case at hand distinguishable from *Giganews*.  Here, plaintiff alleges that

5   defendant does more than make infringing content available to all Facebook users.  Instead, Facebook

6   selectively targets content to specific users based on data that it alone possesses.  Additionally,

7   plaintiff alleges that Facebook monitors the success of advertisements and can alter the audience

8   when an ad is not sufficiently effective.  (*Id.* at ¶ 88.)  In essence, Facebook plays a direct role in

9   determining how and to whom the infringing content is disseminated.

10          Defendant also cites to another case from this district, *Harrison v. Facebook, Inc.*, in which

11   the court dismissed a direct copyright infringement claim against Facebook, finding a lack of

12   volitional conduct.  *Harrison v. Facebook, Inc.*, No. C 19-01547 JSW, 2019 WL 11343562, at *2

13   (N.D. Cal. July 2, 2019), *aff'd*, 816 F. App'x 228 (9th Cir. 2020).  In this pro se action, the conduct

14   at issue was materially different.  There, plaintiff alleged that she had posted images for which she

15   owned copyright onto a Facebook page.  She lost access to the page and alleged Facebook would not

16   take down the images.  Judge White found that plaintiff had failed to allege volitional conduct.  This

17   Court agrees.  An image posted by a user onto a Facebook page is akin to a post on a "message

18   board" like the one at issue in *Giganews*.  Here, Facebook posts the advertisements and does so

19   selectively, sending them to specific Facebook users and not others.

20          Though not cited by either party, the Court finds a Central District decision in *Stross v. Meta*

21   most similar to the case at hand and finds the court's reasoning persuasive.  There, the plaintiff

22   alleged that third parties posted images violating his copyrights which Facebook then displayed to

23   other users through its "news feed."  *Stross v. Meta Platforms, Inc.*, No. 2:21-CV-08023-MCS-AS,

24   2022 WL 1843129, *1 (C.D. Cal. Apr. 6, 2022).  Stross alleged Facebook curated what appears in a

25   user's news feed based on factors like prior activity.  *Id.*  Facebook argued that the process through

26   which items appeared on a user's news feed was an algorithm and was therefore "automated," and

27   not volitional.  The court rejected that argument, stating: "Defendants do not cite, and cannot cite,

28   any case holding that the use of human-designed computer algorithms rather than human employees

United States District Court
Northern District of California

to manage a website absolves a party of liability for direct infringement . . . There is no basis in the law to conclude that active management of a website, which would constitute volitional conduct if performed by a human, fails to meet that element because an algorithm designed by a human engineer manages the website instead." *Id.* at *3.  The same is true here.

Accordingly, given the lack of robust briefing and the lack of significant caselaw, the Court finds it more prudent to **DENY** the motion to dismiss to the extent this claim is based upon Facebook's targeted advertising process.

### C.    Claim 2: Contributory Copyright Infringement

"Contributory liability requires that a party '(1) has knowledge of another's infringement and (2) either (a) materially contributes to or (b) induces that infringement.'" *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 745 (9th Cir. 2019) (citing *Giganews*, 494 F.3d at 795).  Defendant argues that plaintiff has failed to adequately allege both elements.  The Court addresses each in turn.

#### 1.    Actual Knowledge

Defendant does not contest that when it received plaintiff's DMCA notices it had "actual knowledge" of specific acts of infringement on Facebook.  Rather, defendant argues plaintiff fails to allege that it continued posting the infringing work after obtaining actual knowledge.  (Dkt. No. 24 at 15.)  As explained in the context of the safe harbor, this is not an accurate characterization.  The complaint alleges that Facebook did nothing in response to plaintiff's DMCA notices.  It was not until she contacted Lo, which occurred for the first time nearly four weeks after she allegedly sent her first DMCA notice, that infringing content was removed.  Additionally, plaintiff alleges that some of the infringing advertisements that she identified in notices were not taken down.  (Comp. at ¶¶ 114-115.)

#### 2.    Material Contribution or Inducement

Meta contends that plaintiff fails to allege the second element of contributory infringement because "[t]here are no allegations that Meta induced the alleged infringement."  (Dkt. No. 24 at 15.)  In her opposition, plaintiff responds that she "did plainly allege Meta induced infringement" and identifies the exact paragraphs in her complaint that she alleges support her infringement argument.

United States District Court
Northern District of California

(Dkt. No. 28 at 20.)  Meta not only fails to address these allegations in its reply, it misrepresents plaintiff's opposition, stating that it "conceded Meta did not induce infringement."  (*Id.* at 12.)

Additionally, defendant does not address whether plaintiff adequately alleged material contribution, which is a separate theory for meeting the second prong of this claim.  The complaint makes multiple allegations related to material contribution and plaintiff also addresses this theory in her opposition.  (*See, e.g.,* Comp. at ¶¶ 104, 106, 149; Dkt. No. 28 at 19.)

Meta has thus failed to persuade the Court plaintiff did not adequately allege inducement or material contribution.  Defendant's motion to dismiss this claim is **DENIED**.

### D.   Claim 3: Vicarious Copyright Infringement

"To prevail on a claim for vicarious infringement, a plaintiff must prove the defendant has (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity." *Giganews, Inc.*, 847 F.3d at 673 (cleaned up).

Defendant asserts that plaintiff fails to allege both elements.  However, rather than raise these arguments directly, defendant refers the Court to its argument regarding safe harbor protection under section 512(c).  (Dkt. No. 24 at 16.)  Section 512(c)(1)(B) limits safe harbor protection to platforms that "do[] not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity."  Section 512(c)(1)(B).

Defendant provides no authority indicating that the "right and ability to control" analysis under 512(c)(1)(B) is identical to "the right and ability to supervise" analysis for a vicarious infringement claim or that the direct financial interest analysis is the same in both contexts.

"Ordinarily we presume that similar language in similar statutes should be interpreted similarly." *UMG Recordings, Inc. v. Shelter Cap. Partners LLC*, 718 F.3d 1006, 1016 (9th Cir. 2013) (cleaned up).  However, in *UMG*, the Ninth Circuit found that section 512's "control" analysis is not the same as the vicarious liability "right to supervise" analysis.  *Id.* at 1026-1029 ("In light of the DMCA's language, structure, purpose and legislative history, we are compelled to reject UMG's argument that the district court should have employed *Napster*'s vicarious liability standard to evaluate whether Veoh had sufficient 'right and ability to control' infringing activity under § 512(c).").  Though defendant relies on *UMG* in its motion, it ignores this part of the decision.  As

United States District Court
Northern District of California

1  defendant's arguments regarding section 512(c) are not applicable to plaintiff's vicarious liability

2  claim, defendant has provided no argument regarding plaintiff's ability to meet the first prong of her

3  vicarious infringement claim.

4        The Ninth Circuit has held that "direct financial benefit" should be interpreted the same in the

5  DMCA and vicarious liability contexts. *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1117 (9th

6  Cir. 2007).  Accordingly, the Court considers defendant's argument regarding section 512.

7  Defendant argues that plaintiff must plausibly allege that defendant benefits "specifically from

8  infringement as compared to benefitting generally from a content-agnostic tool that might in some

9  instances be used to infringe."  (Dkt. No. 2 at 10.)  Facebook argues it provides the same advertising

10  tool to all comers, and makes the same amount of money regardless of whether the content in the

11  advertisements infringes copyright.

12        The Court agrees that plaintiff does not allege that Facebook makes more from infringing

13  advertisements than it would from non-infringing ads.  However, financial benefit also "exists where

14  the availability of infringing material acts as a draw for customers."[1]  *Ellison v. Robertson*, 357 F.3d

15  1072, 1078 (9th Cir. 2004) (internal quotation and citations omitted); *see also Perfect 10, Inc. v.*

16  *CCBill LLC*, 488 F.3d 1102, 1117 (9th Cir. 2007).  Plaintiff alleges that Facebook's lenience toward

17  copyright infringing advertisements draws advertisers to Facebook in a way that websites that more

18  rigorously police infringement do not.  These allegations support the inference that Facebook's

19

20

21

22

23

24

25

26        [1] The Court notes that "the size of the 'draw' relative to a defendant's overall business is

27  immaterial.  All that is requires is a causal relationship between the infringing activity and any
financial benefit a defendant reaps, regardless of how substantial the benefit is in proportion to a

28  defendant's overall profits."  *Giganews, Inc.*, 847 F.3d at 673 (cleaned up).

alleged lenience toward infringement financially benefits defendant.[2]  Accordingly, plaintiff has adequately pled this element of the claim.[3]  The motion to dismiss Claim 3 is **DENIED**.

## E.      The Visual Artists Rights Act

Plaintiff alleges that defendant violated her rights under VARA "by publishing ads that included her images, but not her name."  (Dkt. No. 28 at 21.)  VARA protects "a work of visual art" which is not defined to include photographs *unless* the photographs are "produced for exhibition purposes only. . . ." 17 U.S.C. §§ 106A(a), 101 (defining "a work of visual art" and by contrast "pictorial, graphic and sculptural works" which includes photographs).  Plaintiff ignores most of defendant's argument.  She does not allege these photos were created for exhibition purposes or that any amendment is possible which the Court considers a concession.  Plaintiff merely alleges they were created and used for the advertisement and promotion of plaintiff's art which is not protected under the plain terms of VARA.  § 101 ("A work of visual art does not include-- . . . any . . . advertising, promotional, descriptive, covering, or packaging material").  Accordingly, VARA cannot apply, and this claim is **DISMISSED WITH PREJUDICE**.

## F.      Claim 6: The Lanham Act

Defendant argues that plaintiff has failed to plead a viable Lanham Act designation of origin claim against Meta because she does not allege conduct by Meta caused the false designation of origin.  (Dkt. No. 24 at 18.)  As defendant notes in its reply, plaintiff does not respond to this argument or explain how she has pled a valid Lanham Act claim against Meta.

To establish a claim for false designation of origin under section 43(a)(1)(A) and 15 U.S.C. section 1125(a)(1)(A), a plaintiff must prove that the defendant (1) used in commerce (2) any word, false designation of origin, false or misleading description, or representation of fact, which (3)

---

[2] Defendant does not respond to this allegation.  Rather, it argues that "the availability of advertisements containing infringing photographs draws customers to Facebook."  (Dkt. No. 33 at 13.)  This argument misrepresents plaintiff's argument.  Plaintiff does not allege that the infringing advertisements draw Facebook users, she alleges that the ability to post infringing advertisements draws *advertisers* to Facebook.

[3] Plaintiff's plausible allegations that defendant benefits financially from infringing advertisements is an additional basis for denying DMCA safe harbor protection at the stage. § 512(c)(1)(B).

United States District Court
Northern District of California

is likely to cause confusion or mistake, or to deceive, as to sponsorship, affiliation, or the origin of the goods or services in question.  *Luxul Tech. Inc. v. Nectarlux, LLC*, 78 F. Supp. 3d 1156, 1170 (N.D. Cal. 2015).

The question here is whether Meta's targeting advertising services constitute "use," such that their conduct could be considered the cause of plaintiff's harm.  The answer is not immediately clear to the Court and plaintiff has provided no argument on this question.   This claim is therefore dismissed.  However, given that defendant has provided no authority showing that plaintiff cannot plead a valid Lanham Act claim against Meta, it is **DISMISSED.**  Out of an abundance of caution, the Court grants leave to amend but is skeptical of how plaintiff can assert this claim within the bounds of Rule 11.

### G.      Claim 8: The Florida Deceptive and Unfair Trade Practices Act

Defendant argues that plaintiff's FDUTPA claim is preempted by the Copyright Act because it is entirely duplicative of her copyright claim.  Plaintiff responds that the claim is not preempted because her FDUTPA claim has an additional element distinct from copyright violation, it alleges that the display of her images to sell counterfeit objects created and sold by others is deceptive. Defendant does not respond to this argument.

The Copyright Act preempts state law claims based on copyright.  *Laws. v. Sony Music Ent.*, Inc., 448 F.3d 1134, 1137 (9th Cir. 2006) ("'[t]he intention of section 301 is to preempt and abolish any rights under the common law or statutes of a State that are equivalent to copyright and that extend to works, within the scope of the Federal copyright law.'") (quoting H. R. Rep. No. 94–1476, at 130 (1976)).  To avoid preemption, a state law claim must address a right separate from copyright and contain "an extra element which changes the nature of the action."  *Id.* at 1143 (quoting *Del Madera Props. v. Rhodes & Gardner*, 820 F.2d 973 (9th Cir.1987), *overruled on other grounds, Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994).  Not all elements can qualify as an extra element.  "An action will not be saved from preemption by elements such as awareness or intent, which alter the action's scope but not its nature." *Comput. Assocs. Int'l, Inc. v. Altai*, 982 F.2d 693, 717 (2d Cir. 1992) (internal quotation marks omitted); *see also Zito v. Steeplechase Films, Inc.*, 267 F. Supp. 2d 1022 (N.D. Cal. 2003).

Here, plaintiff alleges that defendant went beyond violating her copyright, it used her copyright material to deceive consumers into purchasing advertisers' products, diverting customers from plaintiff and causing misconceptions about the quality of her business and the quality of her own sculptures.  Defendant does not explain why these allegations are insufficient to distinguish this claim from a copyright claim.  Accordingly, the motion to dismiss this claim is **DENIED**.

### H.   Claim 9: Unjust Enrichment

! In contrast to the FDUTPA claim, plaintiff does not identify any conduct beyond defendant's violation of her copyrights to support her unjust enrichment claim.  She merely alleges that defendant benefited financially from display of her copyrighted material.  Accordingly, this claim is preempted by the Copyright Act and is **DISMISSED.**  Out of an abundance of caution, the Court grants leave to amend but is skeptical of how plaintiff can assert this claim within the bounds of Rule 11.

### I.   Claims 5 and 7: Injunctive Relief and Violation of the DMCA

Defendant moved to dismiss Claims 5 and 7 with prejudice.  In her opposition, plaintiff seeks to dismiss the claims without prejudice, but does not address defendants' arguments regarding the viability of these claims.

Claim 5 is for injunctive relief, which is a remedy, not a claim.  Count 7 alleges violation of the DMCA, but as defendant notes, plaintiff's claim appears to be based on the DMCA safe harbors in section 512, which do not create a right of action.  *Finley v. YouTube, LLC*, No. 20-CV-04888-RS, 2022 WL 704835, at *1 (N.D. Cal. Mar. 9, 2022).[4]  As these claims cannot be saved by amendment, they are **DISMISSED WITH PREJUDICE.**  The Court notes that dismissal of Claim 5 does not prevent plaintiff from amending to seek injunctive relief in relation to a claim for which such relief is available.

## IV.   CONCLUSION

In conclusion, and for good cause showing as outlined above, the motion is:

1.   **DENIED** as to Claims 1 through 3, and 8;

2.   **GRANTED WITH PREJUDICE** as to Claims 4, 5, and 7; and

---

[4] This claim is dismissed with prejudice because plaintiff does not respond to defendant's argument that the DMCA does not create a private right of action, which this Court takes as a concession.

United States District Court
Northern District of California

United States District Court
Northern District of California

3.   **GRANTED WITHOUT PREJUDICE** as to Claims 6 and 9.

Within seven (7) days of this order, plaintiff shall file a notice indicating whether plaintiff either stands on the complaint pursuant to this order or will amend the complaint consistent with Rule 11.  If the latter, an amended complaint shall be filed within twenty-one (21) days of this order and a redline of the amended complaint shall be provided to the Court and defendant.  Defendant shall respond 14 days after either a notice in which plaintiff stands on the current version of the complaint or an amended complaint.  Defendant shall not repeat any issues decided herein and shall not raise any issues which could have been raised in the instant motion.

The Court hereby sets a case management conference for February 6, 2023 at 2:00 p.m.

This terminates docket number 24.

**IT IS SO ORDERED**.

Dated: January 4, 2023

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**