CALEB MARKER (SBN 269721)
caleb.marker@zimmreed.com
CHARLES R. TOOMAJIAN (SBN 302153)
charles.toomajian@zimmreed.com
**ZIMMERMAN REED LLP**
6420 Wilshire Blvd., Suite 1080
Los Angeles, California 90048
Telephone: (877) 500-8780
Facsimile: (877) 500-8781

BRIAN C. GUDMUNDSON (*pro hac vice*)
brian.gudmundson@zimmreed.com
JUNE P. HOIDAL (*pro hac vice*)
june.hoidal@zimmreed.com
MICHAEL J. LAIRD (*pro hac vice*)
michael.laird@zimmreed.com
RACHEL K. TACK (*pro hac vice*)
rachel.tack@zimmreed.com
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, Minnesota 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0400

*Attorneys for Plaintiff and Putative Class*
(additional attorneys listed on signature page)

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFER L. COOK, d/b/a JL Cook, JL Cook Sculptor, and SNAKEARTS.COM,<br><br>    Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC., F/K/A FACEBOOK, INC.<br><br>    Defendant. | Case No. 3:22-cv-02485-AMO<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>Hearing Date: March 5, 2026<br>Time:         2:00 p.m.<br>Dept.:        Courtroom 10 – 19th Floor<br>Judge:        Honorable Araceli Martínez-Olguín |

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................................i

TABLE OF AUTHORITIES............................................................................................................ii

INTRODUCTION ...........................................................................................................................1

BACKGROUND..............................................................................................................................4

    I.    Meta Is Intricately Involved in the Creation and Placement of Ads.....................................4

    II.    Meta Knowingly Allowed Infringing Ads to Flourish on Facebook .....................................7

    III.    Meta's Repeat Infringer Policy Allowed Infringement to Proliferate on Facebook...............9

    IV.    Meta Benefitted Financially from Infringing Ads .............................................................10

    V.    Plaintiff and the Class were Harmed by Meta's Conduct........................................................11

ARGUMENT .................................................................................................................................12

    I.    The Classes Satisfy Rule 23(a)'s Four Prerequisites ...........................................................13

        A.    The Classes are Sufficiently Numerous..........................................................................13

        B.    The Classes Share Common Issues of Law and Fact .....................................................14

        C.    Plaintiff's Claims are Typical of the Classes...............................................................16

        D.    Plaintiff and Her Counsel are Adequate Representatives of the Classes.......................16

    II.    The Court Should Certify the Proposed Nationwide Class Under Rule 23(b)(2)................17

    III.    The Court Should Certify the Proposed Nationwide Class Under Rule 23(b)(3)................20

        A.    The Central Issues Common to the Nationwide Class Predominate ............................20

            1.    Meta's Liability for Vicarious Copyright Infringement and under the Lanham Act is Subject to Classwide Proof........................................................................20

                a.    Vicarious Copyright Infringement Involves Common Evidence of Meta's Control over and Profit from Infringement..................................................21

                b.    Meta's Lanham Act Liability May be Proved by Common Evidence of Meta's Significant Involvement in Distributing the Infringing Ads........................22

            2.    Meta's DMCA Safe Harbor Defense is Subject to Common Proof.....................24

            3.    Plaintiff's Proposed Classwide Damages Models Support Predominance ..........25

        B.    A Class Action is the Superior Method of Adjudicating the Claims............................26

    IV.    The Court Should Certify the Proposed Florida Subclass Under Rule 23(b)(3) .................27

    V.    The Court Should Alternative Certify Issue Classes Under Rule 23(c)(4)..........................28

        A.    Resolving the (c)(4) Issues Would Advance the Interests of the Entire Class .............29

        B.    Any Remaining Issues May Be Presented in Separate, Manageable Proceedings........31

    VI.    The Court Should Appoint Class Counsel ..................................................................31

CONCLUSION ..............................................................................................................................32

**TABLE OF AUTHORITIES**

*A&M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001).......................................................................................... 21, 29

*Ades v. Omni Hotels Mgmt. Corp.*,
2014 WL 4627271 (C.D. Cal. Sept. 8, 2014)....................................................................... 17

*Alcantar v. Hobart Serv.*,
800 F.3d 1047 (9th Cir. 2015)............................................................................................... 14

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997).......................................................................................................... 14, 20

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)................................................................................................... 12, 20, 30

*B.K. by next friend Tinsley v. Snyder*,
922 F.3d 957 (9th Cir. 2019).................................................................................................. 18

*Bautista-Perez v. Holder,*
2009 WL 2031759 (N.D. Cal. July 9, 2009)........................................................................ 31

*Beaver v. Omni Hotels Mgmt. Corp.*,
2023 WL 6120685 (S.D. Cal. Sept. 18, 2023) ..................................................................... 30

*Bellinghausen v. Tractor Supply Co.*,
303 F.R.D. 611 (N.D. Cal. 2014)........................................................................................... 13

*Berrien v. New Raintree Resorts Int'l, LLC*,
276 F.R.D. 355 (N.D. Cal. 2011) .......................................................................................... 17

*Broomfield v. Craft Brew All., Inc.*,
2018 WL 4952519 (N.D. Cal. Sept. 25, 2018) ..................................................................... 18

*Campion v. Credit Bureau Servs., Inc.*,
206 F.R.D. 663 (E.D. Wash. 2001)........................................................................................ 29

*Carnegie v. Household Int'l, Inc.*,
376 F.3d 656 (7th Cir. 2004)............................................................................................ 26, 31

*Carriuolo v. Gen. Motors Co.*,
823 F.3d 977 (11th Cir. 2016)......................................................................................... 27, 28

*Castillo v. Bank of Am., NA*,
980 F.3d 723 (9th Cir. 2020)................................................................................................. 14

*Columbia Pictures Indus., Inc. v. Fung,*
  710 F.3d 1020 (9th Cir. 2013) ................................................................................. 22, 24, 25

*Cummings v. Connell,*
  316 F.3d 886 (9th Cir. 2003) ................................................................................. 17

*DZ Rsrv. v. Meta Platforms, Inc.,*
  96 F.4th 1223 (9th Cir. 2024) ................................................................................. 12, 16, 20

*Ehret v. Uber Techs, Inc.,*
  148 F. Supp. 3d 884 (N.D. Cal. 2015) ................................................................................. 16

*Ellis v. Costco Wholesale Corp.,*
  285 F.R.D. 492 (N.D. Cal. 2012) ................................................................................. 28

*Ellis v. Costco Wholesale Corp.,*
  657 F.3d 970 (9th Cir. 2011) ................................................................................. 16, 17

*Emami v. Mayorkas,*
  725 F. Supp. 3d 1046 (N.D. Cal. 2024) ................................................................................. 17

*Erica P. John Fund, Inc. v. Halliburton Co.,*
  563 U.S. 804 (2011) ................................................................................. 20

*Fitzgerald v. Pollard,*
  2022 WL 22442009 (S.D. Cal. Nov. 3, 2022) ................................................................................. 31

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.,*
  2015 WL 4776932 (C.D. Cal. May 27, 2015) ................................................................................. 14

*Fonovisa, Inc. v. Cherry Auction, Inc.,*
  76 F.3d 259 (9th Cir. 1996) ................................................................................. 22

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.,*
  443 F.2d 1159 (2d Cir. 1971) ................................................................................. 22

*Hanon v. Dataproducts Corp.,*
  976 F.2d 497 (9th Cir. 1992) ................................................................................. 16

*In re Coll. Athlete NIL Litig.,*
  2023 WL 7106483 (N.D. Cal. Sept. 22, 2023) ................................................................................. 18

*In re Conseco Life Ins. Co. LifeTrend Ins. Sales & Mktg. Litig.,*
  270 F.R.D. 521(N.D. Cal. 2010) ................................................................................. 17

*In re Napster, Inc. Copyright Litig.,*
  2005 WL 1287611 (N.D. Cal. Jun. 1, 2005) ................................................................................. 14

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 934 (9th Cir. 2015) ................................................................................................. 17

*In re Yahoo Mail Litig.*,
    308 F.R.D 577 (N.D. Cal. 2015) ........................................................................................... 17

*Jordan v. Paul Fin., LLC*,
    285 F.R.D. 435 (N.D. Cal. 2012) ......................................................................................... 25

*Just Film, Inc. v. Buono*,
    847 F.3d 1108 (9th Cir. 2017) ............................................................................................... 27

*JUUL Labs, Inc. v. Chou*,
    557 F. Supp. 3d 1041 (C.D. Cal. 2021) ............................................................................... 23

*Kumandan v. Google LLC*,
    2023 WL 8587625 (N.D. Cal. Dec. 11, 2023) ..................................................................... 14

*Leyva v. Medline Indus. Inc.*,
    716 F.3d 510 (9th Cir. 2013) ................................................................................................. 25

*Luxul Tech. Inc. v. Nectarlux, LLC*,
    78 F. Supp. 3d 1156 (N.D. Cal. 2015) ................................................................................. 23

*Mavrix Photographs, LLC v. Livejournal, Inc.*,
    873 F.3d 1045 (9th Cir. 2017) ......................................................................................... 24, 30

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster Ltd.*,
    545 U.S. 913 (2005) ............................................................................................................... 21

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) ........................................................................................... 12, 13

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co., Ltd.*,
    2025 WL 1683472 (9th Cir. Jun. 16, 2025) ........................................................................ 24

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014) ................................................................................................. 18

*Perfect10 v. CCBill LLC*,
    488 F.3d 1102 (9th Cir. 2007) ............................................................................................... 25

*Rahman v. Mott's LLP*,
    693 Fed. Appx. 578 (9th Cir. 2017) ..................................................................................... 28

*Russell v. Educ. Comm'n for Foreign Med. Graduates*,
    15 F.4th 259 (3d Cir. 2021) ................................................................................................... 31

*Shapiro, Bernstein & Co. v. H.L. Green Co.*,
    316 F.2d 304 (2d Cir. 1963) ............................................................................................ 22

*Smith v. City of Oakland*,
    339 F.R.D. 131 (N.D. Cal. 2021) .................................................................................... 14

*teamLab Inc. v. Museum of Dream Space, LLC*,
    650 F. Supp. 3d 934 (C.D. Cal. 2023) ............................................................................ 21

*Tershakovec v. Ford Motor Co.*,
    79 F.4th 1299 (11th Cir. 2023) ....................................................................................... 27

*Tyson Foods v. Bouaphakeo*,
    577 U.S. 442 (2016) ........................................................................................... 13, 20, 24

*U-Haul Int'l, Inc. v. Jartran, Inc.*,
    793 F.2d 1034 (9th Cir. 1986) ........................................................................................ 23

*UMG Recordings, Inc. v. Shelter Cap. Partners LLC*,
    718 F.3d 1006 (9th Cir. 2013) ........................................................................................ 30

*Unicolors, Inc. v. Urban Outfitters, Inc.*,
    853 F. 3d 980 (9th Cir. 2017) ......................................................................................... 21

*Valentino v. Carter-Wallace, Inc.*,
    97 F.3d 1227 (9th Cir. 1996) ..................................................................................... 26, 28

*Valenzuela v. Union Pac. R.R. Co.*,
    2017 WL 1398593 (D. Ariz. Apr. 19, 2017) .................................................................. 29

*Ventura Content Ltd. v. Motherless, Inc.*,
    885 F.3d 597 (9th Cir. 2018) ............................................................................... 19, 24, 29

*Vinole v. Countrywide Home Loans, Inc.*,
    571 F.3d 935 (9th Cir. 2009) .......................................................................................... 27

*W. State Wholesale, Inc. v. Synthetic Indus., Inc.*,
    206 F.R.D. 271 (C.D. Cal. 2002) .................................................................................... 23

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ................................................................................................... 14, 30

*Walters v. Reno*,
    145 F.3d 1032 (9th Cir. 1998) ........................................................................................ 18

*Statutes*

15 U.S.C. § 1117(a) ................................................................................................................ 26
15 U.S.C. § 1125(a) ................................................................................................................ 22
17 U.S.C. § 502(a) ............................................................................................................. 3, 18
17 U.S.C. § 504(b) ................................................................................................................. 26
17 U.S.C. § 512 ..................................................................................................................... 11
17 U.S.C. § 512(c)(1) ....................................................................................................... 24, 29
17 U.S.C. § 512(c)(1)(B) ................................................................................................... 24, 25
17 U.S.C. § 512(c)(3)(A)(i)-(vi) ............................................................................................. 11
17 U.S.C. § 512(c)(3)(A)(ii)–(iii) ........................................................................................... 31
17 U.S.C. § 512(f)(1)(A) ........................................................................................................ 25

*Rules*

Fed. R. Civ. P. 23(a) ........................................................................................................... 3, 13
Fed. R. Civ. P. 23(a)(2) ........................................................................................................... 14
Fed. R. Civ. P. 23(a)(4) ........................................................................................................... 16
Fed. R. Civ. P. 23(b)(2) ..................................................................................................... Passim
Fed. R. Civ. P. 23(b)(3) ..................................................................................................... Passim
Fed. R. Civ. P. 23(c)(4) ................................................................................................. 4, 28, 29
Fed. R. Civ. P. 23(g) ......................................................................................................... 31, 32

**INTRODUCTION**

Plaintiff Jennifer L. Cook ("Plaintiff" or "Cook") filed this class action lawsuit to hold Meta Platforms, Inc. ("Meta" or "Defendant") accountable to copyright holders for copyright infringement it facilitates on Facebook. Cook is an artist who creates sculptures of reptiles with "freakish attention to detail" and sells them to make a living. Her creations are unique, so much so that she successfully registered her works with the U.S. Copyright Office. And her works are good—good enough that pirates took notice, stole her images, and advertised knockoffs on Facebook. While her works are unique, Cook's story is not. Thousands of proposed Class members similarly created their own unique works, registered them with the U.S. Copyright Office, and later found Facebook ads from third parties infringing on their works and attempting to sell knockoffs of their creations.

The pirates' use of Facebook to sell the knockoffs was not an accident. Meta, which owns Facebook, is a world leader in connecting advertisers to buyers, and its policies and procedures knowingly allow rampant use of ads on Facebook that infringe on copyrighted works. Indeed, even when Plaintiff and the Class informed Meta of infringing ads through notices provided pursuant to the Digital Millenium Copyright Act ("DMCA"), as each Class member here did, Meta's policies allowed the ads to continue—or, when removed, for the pirates to re-place them immediately, despite using the same infringing images. Because of Meta's indifference to infringement on Facebook, Plaintiff and the Class are unwillingly stuck in a game of whack-a-mole: they notify Meta of one infringing ad only to find another. Meta blames this on scale and technical limitations despite the fact it: (1) is one of the global leaders in technology; (2) ███████████████████████████████████ (3) ███████████████████████████████████ ; and (4) ███████████████████████████████████ ███████████████████████████████████ ██████

Meta is no passive bystander in the placement of ads on Facebook. Rather, Meta's policies and practices facilitate copyright infringement. Meta is well aware of the significant amount of infringing ads, an issue Meta employees frequently raised as a concern. Rather than take steps to mitigate infringement, Meta turns a blind eye to it or, worse, willingly permits it to occur. Contrary to its written

policies, Meta often declines to take disciplinary action on ad accounts identified by Meta or others as repeatedly infringing on copyrights. For instance, ███████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████

Meta's lax treatment of infringers is contrasted by its harsh treatment of copyright holders. While Meta, one of the world's pre-eminent tech companies, ███████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

As a result, Meta put its power and technology to work for ads it knew or should have known infringed on Plaintiff's and the Class's copyrights. Meta profited from the ad revenue and the infringers benefited from Meta's technology and motivations. Plaintiff and the Class, however, suffered immensely. The infringing ads disrupted Plaintiff's and the Class's lives and business, upended protections afforded to their works, and frustrated their ability to control their intellectual property. Moreover, because Meta willfully put its tech power behind the infringing ads, the infringers pirating Plaintiff's and the Class's works were able to get their ads before more viewers and increase the number of potential buyers, all at the expense of Plaintiff and the Class. Although Meta knew of this issue it placed an unreasonable onus on Plaintiff and the Class to identify every instance of infringement, even when it concerned the same exact images, and notify Meta of it, often to no avail.

Plaintiff brought this action on behalf of herself and a class of similarly situated individuals seeking compensation for harm caused by past infringement on Facebook to compel Meta to take reasonable measures to prevent future infringement. Plaintiff now moves to certify a Nationwide Class under Federal Rule of Civil Procedure 23(b)(2) for injunctive relief and Rule 23(b)(3) for damages

pursuant to two claims, vicarious copyright infringement and violation of the Lanham Act. Plaintiff also seeks to certify under Rule 23(b)(3) a Florida Subclass seeking damages for Meta's violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA").

The Class and Subclass include the following class members:

**Nationwide Class.** All individuals and entities in the United States who submitted or had submitted on their behalf a DMCA takedown notice to Meta that reported one or more ads on Facebook infringing on their registered copyright and that received no counter-notice.

**Florida Subclass.** All individuals and entities in Florida who submitted or had submitted on their behalf a DMCA takedown notice to Meta that reported one or more ads on Facebook infringing on their registered copyright and that received no counter-notice.

The Nationwide Class and Florida Subclass satisfy all requirements of Rule 23. As required by Rule 23(a), both Classes are sufficiently numerous, containing thousands of Class members who, like Plaintiff, registered a copyright and submitted a DMCA takedown notice to Meta. The Nationwide Class members share numerous common issues, arising from their similar experiences, uniform claims, Meta's common course of conduct, and due to Meta's common defenses, including its incorrect claim that it is protected by the DMCA safe harbor provision, which grants protections where internet service providers meet certain conditions. The Florida Subclass, similarly, shares common facts and legal issues arising from Meta's unfair and deceptive practices in violation of FDUTPA.

The Nationwide Class satisfies both Rule 23(b)(2) and (b)(3) and should be certified under each provision. Concerning Rule 23(b)(2), Plaintiff and the Class are entitled to injunctive relief under 17 U.S.C. § 502(a) for Meta's vicarious copyright infringement. Rule 23(b)(2) certification is appropriate because Meta's misconduct impacted the Class as a whole and Plaintiff's proposed injunctive relief would benefit the entire Class. As to Rule 23(b)(3), common issues predominate because Plaintiff's claims depend primarily on evidence of Meta's common course of misconduct, meaning Plaintiff and the Class would each rely on the same, generalized proof for their claims. That is true too for Meta's DMCA safe harbor defense. Whether Meta met the DMCA's statutory prerequisites depends on evaluation of Meta's policies and practices, creating no individualized issues. The common legal and factual issues, thus, predominate. Furthermore, superiority is met because of the similarity of the claims

and the fact that, absent a mechanism for collective action, each Class member's individual claim would likely be too small to warrant individual actions.

The Florida Subclass also meets the requirements of Rule 23(b)(3). The common, predominating question is whether Meta's facilitation of infringing ads constitutes an unfair and deceptive practice. FDUTPA contains no reliance requirement and uses an objective standard to evaluate deception, meaning the claim will not be swamped by individual issues. As with the Nationwide Class, the Florida Subclass is also amenable to 23(b)(3) certification.

As an alternative to (b)(3) certification of the Nationwide Class, Plaintiff proposes three issue classes under Rule 23(c)(4) central to Plaintiff's vicarious copyright infringement claim, specifically, whether: (1) Meta failed to meet the prerequisites required by the DMCA to seek safe harbor protections and is ineligible to invoke the defense as to any Class member; (2) Meta had the right and ability to control copyright infringing ads; and, (3) Meta derived a financial benefit from the copyright infringing ads. While the commonality of the facts and issues amongst the Class suggest Rule 23(b)(3) certification is appropriate, Plaintiff alternatively proposes a highly manageable process for addressing common issues using Rule 23(c)(4) certification and addressing any individualized issues through separate, simple proceedings.

For those reasons and for the reasons stated below, the Court should certify the Nationwide Class under Rule 23(b)(2) and 23(b)(3) or, alternatively, the three proposed (c)(4) issue classes; certify the Florida Subclass under Rule 23(b)(3); and appoint Plaintiff as Class Representative and Zimmerman Reed LLP and Rozier Hardt McDonough PLLC as Class Counsel.

## BACKGROUND

### I.   Meta Is Intricately Involved in the Creation and Placement of Ads

This case concerns Meta's empowerment of infringing ads on Facebook through its ad platform. Meta profited as it worked to find buyers of certain infringers' knockoffs of Plaintiff and the Class's works, while creators, innovators, and businesses like Plaintiff and the Class were harmed.

Meta's ad targeting system is the engine powering the infringement alleged in this case. Meta is not a passive party to the infringement occurring on Facebook. Rather, Meta is an active participant in every phase of advertising on Facebook, including ad creation, reviewing and approving ads, connecting

ads to specific potential buyers, monitoring ad success, and collecting and utilizing engagement metrics to improve its ability to target future ads. *See* Ex. 1.[1] ("Facebook is, and will at all times be, the 'executive producer' of the [ad] Service, and will be responsible for the design, layout, look-and-feel, and maintenance of any and all aspects of the [ad] Service, including with respect to the display and performance of any [c]lient [a]ds.").

To initiate an ad campaign, advertisers must use Meta's products and ad management tools. Ex. 2 (identifying Meta Ads Manager as "an all-in-one tool for creating ads, managing when and where they'll run, and tracking how well your campaigns are performing towards your marketing goals"). Advertisers use these tools, owned and operated by Meta, to propose ad campaigns across Meta's platforms. *Id.* For every ad campaign, Meta dictates the structure of the ad, including the campaign objective, audience, and creative format, with only minor input from advertisers. *Id.* (describing Meta's pre-set ad campaign objectives, including, among others, engagement and sales).

Meta also uses its own data and targeting mechanisms to select the ad audience based on Meta's behavioral, demographic, and interest-based data, which it collects from the billions of worldwide users of its platforms (Facebook, Instagram, and WhatsApp). Ex. 3 ("Instead of paying to use Facebook . . . we can show you personalized ads . . . businesses [] pay us to promote . . . . that may be more relevant to you."). ██████████████ ████████████████████████████████ Ex. 30 (Eichmann Decl.) ¶ 29–32.

In short, ███████████████████████████ ██████ Ex. 29 (Hochman Decl.) ¶ 43 ████████████ ████████████████████████████████). In fact, that is the primary reason advertisers select Meta. Putting its data to use, ████████████ ███████████████████████ *Id.* ¶ 26. ████████ ████████████ *Id.* ¶ 32 ██████████████ ██████████████ ¶ 40; Ex. 1 at 3 ("Facebook may . . . create different versions of [c]lient [a]ds.").

---

[1] All references to an "Exhibit" or "Ex." herein refer to the documents attached to the Declaration of Brian C. Gudmundson ("Gudmundson Decl.") unless otherwise stated.

Meta claims to reject ads that violate its policies and standards. Ex. 1 at 6 ("Facebook may, in its sole discretion, reject or remove any Client Ad at any time."); Ex. 4 at 5 ("Our policies prohibit ads . . . using deceptive or misleading practices, including those meant to scam people out of money."); Ex. 12 at 1–2 ("Ads may be rejected after being reported to us by an intellectual property rights holder or because there are signs that the ad may infringe the rights of a third party."). ████████████████ ████████████████████████████████████ Ex. 5 ████████████████████████ ████████████████████████████████████████████████████████████ *see also* Ex. 29 (Hochman Decl.) ¶ 33 ████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████ ████████████████████████████████████████████████████████████ ████████████ *See* Ex. 6 at 16; Ex. 11 at 2 (Meta reviews ads for policy violations, which "may include specific components of an ad, such as the image" and "advertiser behavior"). ██████████ ████████████████████████████████████████████████████████████ Ex. 29 (Hochman Decl.) ¶¶ 69–72 ████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████

After ad approval, ████████████████████████████ *Id.* ¶ 30. Throughout an ad's campaign, Meta ████████████████████████████████████████ *Id.* ¶ 56 ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████ Advertisers have no visibility into or control over Meta's ad delivery system beyond high level inputs, meaning Meta is exclusively responsible for targeting ads to potential buyers.

For all ads, including those with infringing content, Meta's sophisticated ad targeting significantly enhances the number of users who view the ads, meaning Meta helps the infringing advertisers increase the number of purchasers of the knockoffs being sold by those infringers. *See, e.g.,* Ex. 7. At every stage of an ad's lifecycle, Meta is the ad architect, an active participant, and primary decision-maker concerning how to achieve success in the ad campaign.

## II. Meta Knowingly Allowed Infringing Ads to Flourish on Facebook

As described further below, Meta's policies and practices allowed infringing ads to flourish on Facebook. To start, Meta has known for years that Facebook ads contained rampant infringement, including by third parties seeking to sell knockoff goods. As far back as 2018, ███████████ █████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████ Ex. 10-A. In 2019, ████████ ███████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ Ex. 10-M at 9. ████████ ████████████████████████████████████████ Ex. 10-D at 2 ██████████████ ███████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ In March 2020, ██████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ██████████████████ Ex. 10-H. Around that time, ████████████████████████ ███████████████████████████████████ Ex. 10-I. Similarly, ████████████████ ████████████████████████████████████████████████████ Ex. 10-J.

Despite the substantial amount of infringing ads on Facebook, Meta declined to employ tools to identify, remove, or reduce them. Meta developed technology and designed policies that could have allowed it to reduce infringement on its platforms, but Meta refused to employ those tools and policies to reduce infringement. For example, ████████████████████████████████ ███████████████████████████████ *See* Ex. 29 (Hochman Decl.) ¶¶ 67-70; Ex. 8 at 3 ███████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ██████████████████████████ Ex. 9 at 52:15–20 ███████████████████████████ ████████████████████████████████ Ex. 13 at 54:1–25 ██████████████████████ ███████████████████████████████████ Ex. 29 (Hochman Decl.) ¶ 79 ██████████ ███████████████████████████████████████████████████████████████████████



Despite its capabilities, ███████████████████████████████████████ ████████████████████ Ex. 14; Ex. 15 ███████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████ Ex. 16 █████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██ *See* Ex. 17 at 2 ████████████████████████████████ ██████ Ex. 18 ████████████████████████████████████████ ███████████████████████ Ex. 19 at 5 ████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████

Even when Meta identified or had been put on notice of an infringing ad or advertiser, it failed to remove those infringers or, even worse, deliberately allowed them to continue advertising to ensure Meta made its ad revenue. For example, ████████████████████████████████ ███████████████████████████████████████ *See* Ex. 21 ███████████████████████████████████████████████████ ████████████████████████████████ ; Ex. 22 ██████████████████ ███████████████████████████████████████████████ Ex. 23 ██████████████████████████████████████████ ███████████████████████████████ Under Meta's policies, however, those entities should have been terminated.

In addition to ███████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████ *See* Ex. 30 (Eichmann Decl.) ¶ 52 ████ ███████████████████████████████████████████████████

████████████████████████████████████ Specifically, Meta used ████
████████████████████████████████████████████████████████ Ex. 10-
F. For instance, █████████████████████████████████
████████████████████████████████████████████████████ *Id.*
Illustrating Meta's indifference to enforcing its politics against known infringers, ████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████ Ex. 10-C. Along the
same lines, ███████████████████████████████████████████
███████████████ Ex. 10. Consequently, ████████████████████████
██████████████████████████ *See id.*

### III.   Meta's Repeat Infringer Policy Allowed Infringement to Proliferate on Facebook

Just as Meta was aware of the substantial number of infringing ads on Facebook, Meta also recognized that its policies and their implementation were ineffective at preventing, identifying, and removing known infringers advertising on Facebook. Meta purported to implement a "repeat infringer policy"—a requirement under the DMCA to obtain safe harbor protections against infringement on an internet service provider's platform. Under the policy, ███████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████ Ex. 6 ███████████████████████████████
██████████████████████████████████ Ex 30 (Eichmann Decl.) ¶¶ 12, 64.
Although Meta had a repeat infringer policy on paper, in practice its policy was ineffectual for at least two reasons.

First, Meta's policy exceptions rendered it ineffective. For example, ████████████████
████████████████████████████████████████████████████ Ex. 30
(Eichmann Decl.) ¶ 54 ███████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

███████████████████████████████████████████████████ *Id.* ¶ 44. ████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████ *Id.* ¶ 55 ███████████████████████████████████████████

██████████████████████████████████████████

Second, ████████████████████████████████████ Ex. 10; Ex. 30 (Eichmann Decl.) ¶¶ 58–59. As described above, ████████████████████████████████████████████

█████████████████████████████████████████████████████████ Ex. 30 (Eichmann Decl.) ¶ 52; Ex. 21; Ex. 22. Meta, thus, ████████████████████████████████

███████████████████████████████████████████████████████████████████████

█████████████████ Consequently, Meta's repeat infringer policy accomplished the opposite of the purpose of such a policy—instead of mitigating infringing ads on Facebook, it allowed such activity to flourish.

**IV.    Meta Benefitted Financially from Infringing Ads**

███████████████████████████████████████████████████████████████████████

█████████████████████████████████████████ Ex. 25 ████████████████████████

████████████████████████████████████████ For example, ███████████████████

███████████████████████████████████████████████████████████████████████

Ex. 30 (Eichmann Decl.) ¶ 67. ████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████ And, further, because Meta's ad revenue depends on its performance, Ex. 2, the more Meta profited, the more likely that the infringing ads connected to and engaged potential buyers, incentivizing Meta to help infringers promote their infringing ads and sell the knockoff goods.

While Plaintiff does not yet know the full extent to which Meta profited from services it provided to infringing accounts and concerning infringing ads, ████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████ Ex. 30 (Eichmann Decl.) ¶¶ 67–69.

## V.   Plaintiff and the Class were Harmed by Meta's Conduct

Meta's conduct had real consequences for Plaintiff and the Class. Plaintiff, for example, is a small business owner, who designs, creates, and sells sculptures. Ex 26 at 15:1–25. Plaintiff's business depends on the integrity and value of her original creations, and she accordingly registered her works with the U.S. Copyright Office. *Id*. at 110:1–25. Shortly after launching an e-commerce website to sell her sculptures, however, online fraudsters stole images of her artwork and used them in deceptive Facebook ads to sell knockoffs of her goods and undercut her price. *Id.* at 29:11–19. The aftermath was a relentless and deeply damaging campaign of infringement—enabled and amplified by Meta. *See* Ex. *See id.*

Plaintiff and the Class were left to fend for themselves against the onslaught of fraudulent and misleading Facebook ads. *Id.* at 114:7–12 ("I saw so many other small businesses and artists in the same position that I was in where they were reporting that their works had been taken and infringement made on Meta Platforms, and . . . they were not being heard."). Like each Class member, Plaintiff notified Meta of ads that infringed on her copyrights through Meta's takedown process—a process outlined by the DMCA, *see* 17 U.S.C. § 512, that Meta, at least in its policy, adopted to allow individuals to inform it of infringement on its platforms. Ex. 27. To complete Meta's DMCA takedown notice form, as required by statue, Plaintiff and the Class were required to: (1) include the signature of a person authorized to act on behalf of the rightsholder; (2) identify the copyrighted work alleged to be infringed; (3) identify the ads alleged to infringe on the copyright; (4) provide contact information; and (5) attest that the submitter is acting in good faith and that, under penalty of perjury, the information provided is accurate and the person submitting the form is authorized to act on behalf of the rightsholder.[2]

Consequently, the DMCA takedown notices submitted to Meta informed it both of ads on Facebook infringing certain copyrights and of certain images that were copyright protected. Plaintiff and the Class each incurred significant time searching for and reporting the infringing Facebook ads, which numbered in the hundreds in some cases. *See* Ex. 26 at 119:4–8; Ex. 27. Given that Meta refused to assist copyright holders in identifying or addressing instances of infringement (despite its

---

[2] These requirements are also outlined by statute under 17 U.S.C. § 512(c)(3)(A)(i)-(vi).

technological capabilities to quickly do so itself), Plaintiff and the Class also exhausted significant time scouring Facebook for additional infringement of their works—a process further complicated by the fact that Meta does not show every Facebook user every Facebook ad. *See* Ex. 26 at 116:10–14. ████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████   Ex. 30

(Eichmann Decl.) ¶ 73.

The rampant infringement of Plaintiff's and the Class's works had debilitating and lasting harm. For Plaintiff, the infringing ads disrupted her ability to sell her works online and gave rise to accusations that the infringers' cheap knockoffs were hers, impairing her reputation. Ex. 26 at 216:3–19. Those harms were shared among the Class, a community of artists, creators, and small businesses who saw the product of their ingenuity stolen and sold as knockoffs. *Id.* at 115:9–13. Plaintiff brought this action to protect those similarly situated who were harmed by Meta's profit-driven decision to promote, rather than limit, infringing conduct on Facebook.

## ARGUMENT

"Rule 23 provides a procedural mechanism for a federal court to adjudicate claims of multiple parties at once, instead of in separate suits." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022) (citation modified). "Before certifying a class, the district court must ensure that the plaintiffs have made two showings": (1) "the proposed class action must satisfy four prerequisites under Rule 23(a)," that is, numerosity, commonality, typicality, and adequacy, and (2) "the class must fit into at least one of three categories outlined in Rule 23(b)." *DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223, 1232 (9th Cir. 2024).

Although "[t]he district court must perform a 'rigorous analysis' of these prerequisites," any "'[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" *Id*. (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)). "[A] district court cannot decline certification merely because it considers plaintiffs' evidence relating to the common questions . . . unlikely to succeed in carrying the plaintiffs' burden of proof." *Olean*, 31 F.4th at 667. Rather, the key

inquiry is whether "'each class member could have relied on the same evidence as plaintiffs' to establish liability if he or she had brought an individual action.'" *Id*. (quoting *Tyson Foods v. Bouaphakeo*, 577 U.S. 442, 455 (2016)).

Here, Plaintiff seeks to certify a Nationwide Class and Florida Subclass of copyright owners who, like her, identified Facebook ads infringing on their copyrights and spent time attempting to vindicate their rights due to Meta's failure to adequately police infringement. As described below, the Court should certify the Nationwide Class under Rule 23(b)(2) and Rule 23(b)(3) and the Florida Subclass under Rule 23(b)(3) because: (1) both Classes meet Rule 23(a)'s prerequisites; (2) the Nationwide Class satisfies the requirements of Rule 23(b)(2) because Plaintiff seeks injunctive relief that benefits the Class as a whole; (3) as required by Rule 23(b)(3), the Nationwide Class's vicarious copyright infringement and Lanham Act claims create predominating common issues and a class action is the superior means of adjudicating these claims; and (4) the Florida Subclass's FDUTPA claim creates predominating common issues and satisfies superiority. However, in the alternative to the Nationwide (b)(3) Class, Plaintiff proposes the Court certify a select few Rule 23(c)(4) classes that would resolve critical issues common to the Nationwide Class, leaving the few remaining individual issues to be addressed in highly manageable proceedings.

For the reasons below, the Court should grant Plaintiff's motion.

## I.    The Classes Satisfy Rule 23(a)'s Four Prerequisites

To certify a class under Rule 23(b)(2) or (b)(3), a plaintiff must first satisfy Rule 23(a)'s four prerequisites: (1) "the class is so numerous that joinder of all members is impracticable" (numerosity); (2) "there are questions of law or fact common to the class" (commonality); (3) "the claims or defenses of the representative parties are typical of the claims or defenses of the class" (typicality); and (4) "the representative parties will fairly and adequately protect the interests of the class" (adequacy). Fed. R. Civ. P. 23(a). Here, Plaintiff's proposed Classes satisfy all of Rule 23(a)'s requirements.

### A.    The Classes are Sufficiently Numerous

The Nationwide Class and Florida Subclass both satisfy the numerosity requirement. Numerosity may be satisfied without exact information on the size of the class where "general knowledge and common sense indicate that [the class] is large." *Bellinghausen v. Tractor Supply Co.*, 303 F.R.D. 611,

616 (N.D. Cal. 2014). Furthermore, classes containing as little as forty members may satisfy numerosity. *Smith v. City of Oakland*, 339 F.R.D. 131, 138 (N.D. Cal. 2021) (finding "a presumption of impracticability of joinder" for classes over 40 members). Here, the Class includes copyright owners who submitted DMCA takedown notices that did not receive a counter-notice (*i.e.* challenge to the allegation of infringement in the takedown notice) from the third-party infringer. ██████████

██████████████████████████████████████████████████████████████

███████████ *See* Ex. 30 (Eichmann Decl.) ¶ 22. As such, both the Nationwide Class and Florida Subclass easily exceed the minimum threshold of forty Class members. Numerosity is, thus, met here.

### B.    The Classes Share Common Issues of Law and Fact

The proposed Classes also satisfy commonality under Rule 23(a)(2). Rule 23(a)(2) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). A question is common to the class where "'it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Alcantar v. Hobart Serv.*, 800 F.3d 1047, 1052 (9th Cir. 2015) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). "All questions of fact and law need not be common." *Kumandan v. Google LLC*, No. 19-cv-04286, 2023 WL 8587625, at *8 (N.D. Cal. Dec. 11, 2023). Rather, "[a] single common question of law or fact that resolves a central issue will be sufficient" for commonality. *Castillo v. Bank of Am., NA*, 980 F.3d 723, 728 (9th Cir. 2020). Similarly, "the existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Kumandan*, 2023 WL 8587625, at *8.

Generally, where a defendant harmed class members in a single, uniform course of conduct, commonality is likely to be met. *See, e.g.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). The same is true in copyright infringement cases, where courts have held that a common scheme that impacts copyright holders uniformly supports commonality. *See In re Napster, Inc. Copyright Litig.*, No. 00-md-1369, 2005 WL 1287611, at *3 (N.D. Cal. Jun. 1, 2005) (commonality met where the class's claims arose "from the same factual predicate; namely, that Napster users infringed the class members' exclusive rights in one or more copyrighted musical compositions"); *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, No. 13-cv-5693, 2015 WL 4776932, at *9 (C.D. Cal. May 27, 2015) (commonality met

where "class members argue[d] that [defendant] engaged in the same exploitative conduct against them (broadcasting and streaming then pre-1972 recordings without authorization)").

Here, Plaintiff's claims arise from a uniform course of conduct: Meta's knowing facilitation of third-party infringing ads on Facebook and the difficulties it imposed on copyright holders seeking to remove those ads. Plaintiff asserts two claims on behalf of the Nationwide Class (vicarious copyright infringement and violation of the Lanham Act) and one on behalf of the Florida Subclass (violation of FDUTPA). Those claims and Meta's likely defenses to them create numerous common issues.

For the Nationwide Class, the common legal and factual issues include whether:

1. Plaintiff and the Class sufficiently established ownership of the infringed works because each registered their works with the U.S. copyright office;

2. The third-party infringers' failure to dispute the DMCA takedown notices establishes infringement or waiver of any challenge to it;

3. Meta's control, monitoring, and influence on ad generation and placement establishes that it had the right and ability to supervise and control infringing ad content;

4. Meta's substantial advertising profits from infringing ads establishes it procured a financial benefit from the infringing conduct on Facebook;

5. Meta is liable for confusion as to the origin of the goods caused by the third-party infringing ads because Meta was part of the distribution chain and took substantial acts in commerce through its control of the infringing ads;

6. Meta is precluded from raising a DMCA safe harbor defense to copyright infringement as to the Class because it was an active participant in the infringement, controlled and benefited from the third-party infringing conduct, and failed to reasonably implement an appropriate repeat infringer policy, or some combination of the three; and

7. Plaintiff's proposed damages models establish Classwide damages for copyright infringement and violation of the Lanham Act.

The Florida Subclass also shares many of the common factual questions above and several questions specific to FDUTPA. Those include whether:

1. Meta's facilitation of, and profit from, infringing Facebook ads constitutes an unfair or

deceive business practice;

2. Using a copyrighted work without authorization to sell knockoff goods would deceive a reasonable consumer; and

3. Meta's facilitation of infringing ads caused Plaintiff and the Class to incur unnecessary time  monitoring for and notifying Meta of the infringing ads.

Given the numerous common factual and legal questions (when only one central issue is necessary) among the Nationwide Class members and Florida Subclass members, commonality is met.

### C.    Plaintiff's Claims are Typical of the Classes

Typicality ensures "that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). Typicality is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Ehret v. Uber Techs, Inc.*, 148 F. Supp. 3d 884, 892 (N.D. Cal. 2015); *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011). While typicality requires plaintiff's claims to be "reasonably co-extensive with those of absent class members[,] they need not be substantially identical." *DZ Rsrv.*, 96 F.4th at 1238.

Here, Plaintiff satisfies typicality because she suffered the same types of injuries as the Class, which stemmed from the same alleged misconduct, including Meta's measures to facilitate and protect infringing advertisements on Facebook and, contrary to its policies, refuse to terminate known infringers, causing ads infringing on Plaintiff's and the Class's works to flourish. Plaintiff and the Class, thus, suffered the same harm (the infringement of their works and the lost time addressing that infringement) due to the same misconduct (Meta's facilitation of third-party infringement on Facebook) and they seek the same remedy (actual damages for infringement, injunctive relief, and disgorgement of Meta's profits). Indeed, Plaintiff seeks to remedy the Class's shared harms by seeking compensation for *past* infringement (through damages in the (b)(3) class) and to prevent *future* infringement on Meta's ad platform (through (b)(2) injunctive relief).

As such, Plaintiff is typical of the Nationwide Class and Florida Subclass.

### D.    Plaintiff and Her Counsel are Adequate Representatives of the Classes

Plaintiff also satisfies adequacy under Rule 23(a)(4). Adequacy turns on two questions: "(1) do

the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Ellis*, 657 F.3d at 985; *see also In re Conseco Life Ins. Co. LifeTrend Ins. Sales & Mktg. Litig.*, 270 F.R.D. 521, 531 (N.D. Cal. 2010). Only conflicts that are "fundamental to the suit and that go to the heart of the litigation" may undermine adequacy. *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 942 (9th Cir. 2015). "[T]he mere potential for a conflict of interest is not sufficient to defeat class certification; the conflict must be actual, not hypothetical." *Berrien v. New Raintree Resorts Int'l, LLC*, 276 F.R.D. 355, 359 (N.D. Cal. 2011); *Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003) ("[T]his circuit does not favor denial of class certification on the basis of speculative conflicts.").

Here, Plaintiff does not "ha[ve] interests antagonistic to the class, and [she] ha[s] offered evidence that [she] will prosecute the action vigorously." *Ades v. Omni Hotels Mgmt. Corp.*, No. 2:13-cv-02468, 2014 WL 4627271, at *9 (C.D. Cal. Sept. 8, 2014). As described above, Plaintiff's interests align with those of the Class members because all were injured in a similar manner due to the same alleged misconduct. Plaintiff has already demonstrated her commitment to vigorously litigating this case by enduring extensive discovery demands and actively participating throughout the case. She also retained counsel with extensive "experience in class action actions, including ones involving" the claims at issue, namely, copyright infringement and consumer protection claims. *Id*. at *9; *see also In re Yahoo Mail Litig.*, 308 F.R.D 577, 595 (N.D. Cal. 2015); Ex. 28.

Therefore, Plaintiff is an adequate representative of the Classes.

## II.    The Court Should Certify the Proposed Nationwide Class Under Rule 23(b)(2)

"Class certification under Rule 23(b)(2) requires that the primary relief sought is declaratory or injunctive." *Emami v. Mayorkas*, 725 F. Supp. 3d 1046, 1058 (N.D. Cal. 2024) (internal quotations omitted). The rule does not require the court "to examine the viability or bases of class members' claims," but "only to look at whether class members seek uniform relief from a practice applicable to all of them." *Id*. Further, the "fact that some class members may have suffered no injury or different injuries from the challenged practice does not prevent the class from meeting the requirements of Rule 23(b)(2)." *Id*. at 1059.

Here, Meta's conduct uniformly impacted the Class as a whole, both through affirmative steps

to facilitate infringing Facebook ads and through routine lack of enforcement against repeat infringers. *See In re Coll. Athlete NIL Litig.*, No. 20-cv-03919 CW, 2023 WL 7106483, at \*6 (N.D. Cal. Sept. 22, 2023) ("[T]he requirements of Rule 23(b)(2) are met because it is undisputed that the challenged . . . rules apply, and have applied in the past, in a uniform manner to all members of the . . . [c]lass."); *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998) ("It is sufficient if class members complain of a pattern or practices that is generally applicable to the class as a whole."). Plaintiff's requested injunctive relief, described below, would benefit the Class as a whole, further supporting certification. *See Broomfield v. Craft Brew All., Inc.*, No. 17-cv-01027, 2018 WL 4952519, at \*8 (N.D. Cal. Sept. 25, 2018) (certifying Rule 23(b)(2) class where the injunctive relief benefited the entire class by enjoining defendant's "uniform policy and practice of misrepresenting [information] on its packaging").

Plaintiff may pursue injunctive relief under 17 U.S.C. § 502(a), which empowers courts to "grant temporary or final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." Pursuant to 17 U.S.C. § 502(a), Plaintiff seeks two categories of injunctive relief. She seeks to enjoin Meta from: (1) implementing policies and practices that facilitate third-party infringement; and (2) raising any DMCA safe harbor defense as to Class members' infringement claims in the past, and any such claims in the future until it complies with the DMCA's statutory requirements.

At the class certification stage, Plaintiff need only describe "the general contours of an injunction that would provide relief to the whole class" and may provide "greater substance and specificity" later at an "appropriate stage." *B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 972 (9th Cir. 2019) (quoting *Parsons v. Ryan*, 754 F.3d 657, 689 n.35 (9th Cir. 2014)). However, Plaintiff's experts—Richard Eichmann, a data and economic analyst, and Jonathan Hochman, an internet technology, digital marketing, and security consulting expert with a specialty in digital platforms—have identified specific Meta policies and practices facilitating rampant infringement that, if removed, would properly protect copyright holders.

These include, but are not limited to:

1. Enjoining Meta from █████████████████████████████████████████████████████████████████████████████████, *see* Ex. 30 (Eichman Decl.)  ¶ 61 ███████████████████████████

2. Enjoining Meta from ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████, *see id.* ¶ 50 ████████████████████ ████████████████████████████████████████

Plaintiff's experts also identified steps Meta should be required to take to reasonably address repeat infringement and satisfy the prerequisite to DMCA safe harbor protection. *See Ventura Content Ltd. v. Motherless, Inc.*, 885 F.3d 597, 604 (9th Cir. 2018). As described below in the discussion on predominance, Plaintiff contends Meta failed to meet the prerequisites for DMCA safe harbor protections.

As such, Plaintiff will seek to enjoin Meta from raising any DMCA safe harbor defense against the Class until it implements such measures. Examples of measures Plaintiff will seek to require for Meta to raise a DMCA safe harbor defense include:

1. Requiring ██████████████████████████████████████ ████████████████████████████████ *see* Ex. 29 (Hochman Decl.) ¶¶ 65–66, 74–77;

2. Requiring ██████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████, *id.* ¶¶ 81–84;

3. Requiring ██████████████████████████████████████ ████████████ *id.* ¶¶ 81–84;

4. Requiring ██████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████ *id.* ¶¶ 85–88.

Plaintiff's proposed injunctive relief would protect the Class as a whole from harm caused by Meta's affirmative acts that facilitated infringement and those measures it should have implemented to reasonably remove repeat infringers. Given that the injunctive relief would benefit the Class as a whole,

the Court should certify the Nationwide Class under Rule 23(b)(2).

## III.   The Court Should Certify the Proposed Nationwide Class Under Rule 23(b)(3)

Rule 23(b)(3) requires Plaintiff to show "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Nationwide Class satisfies both requirements.

### A.   The Central Issues Common to the Nationwide Class Predominate

The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. However, Rule 23(b)(3) "does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Amgen*, 568 U.S. at 469. Instead, "[w]hen one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods*, 577 U.S. at 453. The key question is whether those "'common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *DZ Rsrv.*, 96 F.4th at 1238 (quoting *Tyson Foods*, 577 U.S. at 453).

Here, common issues predominate over potential individual ones for three primary reasons: (1) liability for vicarious copyright infringement and under the Lanham Act depends primarily on Meta's misconduct, not circumstances unique to individual Class members; (2) whether Meta is protected by the DMCA's safe harbor provision depends on common factual evidence; and (3) Plaintiff has proposed a common method of measuring Classwide damages.

#### 1.   Meta's Liability for Vicarious Copyright Infringement and under the Lanham Act is Subject to Classwide Proof

The predominance analysis "begins, of course, with the elements of the underlying cause of action.'" *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). As described below, proof of Meta's liability for vicarious copyright infringement and under the Lanham Act requires evaluating generalized, common evidence of Meta's conduct, supporting predominance. *See, e.g., DZ*

*Rsrv.*, 96 F.4th at 1234 (holding that a class may act as a "'cohesive group'" where the "crux of each [class members'] claim is that a company's mass marketing efforts, common to all consumers, misrepresented the company's product").

### a.    Vicarious Copyright Infringement Involves Common Evidence of Meta's Control over and Profit from Infringement

The Supreme Court explained that vicarious copyright infringement exists because, in some circumstances, "a widely shared service or product is used to commit infringement," which makes it "impossible to enforce rights in the protected work effectively against all direct infringers, [and] the only practical alternative being to go against the distributor." *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster Ltd.*, 545 U.S. 913, 929–30 (2005). A service provider "infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." *Id*. at 930. Proof of vicarious copyright infringement requires three showings: (1) a third party directly infringed on a copyright; (2) defendant has the right and ability to supervise or control the infringing conduct; and (3) defendant derived a direct financial benefit from the infringing activity. *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1022–23 (9th Cir. 2001). All three elements will be demonstrated by common proof here.

Regarding the first element, the proposed Class includes only those whose copyrighted materials were infringed on Facebook. Specifically, the Nationwide Class includes: (1) individuals with registered copyrights;[3] (2) who submitted a successful DMCA takedown notice, signed under penalty of perjury; and (3) the alleged infringer never contested the takedown notice. In other words, everyone in the Nationwide Class identified a third party that "reproduced and displayed unauthorized copies [of their copyrighted works]" on Facebook, which is textbook copyright infringement. *teamLab Inc. v. Museum of Dream Space, LLC*, 650 F. Supp. 3d 934, 949 (C.D. Cal. 2023). None of the infringing parties contested the DMCA notices against them, effectively conceding infringement. Furthermore, Plaintiff and the Class may establish this element by reference to objective records, including Meta's DMCA takedown records and registration records at the U.S. Copyright Office. Consequently, no individual

---

[3] Since each Class member registered their work with the U.S. Copyright Office, each also has *prima facie* evidence of copyright ownership. *Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F. 3d 980, 988 (9th Cir. 2017) ("A certificate of registration from the U.S. Copyright Office raises the presumption of copyright validity and ownership.").

evidence is required on this issue.

The remaining two elements concern only Meta's conduct. First, whether Meta had the right and ability to control the infringing conduct depends on whether it was a "pervasive participa[nt] in the formation and direction" of the third-party infringing ads. *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 263 (9th Cir. 1996) (citing *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1163 (2d Cir. 1971)); *see also Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1033 (9th Cir. 2013) (holding vicarious liability depends on "purposeful involvement in the process of reproducing copyrighted material" rather than "the precise nature of that involvement"). Common evidence will establish Meta's role as a "pervasive participa[nt]" due to its full involvement in ad creation, review, approval, placement, and audience targeting, which includes, for example, Meta's policies granting it complete control over advertisers and ads on Facebook. Ex. 1. *Fonovisa*, 76 F.3d at 263 (holding defendant's "ability to police its vendors . . . satisf[ied] the control requirement" for vicarious liability).

Likewise, whether Meta retained a financial benefit also relies on objective, generalized proof, derived from Meta's internal records. The Class will rely on the same evidence to show that Meta receives substantial ad revenue from infringing ads and created DMCA policies that allowed Meta to take financial advantage of third-party infringing ads. Meta, thus, invited third-party infringers to advertise with Meta because it increased the number of ads and, as a result, Meta's revenue. ██████ ████████████████████████████████████████████████████████████ Ex. 30 (Eichmann Decl.) ¶ 67; *see Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963) (holding defendant procured a "financial benefit" from infringement where the infringement "provide[d] the [defendant] with a source of customers and enhanced income."). Plaintiff's vicarious copyright infringement claim depends overwhelmingly on common evidence, supporting predominance.

> **b.      Meta's Lanham Act Liability May be Proved by Common Evidence of Meta's Significant Involvement in Distributing the Infringing Ads**

Plaintiff's Lanham Act claim also depends on common evidence. A false designation of origin claim under 15 U.S.C. § 1125(a) of the Lanhan Act requires showing the defendant: (1) used any word, term, name or symbol, or a false or misleading description or representation of fact in commerce; (2) in

a manner which is likely to cause confusion or mistake, or to deceive as to sponsorship, affiliation, or the origin of the goods in question. *Luxul Tech. Inc. v. Nectarlux, LLC*, 78 F. Supp. 3d 1156, 1170 (N.D. Cal. 2015). These elements are subject to common, classwide proof.

Here, the Class is limited to those whose copyrights were used by third-party infringers and displayed in ads on Facebook to sell knockoffs of the Class's works, creating confusion as to the origin of the goods. *See* ECF No. 51 at 3. Courts have established a presumption of confusion when the deceptive act is intentional. *See W. State Wholesale, Inc. v. Synthetic Indus., Inc.*, 206 F.R.D. 271, 274–75 (C.D. Cal. 2002) ("When a plaintiff shows the defendant's false advertising was intentional, the plaintiff is entitled to a presumption that customers were deceived."); *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1040–41 (9th Cir. 1986) ("The expenditure by a competitor of substantial funds in an effort to deceive consumers and influence their purchasing decisions justifies the existence of a presumption that customers are, in fact, being deceived."). Here, the direct theft of Plaintiff's and the Class's copyrighted images and attempts to sell knockoffs of those works establishes intent to cause confusion as to the origin of the goods. Specifically, the infringing ads gave the false appearance that the knockoff goods were created and sold by Plaintiff and the Class, which leant those knockoff goods false credibility and similarly threatened to associate the lower quality knockoffs with Plaintiff's and the Class's original works. Dkt. No. 51, at 3 (denying Meta's motion to dismiss Plaintiff's Lanham Act claim because Plaintiff alleged the infringing ads gave the impression the knockoff goods were sold by Plaintiff).

Meta is liable under the Lanham Act because it was an active participant in the sale of those knockoff goods. As the Court ruled in denying Meta's motion to dismiss, a service provider's "active participation in disseminating the infringing marks or images" may establish its liability even where the product was sold by a third party. *Id.* at 3 ("[A] defendant need not have directly sold the goods at issue in order to be liable under the Lanham Act."). Indeed, "any member of the distribution chain of allegedly infringing products can be jointly and severally liable" under the Lanham Act. *JUUL Labs, Inc. v. Chou*, 557 F. Supp. 3d 1041, 1052 (C.D. Cal. 2021) (citation modified).

To establish Meta's liability, Meta must have taken a "significant act of commerce" related to advertisement of the knockoff goods. Dkt. No. 51 at 3. Whether Meta undertook such conduct is subject

to common, classwide proof. Specifically, the Class would present the common evidence (described above) of Meta's role and control in every aspect of creating, placing, and targeting the advertising for knockoff goods. Indeed, Meta's revenue was determined by how many ads it placed and how successfully it targeted the infringing ads to potential buyers. Ex. 2. This conduct, by definition, was intended to increase the likelihood potential customers would see the infringing ads and purchase the knockoff goods, making Meta an "active participant" in the sale of the knockoffs.

As such, common evidence of Meta's conduct will show whether it is liable for the confusion created by the third-party infringing ads.

**2.    Meta's DMCA Safe Harbor Defense is Subject to Common Proof**

The Ninth Circuit has repeatedly held that individualized defenses do not defeat predominance. *See, e.g., Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co., Ltd.*, No. 23-cv-55742, 2025 WL 1683472, at *4 (9th Cir. Jun. 16, 2025) (slip op.) ("That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual question to predominate."). But conversely, a key defense that is common and resolvable with generalized, common evidence further supports predominance. *Tyson Foods*, 577 U.S. at 457. One of Meta's principal defenses to liability—the DMCA safe harbor provision—is resolvable with common proof. Specifically, objective evidence of Meta's conduct will entirely invalidate its ability to raise the DMCA safe harbor as to any Class member.

Section 512(c) of the DMCA provides safe harbor from liability for "infringement of copyright by reason of the storage [of material] at the direction of a user." 17 U.S.C. § 512(c)(1). For the DMCA safe harbor provision to apply, however, Meta must establish it satisfied certain prerequisites. *Ventura*, 885 F.3d at 604. Relevant here, Meta must show it only played a passive role in storing the infringing material at issue and only did so at the discretion of users. *See Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1056 (9th Cir. 2017) (safe harbor provision applies only "if the service provider played no role in making that infringing material accessible on its site or if the service provider carried out activities that were 'narrowly directed' towards enhancing the accessibility of [online] posts").

Meta must also establish that it did not receive a "financial benefit" from the infringing conduct it had the right and ability to control. *Columbia Pictures*, 710 F.3d at 1044 (quoting 17 U.S.C. §

512(c)(1)(B)). "Under section 512(c)(1)(B), a service provider loses protection under the safe harbor if two conditions are met: (1) the provider 'receive[s] a financial benefit directly attributable to the infringing activity'; and (2) the 'service provider has the right and ability to control such activity.'" *Id.* (quoting 17 U.S.C. § 512(c)(1)(B)).[4] Additionally, Meta must also establish it implemented an appropriate repeat infringer policy. *See id.* at 1040 ("[A] prerequisite for the safe harbors is that the service provider implement a policy of removing repeat infringers." (quoting 17 U.S.C. § 512(f)(1)(A))); *Perfect10 v. CCBill LLC*, 488 F.3d 1102, 1109 (9th Cir. 2007) (holding safe harbor protection requires showing defendant "terminates users who repeatedly or blatantly infringe copyright").

Whether Meta satisfied these requirements depends entirely on its own conduct, not on the circumstances of any individual Class member. The same, generalized evidence would show Meta failed to comply (or did comply) with the safe harbor prerequisites. For instance, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 29 (Hochman Decl.) ¶¶ 29, 48–50. Further, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 30 (Eichmann Decl.) ¶ 67. Finally, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *Id.* ¶¶ 12, 64.

That the DMCA safe harbor defense, a critical issue in this case, will be resolved through common evidence supports predominance.

**3.  Plaintiff's Proposed Classwide Damages Models Support Predominance**

It is axiomatic that "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013). Therefore, formulaic damages models that apply to each class member can support predominance, even if the individual damages results differ. *See Jordan v. Paul Fin.*, LLC, 285 F.R.D. 435, 466 (N.D. Cal.

---

[4] Notably, these are two of the elements of Plaintiff's vicarious copyright infringement claim, suggesting that Plaintiff may prove her claim and defeat Meta's DMCA safe harbor defense with the same, common evidence. *See, e.g.*, *Columbia Pictures*, 710 F.3d at 1040 (noting "aspects of the inducing behavior that give rise to liability are relevant to the operation of some of the DMCA safe harbors and can, in some circumstances, preclude their application").

2012) (finding "that calculation of damages will be sufficiently mechanical that whatever individualized inquiries need occur do not defeat class certification").

For both vicarious copyright infringement and the Lanham Act, the Class may recover actual damages and profits obtained by the defendant. *See* 17 U.S.C. § 504(b); 15 U.S.C. § 1117(a). Plaintiff's expert Richard Eichmann has developed a common formula for measuring "actual damages" to measure each Class members' damages. Specifically, Plaintiff's expert proposes measuring: ███████

████████████████████████████████████

████████ Ex. 30 (Eichmann Decl.) ¶¶ 66–68. ████████████

████████████████████████████████████

██████ *Id*. ¶ 66. ████████████████████████

████████████████████████████████████

████████████████ *Id*. ¶ 67. Through this information, Eichmann proposes a common formula to measure Class members' actual damages.

Additionally, ████████████████████████

████████████████████████████████████

████████ *Id*. ¶ 63. ████████████████████

████████████████████████████████ *Id*. ¶¶ 64–65. These formulaic measures of Class damages here further support predominance.

## B.    A Class Action is the Superior Method of Adjudicating the Claims

Rule 23(b)(3) requires that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). A class action is a superior means of adjudicating a dispute if class litigation of common issues "reduce[s] litigation costs and promote[s] greater efficiency." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1235 (9th Cir. 1996).

Here, a class action is superior for several reasons. First, few, if any, Class members would bring individual actions against Meta, a well-funded technology company with extensive litigation resources, when the costs of litigating those actions would exceed the available damages for any one copyright owner. *See Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (noting that "[t]he *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits"

(emphasis in original)). While not insignificant, damages under the Copyright Act are likely insufficient to warrant the effort required to bring an action against this Defendant. Consequently, a class action is likely the *only* way Class members can obtain relief and meaningfully deter Meta from continuing the misconduct at issue.

Second, a class action is the most efficient way of litigating the action. Copyright actions are complex and require substantial discovery. The costs of experts alone would likely surpass the value of any one Class member's individual claim. *See Just Film, Inc. v. Buono*, 847 F.3d 1108, 1123–24 (9th Cir. 2017) (finding a class action superior in part because of the "likely need for expert testimony"). Requiring individual cases would lead to duplicative fact and expert discovery, a far less efficient means of litigating the issues presented in this case.

Lastly, class treatment reduces the burden on courts, which may otherwise have to manage and resolve repeated, individual actions, creating the risk of duplicative trials and inconsistent rulings. *See Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 946 (9th Cir. 2009) ("The overarching focus remains whether trial by class representation would further the goals of efficiency and judicial economy."). A class action is the superior and only practical method of resolving these claims. As such, the superiority requirement is met.

## IV.    The Court Should Certify the Proposed Florida Subclass Under Rule 23(b)(3)

Like the Nationwide Class, the Florida Class meets predominance and superiority. The Florida Class's FDUTPA claim includes three elements: (1) a deceptive or unfair act or practice; (2) causation; and (3) actual damages. Classes asserting FDUTPA claims are particularly suitable for class certification because "a plaintiff asserting a FDUTPA claim need not show actual reliance on the representation or omission at issue," meaning "the mental state of each class member is relevant." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 985 (11th Cir. 2016) (citation modified); *see also Tershakovec v. Ford Motor Co.*, 79 F.4th 1299, 1311 (11th Cir. 2023).

Courts often find the unfair or deceptive practice element predominates where a defendant committed a uniform course of misconduct. *See Carriuolo*, 823 F.3d at 986 (finding "the first FDUTPA element is amenable to class-wide resolution" based on defendant's common deceptive practice). This is because proof of an unfair or deceptive practice under FDUTPA requires only objective evidence. *See*

*id.* at 984 ("Under Florida law, an objective test is employed in determining whether the practice was likely to deceive a consumer acting reasonably."). Here, as in *Carriuolo*, Meta's unfair and deceptive conduct—its facilitation and targeting of copyright infringing ads—constitutes a uniform course of conduct that stems from Meta's knowing and deliberate practices. Consequently, this element will be demonstrable by common proof.

Similarly, causation and actual harm will involve common evidence. No individual questions of causation exist here because the Class includes only those who experienced actual infringement and therefore took time to prompt the removal of the infringing conduct via DMCA takedown submissions. The value of that lost time and effort may be measured by the same damages model Plaintiff proposes with respect to her copyright infringement and Lanham act claims. Consequently, common issues predominate here.

Finally, for the same reasons as the Nationwide Class, superiority is satisfied. The Court should certify the Florida Class.

## V.    The Court Should Alternative Certify Issue Classes Under Rule 23(c)(4)

In the alternative to the proposed Nationwide (b)(3) Class, the Court should certify three issue classes under Fed. R. Civ. P. 23(c)(4), each geared towards establishing core common elements of Plaintiff's vicarious copyright infringement claim. "Even if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues." *Valentino*, 97 F.3d at 1234. While Rule 23(b)(3) certification is appropriate, should the Court find predominance lacking, "the Court [c]ould utilize the mechanism under Rule 23(c)(4) to adjudicate those issues capable of classwide resolution separately." *Ellis v. Costco Wholesale Corp.* ("*Ellis II*"), 285 F.R.D. 492, 544 (N.D. Cal. 2012). Such a process would make sense here because, as described below, resolving the three (c)(4) issues permits the Court to address any remaining individual issues through separate, highly manageable proceedings.

Rule 23(c)(4) certification is appropriate where doing so would materially advance the individual case for each Class Member. *Rahman v. Mott's LLP*, 693 Fed. Appx. 578, 579 (9th Cir. 2017); *see also Valentino*, 97 F.3d at 1229 (holding Rule 23(c)(4) certification appropriate where it would "significantly

advance the resolution of the underlying case, thereby achieving judicial economy and efficiency"). Issues that resolve a defendant's liability are particularly apt for Rule 23(c)(4) certification. *See, e.g.*, *Valenzuela v. Union Pac. R.R. Co.*, No. 15-cv-01092, 2017 WL 1398593, at *3 n.4 (D. Ariz. Apr. 19, 2017) ("As a practical matter, however, where issue classes are certified at all, the common issues tend to be critical to the determination of liability."); *Campion v. Credit Bureau Servs., Inc.*, 206 F.R.D. 663, 676 (E.D. Wash. 2001) ("Where an issue is of central importance to the case and common to all class member claims, it can cause class litigation to be appropriate.").

Here, Plaintiff seeks to certify three issues, leaving only a handful of highly manageable issues to be resolved separately for Class members interested in putting forth individual proof. Specifically, Plaintiff asks the Court to certify the issues of whether:

1. Meta failed to meet the prerequisites required by the DMCA to seek safe harbor protections and is ineligible to invoke the defense as to any Class member;

2. Meta had the right and ability to control copyright infringing ads; and

3. Meta derived a financial benefit from the copyright infringing ads.

As described below and in the Rule 23(b)(3) predominance section above, resolution of these issues would advance the interests of the Class as a whole, and the remaining issues could be resolved through a simple, highly manageable process.

### A.    Resolving the (c)(4) Issues Would Advance the Interests of the Entire Class

The three (c)(4) issue classes would materially advance each Class member's vicarious copyright infringement claims. Again, liability for vicarious copyright infringement requires proving three elements: (1) copyright infringement by a third party; (2) defendant had the right and opportunity to supervise and control the infringing conduct; and (3) defendant received a financial benefit from the infringing conduct. *A&M Records*, 239 F.3d at 1022–23. The (c)(4) issues would resolve all but one of those elements, along with one of the most common defenses—that defendant is protected by the DMCA safe harbor provision. *Ventura*, 885 F.3d at 604. As such, (c)(4) certification is appropriate for at least three reasons.

*First*, Meta has raised the DMCA safe harbor defense here. Safe harbor protections are available only to internet service providers who meet certain prerequisites. 17 U.S.C. § 512(c)(1). Plaintiff

contends Meta cannot raise the DMCA safe harbor because it: (1) failed to implement a reasonable repeat infringer policy; (2) had the right to control the infringing ads on its webpages and displayed through its ad platform, and received a financial benefit from its ad revenue;[5] and (3) played an active role in contributing to the infringing acts. Each of these concerns Meta's conduct exclusively. Consequently, they are subject to common proof, the resolution of which will be dispositive to the Class's claims.

*Second*, whether Meta had the right to control the infringing ads and benefited from those ads also depends on common proof. Both questions concern Meta's role in creating and targeting infringing ads and whether it was paid for its ad services. *See, e.g., Mavrix*, 873 F.3d at 1059 (proof of "right and ability to control" requires evaluating "the service provider's procedures that existed at the time of the infringements"). As courts have recognized, elements that principally "focus on the defendant's conduct support[] a finding of predominance." *Beaver v. Omni Hotels Mgmt. Corp.*, No. 20-cv-00191, 2023 WL 6120685, at *17 (S.D. Cal. Sept. 18, 2023).

*Third*, although the merits will be adjudicated later, the resolution of each of these issues will materially advance or end the Class's vicarious copyright infringement claims. *See Amgen*, 568 U.S. at 470 (explaining that a "fatal similarity—an alleged failure of proof as to an element of the plaintiffs' cause of action" supports predominance (citation modified)). Should Plaintiff establish the elements of the vicarious copyright infringement claim, or should Meta fail to establish it satisfied the DMCA's prerequisites, then Plaintiff's and the Class's claims would rise equally. By contrast, should Plaintiff fail, then the Class's claims would fall equally. As such, the Class shares a common fate on each of the (c)(4) issues, establishing predominance and supporting (c)(4) certification. *See, e.g., Wal-Mart*, 564 U.S. at 350 (holding a claim "capable of classwide resolution" is one where the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke"). Certifying the (c)(4) issues would, thus, materially advance the claims of the entire Class.

---

[5] As noted above, establishing Meta lost safe harbor protection because it had the right to control and benefited from the infringing conduct would also establish two of the three elements of vicarious copyright infringement. *See UMG Recordings, Inc. v. Shelter Cap. Partners LLC*, 718 F.3d 1006, 1030–31 (9th Cir. 2013) (noting the standard for establishing "right and ability to control" for vicarious copyright infringement requires less than the same standard for showing the inapplicability of safe harbor protections).

**B.      Any Remaining Issues May Be Presented in Separate, Manageable Proceedings**

Should the Court certify the three proposed (c)(4) issues, Class members would need only prove one additional element individually: proof of third-party infringement. Plaintiff above proposed a method of proving third-party infringement on a Classwide basis sufficient to support a (b)(3) class. However, in the alternative, Class members may present individual evidence of infringement in highly manageable, simple proceedings. Specifically, Class members need only provide records of their copyright registration and the takedown notices in Meta's possession. Indeed, as required by statute and Meta's policies, DMCA takedown notices must, under penalty of perjury, identify both "the material that is claimed to be infringing" and "the copyrighted work claimed to have been infringed." 17 U.S.C. § 512(c)(3)(A)(ii)–(iii). Based on those records, a jury, special master, or the Court could compare the infringing and copyrighted material to determine infringement.

As Plaintiff proposes here, other courts have resolved common issues collectively in one proceeding (here, addressing the (c)(4) issues first) and then separately addressed any outstanding issues in individual proceedings. *See Bautista-Perez v. Holder*, C 07-4192 TEH, 2009 WL 2031759 (N.D. Cal. July 9, 2009) ("[I]n an abundance of caution, the Court will certify the class under Rule 23(b)(2) as to questions of non-monetary injunctive and declaratory relief, and will defer the issue of certification as to monetary relief until after the liability determination."); *Fitzgerald v. Pollard*, No. 20-cv-0848, 2022 WL 22442009, at *13 (S.D. Cal. Nov. 3, 2022) (holding that "this action may retain its 'class' character only through the adjudication of liability to the class; the members of the class may thereafter be required to individually prove" the remaining elements of their claim); *Russell v. Educ. Comm'n for Foreign Med. Graduates*, 15 F.4th 259, 266 (3d Cir. 2021) (noting the court's "broad but well defined discretion to certify particular issues for class treatment"); *Carnegie*, 376 F.3d at 661 (holding that that "prospect" of separate proceedings to determine individual class member's relief "need not defeat class treatment of the question whether the defendants violated" the law).

Consequently, the Court may certify the proposed (c)(4) classes as an alternative to the proposed Nationwide (b)(3) Class.

**VI.      The Court Should Appoint Class Counsel**

Pursuant to Fed. R. Civ. P 23(g), "a court that certifies a class must appoint class counsel." In

appointing Class counsel, Rule 23(g) evaluates four factors: (1) "the work counsel has done in identifying and investigating potential causes of action"; (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; (3) "counsel's knowledge of the applicable law"; and (4) "the resources that counsel will commit to representing the Class." Fed. R. Civ. P. 23(g)(1)(A)(i)–(iv). Here, the factors support appointing Zimmerman Reed LLP and Rozier Hardt McDonough PLLC ("Proposed Class Counsel") as Class Counsel. Proposed Class Counsel have extensive experience in litigating class actions and other complex litigation, including in copyright and intellectual property cases. Ex. 28. Further, Proposed Class Counsel have already spent significant time investigating the facts and potential claims of Plaintiff and the Class, and diligently and vigorously litigating this action to the benefit of Plaintiff and the Class. Proposed Class Counsel also have the resources to litigate this action on the Class's behalf, and have already demonstrated their commitment to putting forth the resources necessary to fully represent the Class and adjudicate their claims. As such, should the Court grant Plaintiff's motion, it should appoint Proposed Class Counsel.

## CONCLUSION

For the foregoing reasons, the Court should certify the Nationwide Class under Rule 23(b)(2) and 23(b)(3) or, alternatively, the three proposed (c)(4) issue classes; certify the Florida Subclass under Rule 23(b)(3); and appoint Plaintiff as Class Representative and Zimmerman Reed LLP and Rozier Hardt McDonough PLLC as Class Counsel.

Respectfully submitted,

Dated: September 18, 2025

/s/ Brian C. Gudmundson
BRIAN C. GUDMUNDSON (*pro hac vice*)
brian.gudmundson@zimmreed.com
JUNE P. HOIDAL (*pro hac vice*)
june.hoidal@zimmreed.com
MICHAEL J. LAIRD (*pro hac vice*)
michael.laird@zimmreed.com
RACHEL K. TACK (*pro hac vice*)
rachel.tack@zimmreed.com
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, Minnesota 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0400

CALEB MARKER (SBN 269721)
caleb.marker@zimmreed.com
CHARLES R. TOOMAJIAN (SBN 302153)
charles.toomajian@zimmreed.com
**ZIMMERMAN REED LLP**
6420 Wilshire Blvd., Suite 1080
Los Angeles, California 90048
Telephone: (877) 500-8780
Facsimile: (877) 500-8781

Jonathan L. Hardt (*pro hac vice*)
**ROZIER HARDT MCDONOUGH PLLC**
712 W. 14th Street, Suite C
Austin, Texas 78701
Telephone: (210) 289-7541
hardt@rhmtrial.com

James F. McDonough, III (*pro hac vice*)
**ROZIER HARDT MCDONOUGH PLLC**
3621 Vinings Slope, Suite 4300
Atlanta, GA 30339
Telephone: (470) 480-9505
jim@rhmtrial.com

Attorneys for Plaintiff,
*Jennifer L. Cook*